Exhibit 27

# CONFIDENTIAL

## Unknown

| | |
|---|---|
| **From:** | Elaine Smith |
| **Sent:** | Friday, October 15, 2010 9:23 AM |
| **To:** | Bill Phillips |
| **Subject:** | RE: FNBCT Bank Statement |
| **Attachments:** | 40023541 - v5 Processing.doc |

Account 40023541 is the main processing account for v5. However, the Check21 account (40025983) handles part of what happens with those transactions. Kris should be able to explain how they both work. One of our objectives this year is to flowchart all of the accounts and for me to get a clear understanding of them.

I've attached the processing statement. The Check21 statement is too large and I can't get it to download. I've request it be emailed to me and I'll pass it on to you as soon as I get it.

Thanks,

***Elaine Smith***
EPS Accounting Supervisor



510 N. Valley Mills # 702 * Waco, TX 76710

---

**From:** Bill Phillips
**Sent:** Friday, October 15, 2010 10:54 AM
**To:** Elaine Smith
**Subject:** RE: FNBCT Bank Statement

The one where we get charged for our ACH and C21 transactions and get credit for compensating balances.

**From:** Elaine Smith
**Sent:** Friday, October 15, 2010 10:53 AM
**To:** Bill Phillips
**Subject:** RE: FNBCT Bank Statement

Do you know which account? We have several.

Thanks,

***Elaine Smith***
EPS Accounting Supervisor



510 N. Valley Mills # 702 * Waco, TX 76710

---

REDACTED

JACK000323

Exhibit 28

# CONFIDENTIAL

**Unknown**

| | |
|---|---|
| **From:** | Greg Divins |
| **Sent:** | Thursday, December 23, 2010 7:44 AM |
| **To:** | Kris Pickett; Jeffrey Bibbee |

**Subject:** FNBCT C21 update

I spoke with Brad and he ran a query for Zaza Pay. This was able to auto match an additional 86 items, bringing us down to 313. He's now trying to configure something for DSI, DPS, whatever their name is.

Thanks,

**Greg Divins**
Data Processor, Sr
ProfitStars

1021 Central Expressway South
Dallas, TX 75013

Exhibit 29

# CONFIDENTIAL

## Unknown

**From:** Chris Brammer
**Sent:** Tuesday, September 28, 2010 2:15 PM
**To:** Jerry Federico; Bill Phillips; Phil Hart; Jeffrey Bibbee; Kris Pickett
**Cc:** Kathy Wheeler; Craig Tull
**Subject:** RE: DPS Merchants - update

Agreed.

**Chris Brammer**
Sales Executive
ProfitStars - a Jack Henry Company
Enterprise Payment Solutions Division
510 North Valley Mills Drive
Suite 702
Waco, TX 76710



**From:** Jerry Federico
**Sent:** Tuesday, September 28, 2010 3:58 PM
**To:** Bill Phillips; Phil Hart; Jeffrey Bibbee; Chris Brammer; Kris Pickett
**Cc:** Kathy Wheeler; Craig Tull
**Subject:** RE: DPS Merchants - update

I know if you are asking me, but I say yes also.
Thanks

*Jerry*

**From:** Bill Phillips
**Sent:** Tuesday, September 28, 2010 3:29 PM
**To:** Phil Hart; Jerry Federico; Jeffrey Bibbee; Chris Brammer; Kris Pickett
**Cc:** Kathy Wheeler; Craig Tull
**Subject:** RE: DPS Merchants - update

Agree

**From:** Phil Hart
**Sent:** Tuesday, September 28, 2010 3:22 PM
**To:** Bill Phillips; Jerry Federico; Jeffrey Bibbee; Chris Brammer; Kris Pickett
**Cc:** Kathy Wheeler; Craig Tull
**Subject:** RE: DPS Merchants - update

Currently we have DPS merchants on a 2 day hold. Based on the length of time it is taking for the C21 returns, Kris recommends increased the hold days to 5 for C21. Please let me know if you agree. If so, we need to communicate this to Ken and Briggett.

Thanks.

Exhibit 30



# The First National Bank
## of Central Texas

## Originating Financial Institution Agreement

**Company Name ("Originator"):**                      ID#:_____

**Third Party Service Provider (TPSP):**

This Originating Financial Institution Agreement ("Agreement") is entered into between First National Bank of Central Texas,(FI) and Jack Henry ACH L.P. (TPSP) as of the date FI has by its signature below indicated acceptance hereof.

**Authorization.** TPSP will obtain from each participating originator the necessary information in proper form authorizing ACH entries to such Consumer's bank account to transfer payment amounts to TPSP's bank deposit account as well as any other information required by FI. The TPSP will indemnify and hold FI and its directors, officers, agents, employees, and successors in interest harmless from and against all claims, damages, losses, penalties, and expenses (including without limitation attorneys' fees), resulting from or related to TPSP's failure to obtain such authorizations. Notwithstanding the foregoing, the FI may refuse to take any action under this Agreement with respect to a consumer if it is not satisfied, in its sole discretion, that all required authorizations have been obtained.

**Approval of Originators.** TPSP shall receive written approval from FI prior to allowing a new originator to begin processing any ACH transactions. This requirement includes but is not limited to any originator other than Jack Henry ACH L.P. that can be defined as a TPSP and originates transactions for other entities. Furthermore, each individual customer of the TPSP must also be preapproved by the FI prior to the processing of ACH transactions. It shall be the FI's sole discretion to accept or decline a new originator as well as require changes to file limits, hold periods or reserve requirements that the FI deems necessary. In addition, TPSP is prohibited by this contract from seeking approval for ACH processing for any individual or entity that is engaged in the practice of telemarketing. Failure to comply with the provisions of this section is considered to be a material breach of the contract and allow the FI to terminate the agreement upon ten (10) days written notice to the TPSP.

**Originator Accounts.** All settlement accounts for originators will be maintained at FI including any settlement accounts for other TPSP's. A separate account will be maintained at FI for the reserves of individual originators.

**Collection Data.** Originator shall provide FI through the TPSP the data necessary for the electronic funds transfer.

**Settlement.** TPSP accepts full financial responsibility for the amount of any debit entries returned unpaid to FI, irrespective of the reason for the return. TPSP is responsible for processing and correcting errors, rejects, returns, and notifications of change. TPSP is also responsible for notifying Receiver institutions of a reversing entry. FI may require TPSP or Originator to maintain a balance or letter of credit with FI to cover returns and may refuse to take any action under this Agreement at any time that such requisite balance is not maintained.

**Compliance with Law and Indemnification.** TPSP shall fully comply, and cause all transactions contemplated by this Agreement to be in full compliance, with all laws and regulations whether federal, state or local, as well as National Automated Clearing House Association (NACHA) rules applicable to ACH transactions, including, without limitation, laws, regulations and rules governing correct authorizations by consumers, disclosures and notices required in connection with electronic funds transfers, and all necessary waivers and releases. Furthermore, TPSP shall comply with all provisions of OFAC and the USA PATRIOT ACT. TPSP will indemnify and hold harmless FI from any and all claims, lawsuits, demands, damages, costs or other expenses, including, but not limited to, attorney fees resulting from or in any way related to: (i) TPSP's or Originator's breach of any warranty contained herein or arising by operation of law, (ii) any act or omission of TPSP's or Originator or its employees or agents (iii) failure of Originator to perform its obligations as an Originator under the NACHA OPERATING RULES including but not limited to claims arising from errors.

**Delays and Excuse from Performance.** FI shall not be liable for any delay or other failure of performance caused by factors beyond the reasonable control of FI, such as, but not limited to: strikes, insurrection, war, fire, lack of energy, acts of God, mechanical or electrical breakdown, governmental acts or regulations, computer malfunction or acts of third parties. If, after the date of this Agreement, any law, regulation, or ordinance, whether federal, state, or local, becomes effective which substantially alters the ability of FI to perform its services hereunder, FI shall have the right

to terminate this Agreement upon thirty (30) days written notice to TPSP.

**Confidential Information.** All information received by either party will be considered confidential and shall be restricted to those officers, employees, accountants, attorneys, or regulatory authorities of such party (collectively referred to as Representatives.) Such representatives will be notified of the confidentiality of the information and each party shall be responsible for any breach of its representatives.

**Annual ACH Audit.** By December 1, of each year the TPSP shall have, at its expense, completed an annual ACH audit conducted which meets the requirements as set forth in NACHA's Operating Rules Appendix Eight and cause report to be delivered to FI upon completion. TPSP will have 60 days to correct any weaknesses noted in the audit.

**Data Security.** TPSP agrees that it will comply with NACHA Operating Rules, on or before the effective date of effective September 10, 2004, that require that banking information must be either (1) encrypted using a commercially reasonable security technology that, at a minimum, is equivalent to 128-RC4 bit encryption technology, or (2) transmitted via a secure session that utilizes a commercially reasonable security technology that provides a level of security that, at a minimum, is equivalent to 128-RC4 bit encryption technology .These requirements do not apply to transmissions over a wire line or wireless telephone unless the telephone is used to access the internet. Dial in to the FI modem is not subject to the requirement.

**Record Retention.** TPSP hereby agrees to comply with NACHA Operating Rules as they pertain to the retention of records regarding all facets of ACH transmissions including but not limited to authorizations.

**Financial Information.** Both the FI and TPSP will provide the other party with quarterly financial information not less than 30 days after quarter end. Such information will be considered confidential and cannot be shared with third parties unless the party providing the information grants written approval.

**Return Rate Covenants.** TPSP hereby agrees that TPSP will cease processing ACH transactions for any originator that has a R10 return ratio of greater than or equal to 2.50%. TPSP shall have 60 days to cease processing for the originator. TPSP acknowledges that upon thirty (30) days written notice, FI has the exclusive right to modify the R10 ratio covenant or add additional return rate covenants that FI deems necessary.

**Other TPSP Obligations.** TPSP warrants that it will comply with the following obligations

(1) Utilize commercially reasonable methods to establish the identity of the originator from which it receives ACH transactions regardless of SEC code.
(2) Establish procedures to monitor, on an on-going basis, the credit-worthiness of any originator

(3) Establish exposure limits for each originator including file limits, SEC codes to be originated, hold periods and reserve requirements.
(4) Implement procedures to review exposure limits on a periodic basis.
(5) Implement procedures to monitor ACH transactions by originator relative to their exposure limits across multiple settlement dates.
(6) Institute controls and procedures to reject any file that exceeds the established parameters as described in # 3 above, including but not limited to the approval of the FI prior to transmitting a file that does not meet established parameters.
(7) Establish procedures to reconcile custodial ACH DDA account(s) on a daily basis. This requirement includes reconciling custodial accounts for any other TPSP that originates transactions for originators.
(8) Notify the FI immediately of any originator that becomes overdrawn in either its own account or in a combined custodial account.
(9) On a monthly basis, provide FI with a written plan on steps being taken to reduce R10 return rates on any merchant that has a R10 return ratio greater than or equal to 1.50%.
(10) As required by NACHA RULES, effective December 10,2004, upon receipt of a reasonably necessary request from the FI concerning the identification of an originator, TPSP will provide the requested information within two (2) banking days.

**Other Information.** No later than ten (10) days after month end or quarter end if so noted, TPSP is required to provide the following information to the FI.

(1) Summary ACH Totals report that shows total ACH Debits and ACH Credits originated by TPSP. Report shall be broken down by SEC code and shall include a detailed return analysis by SEC code.
(2) ACH detail report that shows originations and returns by merchant further broken down by SEC codes and return reasons.
(3) Copy of reconcilement of ACH custodial DDA account(s).
(4) Updated monthly list of reserves held by individual merchant.
(5) On a quarterly basis an updated list of merchants including file limits, hold days and reserve requirements.

**Insurance.** Each of the parties agrees to maintain in full force and effect errors and omissions insurance which covers transactions contemplated by this agreement.

**Warranties and Limitations of Liability.** FI warrants that it will exercise reasonable care in the performance of its obligations under the Agreement. FI makes no other warranties, express or implied, including without limitation, any warranty of merchantability or fitness for a particular purpose with respect to the services provided hereunder. Because of the extreme difficulty of fixing actual damages for any material failure by FI to perform its obligations hereunder, the parties agree that FI's liability hereunder, if any, shall be limited to liquidated damages in the amount of the transaction

fees charged by the TPSP for processing services paid for the three (3) calendar months immediately preceding the month in which the event occurred which gave rise to the damages. In no event will FI be responsible for (a) any incidental or consequential losses resulting from the performance or non-performance of any of FI's duties hereunder, or (b) for any loss or damage to TPSP, direct or consequential arising out of or in any way related to acts or omissions of third parties including, but not limited to: various courier services, any Federal Reserve bank, any bank with which the TPSP deals or the employees or agents of such bank, or any financial institution which receives or originates entries or pays electronic debits or credit card payments from consumer accounts.

**Terms and Termination.** The term of this Agreement shall be for one year from the date of this Agreement and will automatically renew for one (1) year on the anniversary date of the agreement and each year thereafter, provided, however, that FI or TPSP may terminate this Agreement subject to providing thirty (30) days written notice to the other party or subject to the termination provisions stated elsewhere in this contract. In addition, the FI may terminate this Agreement, at any time, effective upon giving ten (10) days written notice; if the FI's participation in the transactions contemplated by this contract adversely affect the regulatory condition of the FI. The Agreement shall be automatically renewed, subject to earlier termination as provided herein, unless TPSP gives FI written notice of its intention not to renew at least sixty (60) days prior to the last day of the current term, in which event the effective date of the termination shall be such last day. In addition, either party shall have the right to terminate this Agreement, effective immediately, if either party is in default of any obligation under this Agreement, or if either party is declared bankrupt, files a petition under any bankruptcy laws, has a receiver appointed for all or substantially all of its property, or makes an assignment of all or substantially all of its assets for its creditors. Notwithstanding the foregoing, the TPSP shall have sixty (60) days after receipt of proper termination notice to continue processing ACH transactions with the FI. Upon termination, all rights and obligations hereunder shall cease except TPSP's obligations to pay: (a) the applicable fees for any services performed by FI prior to the effective date of termination; (b) all amounts due under any other agreement between FI and TPSP; (c) any amounts under the indemnification provisions of this Agreement; and (d) for any items returned subsequent to the effective date of termination. To cover returned items under (a) and/or (b) of this paragraph, FI shall be entitled to hold from TPSP's final deposit an amount FI considers to be adequate. Notwithstanding the foregoing, the termination of this Agreement shall not relieve TPSP from liability for any breach by it of this Agreement.

**Entire Agreement.** This Agreement constitutes the entire agreement between the parties relating to the specific subject matter hereof, and no modification of this Agreement shall be binding on FI unless such modification is in writing and signed by an authorized representative of FI.

**Notices.** Any notice required or allowed to be given under this Agreement shall be addressed to the other party at the address set forth in the agreement or to such other address as either party may instruct the other party in writing.

**Unenforceable Terms.** If any provision of this Agreement is held invalid, illegal or unenforceable, this Agreement will be interpreted as if such provision, to the extent the same has been held invalid, illegal or unenforceable, had never been contained herein.

**Assignability.** This Agreement is not assignable by either party without first receiving the prior written consent of the other party. **Applicable Laws.** This Agreement shall be construed in accordance with the laws of the State of Texas without regard to choice of law principles.

ACKNOWLEDGED AND AGREED TO BY Originator:
Authorized
Signature: _Jack Prim_
Name: _Jack Prim_
Date _9/1/04_
Title: _President_
Address: _4800 W. Waco Dr., Waco TX_

ACCEPTED BY:
FIRST NATIONAL BANK OF CENTRAL TEXAS
Authorized
Signature: _Randall W Crow_
Name: _RANDALL W CRAWFORD_    Date _4/01/04_

Title: _EVP_
Address: _1835 N Valley Mills Dr_

Exhibit 31



**Enterprise Payment Solutions**

| | |
|---|---|
| **Legal Name:** | Zaza Pay LLC |
| **DBA Name:** | |
| **Partner Name:** | DPS |
| **Partner Sales Agent Name:** | Jerry Federico |

Party responsible for Application Fee: ☒ Partner ☐ Merchant
Party responsible for Monthly Billing/Invoices: ☒ Partner ☐ Merchant

## Application Checklist:

For underwriting purposes, the following documents must be submitted

☐ Signed Application for Payment Processing

☐ Signed Merchant Processing Services Agreement

☐ Signed Fee Schedule (If Merchant is responsible for monthly billing)

☐ Financials, dated within the Last 18 Months (provide at least two of the following)
  - Bank Statements (last 3-months)
  - Profit & Loss Statement
  - Balance Sheet
  - Tax Returns

☐ Copy of DBA/Fictitious Name document (required if using a DBA)

☒ Copy of Voided Company Check(s), used to verify account information

☒ Copy of Drivers License for the Owner, Officer and/or authorized signer

## Send all requested information to:

### Fax: (888) 391-1934   Email: EPSRisk@ProfitStars.com

Please type all information, then print and sign the application (handwritten forms will not be accepted). Once EPS Risk Management (RM) receives your completed application materials, your submitted documents will be reviewed for approval or decline. If approved, RM will determine your transaction limits, as well as the number days it will take to settle funds into your account(s). During the financial review, additional information may be requested. Upon approval, ProfitStars EPS will email everything you need to get started.

**ProfitStars - Enterprise Payment Solutions** • 1025 Central Expressway South • Dallas, TX 75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934

ProfitStars-Merchant Application (Aug2010).doc   JACK000161

REDACTED



Pl  type all information, then print and sign the application (handwritten forms will not be accepted).

## BUSINESS & CONTACT INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| **Legal Name:** Zaza Pay LLC | | | **DBA Name:** | | |
| **Physical Address:** 8777 N Gainey Center Drive, Suite 175 | | **City:** Scottsdale | | **State:** AZ | **ZIP:** 85258 |
| **Billing Address:** (if different) | | **City:** | | **State:** | **ZIP:** |

| | | | | |
|---|---|---|---|---|
| **Phone:** 480.998.3200 | **Fax:** 480.483.1231 | | **Customer Service Phone:** | **Website Address/URL:** |
| **Primary Contact Name:** Moe | **Title:** | **Phone:** ▓▓▓ | **Email Address:** ▓▓▓ | |
| **Secondary Contact Name:** Christi | **Title:** | **Phone:** | **Email Address:** ▓▓▓ | |

## BUSINESS PROFILE

**Business Structure:** (Select one)
☐ Corporation   ☒ LLC   ☐ LLP   ☐ Non-Profit   ☐ Partnership   ☐ Sole Proprietor   ☐ Other   ☐ Publicly-Traded

**Stock Symbol:**

| | | | |
|---|---|---|---|
| **Federal Tax ID # / EIN:** ▓▓▓ | **Date Formed:** 4/4/2006 | **Length of Current Ownership:** 4 years | **Business Type/Industry:** (include NAICS or SIC Code if available) |

**Provide a detailed description of the products/services that you provide:**
discount clubs, coupon/grocery savings

**Describe the primary method of marketing your products/services:**
affiliate mktg, blogs, emails, exit pages, search engines

**Refund Policy:**
full refund within 30 days

## OWNER/OFFICER INFORMATION

| | | | | |
|---|---|---|---|---|
| **Primary Officer Name:** I   Tassoudji | **Title:** President | **Ownership %:** | **Date of Birth:** 9/22/67 | **Social Security Number:** ▓▓▓ |
| **Home Address:** ▓▓▓ | | **City:** ▓▓▓ | **State:** ▓▓▓ | **ZIP:** ▓▓▓ |

| | | | | |
|---|---|---|---|---|
| **Secondary Officer Name:** | **Title:** | **Ownership %:** | **Date of Birth:** | **Social Security Number:** |
| **Home Address:** | | **City:** | **State:** | **ZIP:** |

## SERVICES / TRANSACTION SUBMISSION OPTIONS

**EPS Online Merchant Portal Options:** (Select all that apply)

☐ Remote Deposit Capture (Check Conversion - CAR/LAR)
☐ Merchant Capture (Check Conversion - Scan Check/Key Entry)
☒ ACH Services
☐ Fed-Ready/NACHA File Upload

**Other Options:** (Select all that apply)

☐ Real-Time Gateway (XML file format)
☒ Web Services
☐ Hosted Pay Page
☐ Remit Plus
☐ Credit Card Gateway:

## TRANSACTION TYPES                                (Select all that apply)

**Check Conversion:**
☒ Check 21   ☐ ARC - Accounts Receivable Conversion   ☐ BOC - Back Office Conversion   ☐ POP - Point of Purchase Conversion

*Virtual Endorsement* - All Check 21 items are virtually endorsed by ProfitStars. Please do not endorse items that you process through the ProfitStars system.

**Preauthorized Payments CCD/PPD:**
☐ ACH Debit   ☐ ACH Recurring Debit   ☐ ACH Credit   ☐ ACH Recurring Credit   ☒ ACH Refund

**Other ACH:** (Select all that apply)
☐ EB - Internet Check   ☐ TEL - Telephone Check

**Credit Card Processor Options:**
☐ Merchant-E Solutions   ☐ Elavon   ☐ Chase Payment Tech          *Requires a separate processing agreement with the selected card service provider.*

**ProfitStars - Enterprise Payment Solutions • 1025 Central Expressway South • Dallas, TX 75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934**

ProfitStars-Merchant Application (Aug2010).doc          REDACTED          JACK000162



**ProfitStars®**
A JACK HENRY COMPANY

**Enterprise Payment Solutions**

Please type all information, then print and sign the application (handwritten forms will not be accepted).

### TRANSACTION PROFILE & VELOCITY INFORMATION

Please provide accurate estimates of your expected ACH and/or Check21 activity. This information will be used during underwriting as a guide to establish your transaction limits (velocities). Please provide estimates of Credits only if you selected "Transaction Types" ACH Credit and/or ACH Recurring Credit on the previous page. Requested amounts below are subject to approval by EPS Risk Management. Transaction counts and/or amounts that fall outside of your approved limits will be declined.

| Description | Debits | | Credits | |
|---|---|---|---|---|
| **Average Dollar Amount per Single Transaction** Please provide your average transaction amount. | $ | 29.00 | $ | 29.00 |
| **Maximum Dollar Amount per Single Transaction** The largest allowable dollar amount ($) per individual transaction. | $ | 49.00 | $ | 49.00 |
| **Maximum Dollar Amount per Day** The largest allowable amount ($) total for any given day. | $ | 1,000,000 | $ | 25,000 |
| **Maximum Number of Transactions per Day** The largest allowable number (#) of transactions on any given day. | # | 30,000 | # | 3,000 |
| **Maximum Dollar Amount per Month** The largest allowable amount ($) total during a one month period. | $ | 20,000,000 | $ | 500,000 |
| **Maximum Number of Transactions per Month** The largest allowable number (#) of transactions during a one month period. | # | 500,000 | # | 50,000 |

### SCANNER INFORMATION

| Scanner Make: | Model: | Serial Number: |
|---|---|---|
| Scanner Make: | Model: | Serial Number: |

### ACH COLLECTION & RE-PRESENTMENT OPTIONS

In the event of a return, EPS can automatically re-present the item to the check writer's bank in order to attempt collection on the face amount, as well as a returned-check fee.

**Face Amount: Maximum Number of Re-Presentments:**
If an ACH item returns, attempt collection on the <u>Face Amount</u> up to how many times (select one)? ☐ 2 ☐ 1 ☐ None

**Timing of First Re-Presentment:**
First ACH re-presentment will occur how many days following 1st return? Please specify the number of days (0=immediately): [ ]

**Timing of Final Re-Presentment:**
☐ Final ACH re-presentment will coincide with common paydays (i.e., 1st & 15th).
☐ Final ACH re-presentment will occur after a fixed number of days. Please specify the number of days (0=immediately): [ ]

**Returned-Check Fee: Maximum Number of Re-Presentments:**
If an ACH item returns, attempt collection on the Returned-Check fee up to how many times (select one)? ☐ 3 ☐ 2 ☐ 1 ☐ None

**Returned-Check Fee Amount:**
If you selected one or more Returned-Check Fee collection attempts, enter the amount to be charged to the check writer: $ [ ]

**Returned-Check Fee Settlement:**
☐ Deposit collected fees into <u>Customer's</u> settlement bank account.
☐ Deposit collected fees into <u>Other</u> bank account. Please specify below.

**Returned-Check Fee Settlement: Name On Account:**

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking ☐ Savings |
|---|---|---|

**ProfitStars - Enterprise Payment Solutions • 1025 Central Expressway South • Dallas, TX 75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934**

ProfitStars-Merchant Application (Aug2010).doc    REDACTED    JACK000163



# CONFIDENTIAL

**Enterprise Payment Solutions**

## Application for Payment Processing Page 4 of 4

Pl    type all information, then print and sign the application (handwritten forms will not be accepted).

### BUSINESS BANKING INFORMATION

Enter your primary settlement account information here.  Please include a voided check for account verification.

| Bank Name: | Bank Officer/Contact Name: | Phone: | |
|---|---|---|---|

| Bank Address: | City: | State: | ZIP: |
|---|---|---|---|

Name on Account/Location Display Name:

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking   ☐ Savings |
|---|---|---|

### ADDITIONAL BANK ACCOUNTS – "LOCATIONS"

Enter additional location settlement account information here.  If you require more than 10 locations, you may provide banking information on a separate form or spreadsheet.  For verification, please include a voided check for each account.

Name on Account/Location Display Name:

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking   ☐ Savings |
|---|---|---|

Name on Account/Location Display Name:

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking   ☐ Savings |
|---|---|---|

Name on Account/Location Display Name:

| A.   .outing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking   ☐ Savings |
|---|---|---|

### SIGNATURES

On behalf of the foregoing legal business ("Merchant"), to induce Jack Henry & Associates, Inc., acting through its ProfitStars ™ division ("JHA") reliance thereon, the undersigned certifies the accuracy of all the foregoing information and authorizes JHA, Bank, Credit Bureau, or other investigative agency contracted by JHA to investigate any and all references, statements or other data contained herein or obtained from Merchant, other persons, companies or agencies pertaining to Merchant's and/or Guarantor's credit, financial responsibility and accuracy of any of the foregoing information. The undersigned further agrees to notify JHA of any and all changes which may occur from time to time in the information and statements contained herein. The person(s) signing this agreement certifies that he/she is authorized to enter into this agreement on behalf of Merchant.

WARRANTY OF APPLICATION: In connection with this Agreement, Merchant has executed and delivered an application to JHA containing, among other things, information describing the nature of Merchant's business and, where applicable, the individuals who are Merchant's principal owners.  Merchant warrants to JHA that all information and statements contained in such application are true, correct, and complete. Merchant further agrees to notify JHA promptly of any changes which may occur from time to time regarding any information contained in such application, including, but not limited to, the identity of the principal owners, type of goods and services provided and how sales are completed.  Merchant and principal owner(s) identified on approved applications shall be jointly and severally liable to JHA and remain liable for any and all loss, costs and expense suffered or incurred by JHA.

JHA FEES: If the Merchant is designated on page one of this application as the party responsible for the Application Fee and/or Monthly Billing/Transaction Fees, JHA will assess fees via ACH debit to Merchant.

ACH DEBIT AUTHORIZATION: I authorize JHA to electronically debit my (select one) ☐ Checking account / ☐ Savings account for any fees due JHA.  If an item is dishonored for any reason, I authorize JHA to initiate an additional electronic debit to the same account for a returned check fee in the amount of $30.  This authorization shall remain in full force and effect until JHA has received written notification from me of its termination in such a time and manner as to afford JHA a reasonable opportunity to act on it.

Name on Bank Account:

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking   ☐ Savings |
|---|---|---|

#### Signed By:

| Name: (please print) | Title: (please print) |
|---|---|
| S  ature: X | Date: |

**ProfitStars - Enterprise Payment Solutions • 1025 Central Expressway South • Dallas, TX  75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934**

ProfitStars-Merchant Application (Aug2010).doc    REDACTED    JACK000164



**Enterprise Payment Solutions**

| | |
|---|---|
| **Legal Name:** | Zaza Pay LLC |
| **DBA Name:** | |
| **Partner Name:** | DPS |
| **Partner Sales Agent Name:** | Jerry Federico |

Party responsible for Application Fee:   ☒ Partner   ☐ Merchant
Party responsible for Monthly Billing/Invoices:   ☒ Partner   ☐ Merchant

## Application Checklist:

For underwriting purposes, the following documents must be submitted

☐ Signed Application for Payment Processing

☐ Signed Merchant Processing Services Agreement

☐ Signed Fee Schedule (If Merchant is responsible for monthly billing)

☐ Financials, dated within the Last 18 Months (provide at least two of the following)
- Bank Statements (last 3-months)
- Profit & Loss Statement
- Balance Sheet
- Tax Returns

☐ Copy of DBA/Fictitious Name document (required if using a DBA)

☒ Copy of Voided Company Check(s), used to verify account information

☒ Copy of Drivers License for the Owner, Officer and/or authorized signer

### Send all requested information to:

### Fax: (888) 391-1934   Email: EPSRisk@ProfitStars.com

Please type all information, then print and sign the application (handwritten forms will not be accepted). Once EPS Risk Management (RM) receives your completed application materials, your submitted documents will be reviewed for approval or decline. If approved, RM will determine your transaction limits, as well as the number days it will take to settle funds into your account(s). During the financial review, additional information may be requested. Upon approval, ProfitStars EPS will email everything you need to get started.

**ProfitStars - Enterprise Payment Solutions** • 1025 Central Expressway South • Dallas, TX  75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934

ProfitStars-Merchant Application (Aug2010).doc                    JACK000161

REDACTED



**ProfitStars**
A JACK HENRY COMPANY

Enterprise Payment Solutions

Pl— type all information, then print and sign the application (handwritten forms will not be accepted).

## BUSINESS & CONTACT INFORMATION

| | |
|---|---|
| Legal Name: **Zaza Pay LLC** | DBA Name: |

| Physical Address: **8777 N Gainey Center Drive, Suite 175** | City: **Scottsdale** | State: **AZ** | ZIP: **85258** |
|---|---|---|---|

| Billing Address: (if different) | City: | State: | ZIP: |
|---|---|---|---|

| Phone: **480.998.3200** | Fax: **480.483.1231** | Customer Service Phone: | Website Address/URL: |
|---|---|---|---|

| Primary Contact Name: **Moe** | Title: | Phone: ███ | Email Address: ███ |
|---|---|---|---|

| Secondary Contact Name: **Christi** | Title: | Phone: | Email Address: ███ |
|---|---|---|---|

## BUSINESS PROFILE

Business Structure: (Select one)
☐ Corporation ☒ LLC ☐ LLP ☐ Non-Profit ☐ Partnership ☐ Sole Proprietor ☐ Other ☐ Publicly-Traded

Stock Symbol:

| Federal Tax ID # / EIN: ███ | Date Formed: **4/4/2006** | Length of Current Ownership: **4 years** | Business Type/Industry: (include NAICS or SIC Code if available) |
|---|---|---|---|

Provide a detailed description of the products/services that you provide:
**discount clubs, coupon/grocery savings**

| Describe the primary method of marketing your products/services: **affiliate mktg, blogs, emails, exit pages, search engines** | Refund Policy: **full refund within 30 days** |
|---|---|

## OWNER/OFFICER INFORMATION

| Primary Officer Name: **Tassoudji** | Title: **President** | Ownership %: | Date of Birth: **9/22/67** | Social Security Number: ███ |
|---|---|---|---|---|

| Home Address: ███ | City: ███ | State: ███ | ZIP: ███ |
|---|---|---|---|

| Secondary Officer Name: | Title: | Ownership %: | Date of Birth: | Social Security Number: |
|---|---|---|---|---|

| Home Address: | City: | State: | ZIP: |
|---|---|---|---|

## SERVICES / TRANSACTION SUBMISSION OPTIONS

EPS Online Merchant Portal Options: (Select all that apply)
☐ Remote Deposit Capture (Check Conversion - CAR/LAR)
☐ Merchant Capture (Check Conversion - Scan Check/Key Entry)
☒ ACH Services
☐ Fed-Ready/NACHA File Upload

Other Options: (Select all that apply)
☐ Real-Time Gateway (XML file format)
☒ Web Services
☐ Hosted Pay Page
☐ Remit Plus
☐ Credit Card Gateway:

## TRANSACTION TYPES

(Select all that apply)

Check Conversion:
☒ Check 21 ☐ ARC - Accounts Receivable Conversion ☐ BOC - Back Office Conversion ☐ POP - Point of Purchase Conversion

*Virtual Endorsement* - All Check 21 items are virtually endorsed by ProfitStars. Please do not endorse items that you process through the ProfitStars system.

Preauthorized Payments CCD/PPD:
☐ ACH Debit ☐ ACH Recurring Debit ☐ ACH Credit ☐ ACH Recurring Credit ☒ ACH Refund

Other ACH: (Select all that apply)
☐ EB - Internet Check ☐ TEL - Telephone Check

Credit Card Processor Options:
☐ Merchant-E Solutions ☐ Elavon ☐ Chase Payment Tech    *Requires a separate processing agreement with the selected card service provider.*

**ProfitStars - Enterprise Payment Solutions • 1025 Central Expressway South • Dallas, TX 75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934**

ProfitStars-Merchant Application (Aug2010).doc    REDACTED    JACK000162



**Enterprise Payment Solutions**

Please type all information, then print and sign the application (handwritten forms will not be accepted).

## TRANSACTION PROFILE & VELOCITY INFORMATION

Please provide accurate estimates of your expected ACH and/or Check21 activity. This information will be used during underwriting as a guide to establish your transaction limits (velocities). Please provide estimates of Credits only if you selected "Transaction Types" ACH Credit and/or ACH Recurring Credit on the previous page. Requested amounts below are subject to approval by EPS Risk Management. Transaction counts and/or amounts that fall outside of your approved limits will be declined.

| Description | Debits | | Credits | |
|---|---|---|---|---|
| **Average Dollar Amount per Single Transaction** Please provide your average transaction amount. | $ | 29.00 | $ | 29.00 |
| **Maximum Dollar Amount per Single Transaction** The largest allowable dollar amount ($) per individual transaction. | $ | 49.00 | $ | 49.00 |
| **Maximum Dollar Amount per Day** The largest allowable amount ($) total for any given day. | $ | 1,000,000 | $ | 25,000 |
| **Maximum Number of Transactions per Day** The largest allowable number (#) of transactions on any given day. | # | 30,000 | # | 3,000 |
| **Maximum Dollar Amount per Month** The largest allowable amount ($) total during a one month period. | $ | 20,000,000 | $ | 500,000 |
| **Maximum Number of Transactions per Month** The largest allowable number (#) of transactions during a one month period. | # | 500,000 | # | 50,000 |

## SCANNER INFORMATION

| Scanner Make: | Model: | Serial Number: |
|---|---|---|
| Scanner Make: | Model: | Serial Number: |

## ACH COLLECTION & RE-PRESENTMENT OPTIONS

In the event of a return, EPS can automatically re-present the item to the check writer's bank in order to attempt collection on the face amount, as well as a returned-check fee.

**Face Amount: Maximum Number of Re-Presentments:**
If an ACH item returns, attempt collection on the <u>Face Amount</u> up to how many times (select one)?   ☐ 2  ☐ 1  ☐ None

**Timing of First Re-Presentment:**
First ACH re-presentment will occur how many days following 1st return?    Please specify the number of days (0=immediately): ☐

**Timing of Final Re-Presentment:**
☐ Final ACH re-presentment will coincide with common paydays (i.e., 1st & 15th).
☐ Final ACH re-presentment will occur after a fixed number of days.    Please specify the number of days (0=immediately): ☐

**Returned-Check Fee: Maximum Number of Re-Presentments:**
If an ACH item returns, attempt collection on the Returned-Check fee up to how many times (select one)?   ☐ 3  ☐ 2  ☐ 1  ☐ None

**Returned-Check Fee Amount:**
If you selected one or more Returned-Check Fee collection attempts, enter the amount to be charged to the check writer:    $ ☐

**Returned-Check Fee Settlement:**
☐ Deposit collected fees into <u>Customer's</u> settlement bank account.
☐ Deposit collected fees into <u>Other</u> bank account. Please specify below.

**Returned-Check Fee Settlement: Name On Account:**

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking  ☐ Savings |
|---|---|---|

**ProfitStars - Enterprise Payment Solutions • 1025 Central Expressway South • Dallas, TX 75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934**

ProfitStars-Merchant Application (Aug2010).doc          REDACTED          JACK000163



# CONFIDENTIAL

**Enterprise Payment Solutions**

## Application for Payment Processing

Pl~ type all information, then print and sign the application (handwritten forms will not be accepted).

## BUSINESS BANKING INFORMATION

Enter your primary settlement account information here. Please include a voided check for account verification.

| Bank Name: | Bank Officer/Contact Name: | Phone: | |
|---|---|---|---|

| Bank Address: | City: | State: | ZIP: |
|---|---|---|---|

**Name on Account/Location Display Name:**

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking ☐ Savings |
|---|---|---|

## ADDITIONAL BANK ACCOUNTS – "LOCATIONS"

Enter additional location settlement account information here. If you require more than 10 locations, you may provide banking information on a separate form or spreadsheet. For verification, please include a voided check for each account.

**Name on Account/Location Display Name:**

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking ☐ Savings |
|---|---|---|

**Name on Account/Location Display Name:**

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking ☐ Savings |
|---|---|---|

**Name on Account/Location Display Name:**

| A. .outing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking ☐ Savings |
|---|---|---|

## SIGNATURES

On behalf of the foregoing legal business ("Merchant"), to induce Jack Henry & Associates, Inc., acting through its ProfitStars ™ division ("JHA") reliance thereon, the undersigned certifies the accuracy of all the foregoing information and authorizes JHA, Bank, Credit Bureau, or other investigative agency contracted by JHA to investigate any and all references, statements or other data contained herein or obtained from Merchant, other persons, companies or agencies pertaining to Merchant's and/or Guarantor's credit, financial responsibility and accuracy of any of the foregoing information. The undersigned further agrees to notify JHA of any and all changes which may occur from time to time in the information and statements contained herein. The person(s) signing this agreement certifies that he/she is authorized to enter into this agreement on behalf of Merchant.

WARRANTY OF APPLICATION: In connection with this Agreement, Merchant has executed and delivered an application to JHA containing, among other things, information describing the nature of Merchant's business and, where applicable, the individuals who are Merchant's principal owners. Merchant warrants to JHA that all information and statements contained in such application are true, correct, and complete. Merchant further agrees to notify JHA promptly of any changes which may occur from time to time regarding any information contained in such application, including, but not limited to, the identity of the principal owners, type of goods and services provided and how sales are completed. Merchant and principal owner(s) identified on approved applications shall be jointly and severally liable to JHA and remain liable for any and all loss, costs and expense suffered or incurred by JHA.

JHA FEES: If the Merchant is designated on page one of this application as the party responsible for the Application Fee and/or Monthly Billing/Transaction Fees, JHA will assess fees via ACH debit to Merchant.

ACH DEBIT AUTHORIZATION: I authorize JHA to electronically debit my (select one) ☐ Checking account / ☐ Savings account for any fees due JHA. If an item is dishonored for any reason, I authorize JHA to initiate an additional electronic debit to the same account for a returned check fee in the amount of $30. This authorization shall remain in full force and effect until JHA has received written notification from me of its termination in such a time and manner as to afford JHA a reasonable opportunity to act on it.

**Name on Bank Account:**

| ABA Routing/Transit Number: | Bank Account Number: | Account Type: ☐ Checking ☐ Savings |
|---|---|---|

### Signed By:

| Name: (please print) | Title: (please print) |
|---|---|
| S. .ature:<br><br>X | Date: |

**ProfitStars - Enterprise Payment Solutions • 1025 Central Expressway South • Dallas, TX 75013 • Ph: (877) 542-2247 • Fax: (888) 391-1934**

ProfitStars-Merchant Application (Aug2010).doc      REDACTED      JACK000164

Exhibit 32



# Demand Draft Fraud

## The House Banking Committee

## Washington, D.C.

DATE: April 15, 1996

BY: Jodie Bernstein, Former Director

Mr. Chairman and members of the Committee, I am Jodie Bernstein, Director of the Bureau of Consumer Protection of the Federal Trade Commission. I appreciate the opportunity to appear before you today on behalf of the Commission to discuss the problem of demand draft fraud, its effect on consumers, and what the Commission is doing about it.(1)

Combatting fraud is one of the Commission's most important consumer protection priorities. The Commission challenges fraudulent practices generally using its authority under the Federal Trade Commission Act.,(2) which prohibits "unfair or deceptive acts or practices in or affecting commerce."(3) Under the FTC Act, the Commission may file civil actions in federal district court seeking injunctive and monetary relief. Where appropriate, the Commission may seek extraordinary relief that includes an ex parte temporary restraining order, asset freeze and the appointment of a receiver to halt ongoing fraudulent activities and preserve assets for consumer redress. The Commission also has other tools to combat fraud including the recently issued Telemarketing Sales Rule.(4) The Commission has and will use these tools in attacking demand draft fraud. It is important to note at the outset, however, that the Commission does not have jurisdiction over banks.(5)

Demand draft fraud, or the unauthorized debiting of a consumer's checking account, is a growing problem. Currently, it is the favorite method of fraudulent actors for taking consumers' money through fraudulent telemarketing and other scams. The Commission believes that it is a growing problem because strong measures taken by the credit card associations over the last several years have made it increasingly difficult for fraudulent actors to obtain access to the credit card system. As a result, these scurrilous operators have turned to other methods of stealing money, including demand drafts.

How do these fraudulent actors steal consumers' money through demand drafts? In a word, by lying. Many fraudulent actors persuade consumers, either over the telephone or through the mail, to divulge their checking account numbers by telling them that their bank account numbers are needed to verify prizes or to deposit prize money directly into consumers' bank accounts. In other cases, fraudulent actors tell consumers that only a small amount will be withdrawn, but in fact withdraw huge amounts of money from the consumer's checking account. As a further insult, the unauthorized demand draft may generate significant overdraft charges to the consumer if

the consumer does not have the additional money in the first instance or has written subsequent checks. Little do consumers know that once they give fraudulent actors access to their bank account information, their money will disappear.

Once a consumer provides his or her checking account number, a fraudulent actor can generate a document that looks exactly like the checks in the consumer's checkbook -- imprinted with the consumer's name, address, phone number and, most importantly, the account numbers and the numbers necessary to route the draft through the banks' check clearing system. The only difference is that in place of the consumer's signature, there is a notation such as "pre-approved" or "signature on file." The fraudulent actor deposits this draft the same as any conventional check, and in most cases it clears in exactly the same way as a conventional check; the lack of a handwritten signature is not a problem in processing it. This form of fraud is a very lucrative business. Based on our enforcement experience, the Commission estimates that at a minimum, demand draft fraud has already caused tens of millions of dollars in consumer injury.(6)

Despite the potential for fraudulent misuse, demand drafts are a completely legitimate, though relatively unfamiliar, payment method. Consumers are generally aware that arrangements can be made for recurring payments, such as mortgage payments or car payments, to be withdrawn automatically from their checking accounts. The surprise for many consumers is that withdrawals from their checking accounts can happen on a one-time basis, with no prior written authorization. This one-time third party withdrawal was also a surprise to the Commission when it first observed unauthorized debiting in some of our telemarketing fraud cases. The Commission's initial conclusion was that demand drafts were just another tool in the fraud operator's toolbox. Accordingly, the Commission's initial proposal for a Telemarketing Sales Rule pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act,(7) required sellers who use demand drafts to obtain express prior written authorization, which, in effect, would have eliminated demand drafts as an alternative payment method. In response to that initial proposal, the Commission received hundreds of comments from members of the automated payment industry and from legitimate merchants and businesses objecting to the elimination of demand drafts as a payment method. These comments and oral presentations persuaded the Commission that there is nothing inherently unfair or deceptive about the use of demand drafts as a payment method; and, in fact, that demand drafts provide consumers the same convenience and opportunity to purchase goods or services that they could enjoy using credit cards. But like so many other innovative developments in the marketplace, demand drafts are susceptible to misuse by unscrupulous operators.

During the rulemaking, the Commission learned that millions of consumers use demand drafts in lieu of credit cards and that demand drafts are used by Fortune 500 companies, airlines, car rental companies, insurance companies, and mortgage companies. In fact, demand drafts are used by a variety of businesses that are characterized by quick turn-around transactions, and as a payment alternative for consumers who do not have, or would rather not use, credit cards. Demand drafts are a large and growing payment mechanism. One member of the automated payment industry, Telephone Check Payment Systems ("TCPS"), commented in the telemarketing rulemaking that nine of the current twenty demand draft service bureaus process approximately 38,000 demand drafts weekly, totaling over five million dollars for over 700 business clients throughout the country.(8) Accelerated Payment Systems ("APS") stated at the Commission's rulemaking workshop in April 1995, that it processes half a billion dollars a year through demand drafts.(9) The vast majority of these transactions are not tainted by fraud. So the lesson the Commission staff learned during the telemarketing rulemaking proceeding, was that it was not the payment method itself that was the problem; rather, the problem was a lack of uniform industry standards, ineffective dispute resolution methods, and consumers' lack of awareness that their bank accounts could be debited without their written authorization.

In demand draft transactions, consumers are largely unprotected, in marked contrast to credit card transactions, where consumers are protected nationwide against unauthorized or incorrect charges by the Fair Credit Billing

Act ("FCBA").(10) The FCBA creates a mechanism for consumers to dispute charges before they pay, and requires the creditor to investigate a consumer's dispute. Moreover, under the FCBA a consumer can only be liable for up to $50 for unauthorized charges. By contrast, in the case of demand drafts, there is no legally mandated dispute mechanism, and no limit on liability. Disputes are governed by state law, specifically, state laws that follow the Uniform Commercial Code ("UCC"). The UCC requires that checks or drafts be signed, but unbeknownst to many consumers, the signature need not take any particular form,(11) and the authority to sign can be granted orally.(12) The UCC's liberal definition of what constitutes a signature creates a problem of proof for a consumer who is victimized by demand draft fraud. Under the UCC, a consumer can only recover money from his or her bank if the consumer can persuade the bank that he or she did not in fact authorize the demand draft in the first place.(13) When a consumer disputes an unauthorized demand draft to his or her checking account, banks often take the position that the mere fact that the consumer's bank account number is on the draft shows that the consumer gave authority for the draft.(14) Indeed, banks may hold consumers responsible for fraudulent demand drafts because of the consumers' negligence in giving out their checking account numbers. (15) Although some banks may refund consumers' money in some instances, it is largely consumers who must bear monetary losses related to demand draft fraud, losses that many consumers cannot afford. As noted by the Federal Reserve Bank of San Francisco in a comment submitted during the Telemarketing Sales Rulemaking proceeding, any protection under the UCC for consumers victimized by demand draft fraud is largely illusory.

It is with this background and knowledge that the Commission has taken various actions to limit demand draft fraud. In adopting certain provisions of the Telemarketing Sales Rule that require consumers' express verifiable authorizations for demand drafts in telemarketing transactions, the Commission has addressed the problem of nonexistent demand draft industry standards by establishing such standards, at least in the telemarketing context. The Commission has taken and will continue to take a strong enforcement stance against demand draft fraud under the Telemarketing Sales Rule,(16) and, where appropriate, will bring actions under Section 5 of the FTC Act against fraudulent users of the automated payment system that are not covered by the Rule.(17) Additionally, the Commission has taken the lead in establishing a broad consumer education campaign to help consumers learn about and therefore protect themselves against demand draft fraud.

## Establishing Industry Standards In Telemarketing

The Telemarketing Sales Rule prohibits the use of demand drafts in a telemarketing transaction without a consumer's express verifiable authorization,(18) and establishes an industry standard for what constitutes such authorization. Express verifiable authorization may be obtained by any one of three methods: (1) written authorization; (2) tape recording; or (3) written confirmation notices sent to a consumer before the demand draft is submitted for payment.(19) Any tape recorded authorization must clearly demonstrate that the consumer has received each of six specific pieces of information about the transaction -- the date of the draft(s); the amount of the draft(s); the name of the consumer from whose account funds will be withdrawn; the number of draft payments authorized, if more than one; a telephone number answered during normal business hours that the consumer can call with questions; and the date of the consumer's authorization.(20) Moreover, the recording must demonstrate that the consumer has authorized that funds be taken from his or her bank account based on the required disclosures that the seller or telemarketer has provided. If the tape recording method is used, the seller or telemarketer must provide the consumer's bank, upon request, a copy of the consumer's verifiable authorization.(21) If the written confirmation method is used, the notice must contain the same items of information required in a tape recorded authorization, and the seller or telemarketer must offer, and at the consumer's request, provide a full refund to the consumer in the event the confirmation is inadequate or incorrect. (22) A merchant using demand drafts in connection with telemarketing must keep consumers' authorizations for two years.(23) If a merchant fails to obtain a consumer's express verifiable authorization, the merchant could be liable for civil penalties of up to $10,000 per violation, nationwide injunctive relief, rescission of contracts, damages, and disgorgement of any money obtained in violation of the Rule.(24)

The Rule also reaches individuals and organizations who do not themselves telemarket to consumers but who generate and process demand drafts for those who do. Who are these processors of demand drafts? Generally, if a seller or telemarketer does not generate demand drafts on its own, it uses what is known as a service bureau. In this context, a service bureau is a third party processor who takes bank account information provided by a merchant and, through a computerized system, generates the actual demand draft document based on that information. A service bureau will then forward the demand draft to the merchant, who will deposit the demand draft into the merchant's bank account for processing in the same manner as a conventional check. Demand draft service bureaus, unlike sellers or telemarketers, are not subject directly to the Rule's demand draft requirements because they are not themselves engaged in selling goods or services through telemarketing. However, because service bureaus may provide substantial assistance to a seller or telemarketer in connection with a telemarketing transaction, they are covered by the Rule's "assisting and facilitating" provision.

Under the Rule, a third party can be held liable as an assister or facilitator if the third party substantially assists a seller or telemarketer and knows or consciously avoids knowing that the seller or telemarketer is violating the Rule.(25) Therefore, if a service bureau knows or consciously avoids knowing that a merchant or telemarketer is not obtaining verifiable authorizations before submitting consumers' checking account information for debiting -- or indeed, that the seller or telemarketer is engaging in any other activity that violates the Rule -- that processor may itself be in violation of the Rule and may be liable for civil penalties or the equitable remedies applicable under the Rule. The Commission is optimistic that the Telemarketing Sales Rule will prove to be a potent weapon to discourage demand draft fraud in telemarketing transactions.

Additionally, the Commission believes that consumers will now have the ability to support their claims to banks in the case of unauthorized demand drafts. In many cases banks have interpreted the presence of a consumer's checking account number on a demand draft as proof of the consumer's authorization. Before adoption of the Telemarketing Sales Rule, a consumer had few means at his or her disposal to enable the consumer to prove to a bank that a demand draft alleged to be unauthorized was in fact unauthorized. In the context of a telemarketing transaction, the Rule shifts the onus of proving that a demand draft is authorized to the merchant submitting the demand draft. Now, in that context a consumer can insist that his or her bank request that the merchant produce the consumer's verifiable authorization. Under the Rule, the merchant must provide proof of authorization to the bank upon request. If that merchant cannot or does not provide the bank with the consumer's verifiable authorization, the merchant is in violation of the Rule. Moreover, in such a situation, the consumer also has solid grounds to support his or her claim that the consumer's account was debited without the consumer's authorization. Because the Rule enhances the ability of banks to determine whether a demand draft has a consumer's authorization in connection with a telemarketing transaction, consumers may be more likely to succeed in obtaining refunds from banks for unauthorized demand drafts.

## Commission Enforcement Actions

Although the Rule has only been in effect since December 31, 1995, the Commission has already established its commitment to enforce compliance with the Rule's demand draft requirements. On March 12, 1996, the Commission filed an enforcement action in the District Court for the Northern District of Georgia against a cluster of allegedly fraudulent sellers of magazine subscriptions who had used demand drafts in violation of Rule.(26) This was the first action filed under the Rule, but it certainly won't be the last. The Commission intends to continue to take quick enforcement action against fraudulent actors who use demand drafts in violation of the Rule and is already working closely with state law enforcement agencies who will bring these actions as well. Under the Telemarketing and Consumer Fraud and Abuse Prevention Act each state Attorney General and the District of Columbia can enforce the Telemarketing Sales Rule in federal court and obtain nationwide injunctions and redress for their citizens.(27) This means that now there are an additional fifty-one cops on the nationwide telemarketing fraud beat. The Commission anticipates that this innovative enforcement scheme will be a strong

new weapon in the arsenal against demand draft fraud and telemarketing fraud in general. The Commission will also continue to use its authority under Section 5 of the FTC Act to bring federal district court cases against companies and individuals that engage in demand draft fraud in non-telemarketing contexts.

## Consumer Education

In addition to regulation and enforcement actions, the Commission is targeting demand draft fraud through consumer education. It is clear from the Commission's own learning experience about demand drafts that, for the most part, consumers are not aware that money can be taken from their checking accounts without their written authorization. Because of this lack of knowledge, many consumers fall prey to demand draft fraud by failing to protect their checking account information -- even though these same consumers might never dream of giving out their credit card numbers to strangers. Ultimately, consumers are the first line of defense against any fraud. Thus, the Commission believes it is crucial to supplement its strong enforcement presence in this area with consumer education. Consumers must be armed with knowledge of the fraud and how to avoid it if they are to protect themselves effectively.

In support of its consumer education goals, the Commission's Bureau of Consumer Protection has formed the Partnership for Consumer Education. The Partnership is a cooperative effort among federal agencies, private industry, and consumer groups, to provide effective and coherent educational campaigns against fraud on a much broader scale than would be possible for any member acting alone. As its first goal, the Partnership is developing and implementing consumer education campaigns against telemarketing fraud. The Partnership campaigns supplement the Commission's own educational materials produced by the Commission's Office of Consumer and Business Education.

Members of the automated payment industry were at the forefront in launching the Partnership's first educational campaign against demand draft fraud. Since March 19, five of the largest industry members have been providing consumers with information that consumers can use to protect themselves against demand draft fraud.(28) We estimate that in the first month of this campaign, over 1.5 million consumers will receive this information. The Commission and the Partnership will continue to inform consumers that they must protect their bank account information.

Consumers can protect themselves and their bank accounts by never disclosing their checking account information to anyone they do not know or for any purpose other than to pay for a purchase through direct debiting of their accounts. Consumers need to know that the only purpose for which anyone ever requests them to disclose their checking account numbers is to deduct funds from their accounts. When this information is requested, consumers can be sure that the company is not legitimate if it misrepresents that the information is for any other purpose. Legitimate companies that use demand drafts as a payment method fully disclose the terms of the sale and the payment method, including their purpose in asking for bank account information, and that the information will be used to obtain payment for goods or services by debiting funds from consumers' checking accounts.

Victims of demand draft fraud will likely be unable to stop payment on the draft unless they become aware of the fraud and contact their banks immediately after divulging their account information. Nevertheless, consumers should complain to their banks immediately upon learning of any demand draft against their checking accounts that they have not authorized or that is inconsistent in any way with any authorization they have given to any seller to obtain payment by means of a demand draft. They should insist that the bank require proof from the seller that the demand draft was appropriately authorized, and insist that the demand be dishonored if such proof is not forthcoming. Finally, consumers should report incidents of misrepresentation or fraud regarding demand drafts to their state Attorney General. Consumer complaints are an invaluable tool in identifying appropriate targets for enforcement action. To maximize the effectiveness of this tool, the FTC also urges consumers to

report any type of telemarketing complaint, including those involving demand drafts, to the telemarketing fraud hotline operated by the National Fraud Information Center (NFIC), a project of the National Consumer League. NFIC compiles complaint information received through its hotline and enters it on a daily basis into the computerized telemarketing complaint database jointly maintained by the FTC and the National Association of Attorneys General. Over one hundred federal, state and local law enforcement agencies use this database to help in identifying overall trends in telemarketing fraud as well as individual operators that are likely candidates for prosecution or other law enforcement action. By reporting demand draft fraud to the NFIC hotline, consumers greatly enhance the ability of the Commission and other law enforcement agencies to take action.

## Conclusion

The Commission recognizes that demand draft fraud is a serious problem and has attempted to address this problem within the scope of its jurisdiction. The Commission believes it has provided a strong tool in the Telemarketing Sales Rule to curb its fraudulent use in telemarketing. The Commission will continue to take a leading role in enforcing the Rule against demand draft fraud as well as attacking such fraud with other enforcement actions that are not covered under the Rule. The Commission also will continue to take the lead in educating consumers about how they can protect themselves and their checking accounts.

The Commission is pleased to provide this information to the Committee and welcomes the opportunity to provide any further assistance.

(1)The views expressed in this statement represent the views of the Commission. However, my response to any questions you may have are my own and do not necessarily reflect the Commission's views or the views of any individual Commissioner.

(2)15 U.S.C. § 41 et seq.

(3)*See, e.g., FTC v. Universal Credit Corp.*, No. SA CV 96-114 LHM (EEx)(C.D. Calif. filed Feb. 7, 1996)(alleging, among other things, demand draft fraud).

(4)16 C.F.R. Part 310.

(5)*See* Section 5(a)(2) of the FTC Act, 15 U.S.C. § 45(a)(2).

(6)In just two cases that the Commission recently filed, out of potential consumer injury totalling twenty-four million dollars, injury resulting from demand draft fraud could exceed over 12 million dollars. *See FTC v. Diversified Mktg. Serv. Corp.*, No. 96-388 (W.D. Okla. filed Mar. 13, 1996)(consumer injury estimated at approximately twenty million dollars with significant percentage caused by demand draft fraud); *FTC v. Windward Mktg., Ltd., et al.*, No. 96-CV-0615-FMH (N.D. Ga. filed Mar. 12, 1996)(consumer injury estimated at approximately four million dollars, almost all attributable to demand draft fraud).

(7)15 U.S.C. § 6101.

(8)TCPS Comment at 1.

(9)Workshop Transcript at 547.

(10)15 U.S.C. § 1666.

(11)See, e.g., UCC §§ 1-201(39), 3-401(2), 3-403(1) (1990).

(12)See, e.g., UCC §§ 1-201(43), 3-401 (1990).

(13)See UCC §§ 4-401, 4-406 (1990).

(14) See UCC § 3-407(3) (1990).

(15)See UCC § 3-406 (1990); FTC's Statement of Basis and Purpose to the Telemarketing Sales Rule, 60 Fed. Reg. 43,850 (1995)(discussing Federal Reserve Bank of San Francisco Comment).

(16)16 C.F.R. Part 310.

(17)See 15 U.S.C. § 41 et seq.

(18)16 C.F.R. § 310.3(a)(3).

(19)16 C.F.R. § 310.3(a)(3).

(20)16 C.F.R. § 310.3(a)(3)(ii).

(21)Id.

(22)16 C.F.R. § 310.3(a)(3)(iii).

(23)16 C.F.R. § 310.5(a)(5).

(24)See The Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105 (providing that any person who violates the Rule shall be subject to the penalties provided under the FTC Act, 15 U.S.C. § 41 *et seq.*) and § 6103(a) (providing that state officials may obtain damages, restitution, or other compensation on behalf of residents of such State for violations of the Rule).

(25)16 C.F.R. § 310.3(b).

(26)*FTC v. Windward Mktg., Ltd., et al.,* No. 96-CV-0615-FMH (N.D. Ga. filed Mar. 12, 1996)(TRO and asset freeze issued Apr. 3, 1996).

(27)15 U.S.C. § 6103.

(28)These companies include: Accelerated Payment Systems, Check/Debit, Autoscribe, Intell-A-Check, and QuickCard Systems, Inc. Although Autoscribe recently terminated its business, its clients have been absorbed by the other listed companies and will continue to receive educational messages through those companies.

# Media Resources

Our Media Resources library provides one-stop collections of materials on numerous issues in which the FTC has been actively engaged. These pages are especially useful for members of the media.

## ABOUT THE FTC

What We Do

Our History

Commissioners

Bureaus & Offices

Biographies

Budgets

Performance

Office of Inspector General

FOIA

Careers at the FTC

## NEWS & EVENTS

Press Releases

Media Resources

Events Calendar

Speeches

Audio/Video

Social Media

Blogs

## ENFORCEMENT

Cases and Proceedings

Premerger Notification Program

Merger Review

Anticompetitive Practices

Rules

Statutes

Consumer Sentinel Network

## POLICY

Advocacy

Advisory Opinions

Cooperation Agreements

Federal Register Notices

Reports

Testimony

Public Comments

Policy Statements

International

**TIPS & ADVICE**

For Consumers

Business Center

Competition Guidance

**I WOULD LIKE TO...**

Submit a Consumer Complaint to the FTC

File a Comment

Get a Free Copy of My Credit Report

List a Number on the National Do Not Call Registry

Report An Antitrust Violation

**SITE INFORMATION**

Privacy Policy

Website Policy

No FEAR Act

USA.gov

Accessibility

Digital Government Strategy

Open Government

**FEDERAL TRADE COMMISSION**

Headquarters:
600 Pennsylvania Avenue, NW
Washington, DC 20580
Contact Us

Stay Connected with the FTC

Exhibit 33



# FTC Action Bans Payment Processor from Using a NovelPayment Method to Debit Accounts

## Allegedly Debited Millions of Dollars from Consumers' Bank Accounts Without Their Consent

FOR RELEASE

January 5, 2012

TAGS:  Consumer Protection

A payment processor and two of its principals are now banned from using a new payment method to process electronic payments under a settlement with the Federal Trade Commission, which resolves charges that they debited consumers' bank accounts without their consent. The settlement furthers the FTC's ongoing efforts to protect financially-strapped consumers during the economic downturn by scrutinizing not only merchants, but all parties who participate in defrauding consumers.

Payment processors provide merchants with the ability to obtain customer payments for products and services via electronic banking. According to the FTC's complaint against Landmark Clearing, Inc., Larry Wubbena, and Eric Loehr, the defendants used a relatively new payment method called "remotely created payment orders" to give merchants access to consumer bank accounts. From the fall of 2008 until the spring of 2011, Landmark allegedly used remotely created payment orders to debit, or attempt to debit, millions of dollars from consumers' accounts without their consent. The FTC charged that in many instances Landmark debited consumers who had never heard of Landmark or its client merchants, had never gone to any of the merchants' websites, and had never knowingly agreed to purchase products or services from the merchants.

According to the FTC's complaint, Landmark's payment processing activities caused substantial injury to thousands of consumers, often those who could least afford to have funds unexpectedly taken from their accounts without authorization. The FTC alleged that as a result of the unauthorized debits, many consumers suffered significant costs from overdraft and bounced check fees, plus the time and expense of closing bank accounts, opening new ones, and ordering new checks. An example is John Chagoya, a consumer in California who was living on a fixed income when money was taken from his account. While checking his bank statement, he noticed a debit from Landmark payable to Direct Benefits Group (DBG), one of Landmark's client merchants. "They never contacted me at all, and I never authorized anyone to debit money from my account." As a result of the debit, Chagoya's account became overdrawn, and he had to pay bounced check fees.

The FTC's complaint alleged that Landmark's clients routinely failed to obtain consumers' authorization for the debits. By continuing to process these debits, Landmark played a critical role in its clients' unlawful business practices.

According to the FTC, remotely created payment orders are created by entering a consumer's name and bank account information into an electronic form and are processed like an ordinary paper check. When printed, remotely created payment orders look like regular bank checks, but instead of having the account holder's signature, they bear a statement such as "Authorized by Account Holder" or "Signature on File." Federal banking regulations require the creator of a remotely created payment order to have the express authorization of a consumer to process the debit. Unlike some payment mechanisms, such as credit cards, remotely created payment orders are not subject to significant oversight and monitoring, making them vulnerable to abuse. As a result, the FTC alleges, they have become a particularly attractive payment method for merchants and processors engaged in fraud and unauthorized debiting.

A red flag indicating unlawful debiting is a high rate of consumers and their banks rejecting and returning transactions submitted for debiting. According to the FTC's complaint, some of Landmark's clients generated astronomical return rates, sometimes higher than 80 percent, which gave Landmark compelling evidence that its client merchants had not obtained valid consumer authorizations for their debits.

"The return rates posted by Landmark's clients provided obvious signs that they were engaged in dubious practices," said David Vladeck, Director of the FTC's Bureau of Consumer Protection. "But the defendants looked the other way. Payment processors who reach into consumer accounts on behalf of clients engaged in fraud will be held accountable."

The FTC complaint alleges that Landmark actively promoted remotely created payment orders as a way to avoid the scrutiny associated with other payment mechanisms, advertising on its website that merchants "with a high percentage of overall returns" would benefit from using its remotely created payment order product.

According to the FTC, Landmark processed more than 110,000 remotely created payment orders with a value exceeding $5.3 million through the First Bank of Delaware on behalf of one client merchant, Direct Benefits Group (DBG), of which more than 70 percent were rejected and returned. In August 2011, the FTC charged DBG with debiting consumers' bank accounts without their consent, and a federal judge halted DBG's operation and froze its assets pending further litigation.

Similarly, Landmark allegedly processed more than $5.7 million in debits through the First Bank of Delaware on behalf of Platinum Online Group, of which more than 83 percent were rejected and returned. The FTC complaint alleges that Landmark accepted Platinum Online as a client even though Landmark had terminated EdebitPay, Platinum Online's parent company, because of its high return rates. Landmark also knew that in 2008, EdebitPay and its principals had agreed to pay $2.2 million in consumer redress to settle FTC charges for debiting consumers without their consent. The FTC later filed a contempt action against EdebitPay for violating the settlement order.

The settlement order bans the Landmark defendants from processing payments through remotely created payment orders and a similar payment mechanism called "remotely created checks." The order permits the defendants to provide other forms of payment processing, subject to stringent conditions. The settlement order:

Permanently prohibits the defendants from processing payments for any client they know, or should know, is violating the FTC Act or the Telemarketing Sales Rule (TSR);

Requires them to screen and monitor prospective and existing clients to determine whether their business practices violate the FTC Act or the TSR;

Requires them to monitor clients' total return rates, reasons for returned transactions, and unusual transaction patterns, values, and volume;

Prohibits them from failing to investigate a total return rate exceeding 2.5 percent, and requires them to stop payment processing for a client unless the investigation shows its business practices did not violate the FTC Act; and

Bars them from referring any past remote payment clients to third parties for a fee, and from selling or otherwise benefitting from consumers' personal information.

As part of the settlement, Landmark, Wubbena and Loehr have agreed to a $1.5 million judgment that will be suspended upon payment of $126,000 and the surrender of a parcel of land. The full judgment will become due immediately if the defendants are found to have misrepresented their financial condition or fail to meet the terms of the order.

The Commission vote to authorize staff to file the settlement was 4-0. The complaint and consent order were filed in the U.S. District Court for the Eastern District of Texas, Sherman Division, on December 15, 2011. The order was entered by the court on December 29, 2011.

NOTE: The Commission authorizes the filing of a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. The complaint is not a finding or ruling that the defendant has actually violated the law. The consent order is for settlement purposes only and does not constitute an admission by the defendants of a law violation. Consent orders have the force of law when signed by the District Court judge.

The Federal Trade Commission works for consumers to prevent fraudulent, deceptive, and unfair business practices and to provide information to help spot, stop, and avoid them. To file a complaint in English or Spanish, visit the FTC's online Complaint Assistant or call 1-877-FTC-HELP (1-877-382-4357). The FTC enters complaints into Consumer Sentinel, a secure, online database available to more than 2,000 civil and criminal law enforcement agencies in the U.S. and abroad. The FTC's website provides free information on a variety of consumer topics. Like the FTC on Facebook and follow us on Twitter.

(Landmark Clearing)
(FTC File No. 1123117)

## CONTACT INFORMATION

MEDIA CONTACT:
  Frank Dorman,
  Office of Public Affairs
  202-326-2674



## Related Cases

Landmark Clearing, Inc., Larry Wubbena, and Eric Loehr

## Media Resources

Our Media Resources library provides one-stop collections of materials on numerous issues in which the FTC has been actively engaged. These pages are especially useful for members of the media.

Contact
Stay Connected
Privacy Policy
FTC en español

ABOUT THE FTC

What We Do

Our History

Commissioners

Bureaus & Offices

Biographies

Budgets

Performance

Office of Inspector General

FOIA

Careers at the FTC

NEWS & EVENTS

Press Releases

Media Resources

Events Calendar

Speeches

Audio/Video

Social Media

Blogs

ENFORCEMENT

Cases and Proceedings

Premerger Notification Program

Merger Review

Anticompetitive Practices

Rules

Statutes

Consumer Sentinel Network


POLICY

Advocacy

Advisory Opinions

Cooperation Agreements

Federal Register Notices

Reports

Testimony

Public Comments

Policy Statements

International


TIPS & ADVICE

For Consumers

Business Center

Competition Guidance


I WOULD LIKE TO...

Submit a Consumer Complaint to the FTC

File a Comment

Get a Free Copy of My Credit Report

List a Number on the National Do Not Call Registry

Report An Antitrust Violation


SITE INFORMATION

Privacy Policy

Website Policy

No FEAR Act

USA.gov

Accessibility

Digital Government Strategy

Open Government


FEDERAL TRADE COMMISSION

Stay Connected with the FTC

Exhibit 34

| PROCESSOR | MONTH | TOTAL TRANS | TOTAL PROCESSED REVS | Ave Billing Per Trans | Total Collected Revs | Ave Billing Per Coll | Coll % | Total Processor Charges | Fee % | Bank Reserve | R-10 RETURNS | RETURN REVENUES | CHARGE BACK % | CUST SERV/REFUND | CUST SERV REFUND $ | ALL TYPES OF RETURNS | CUST SERV. REFUND % | REFUND CHKS | REFUND CHECKS | TOTAL REFUNDS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AE Checking | Dec-09 | 643 | $ 17,521.93 | $ 27.25 | 13,827.10 | $ 28.05 | 79% | $ 762.20 | 6% | $ 1,520.98 | 14 | $ 298.86 | 2.20% | 22 | $ 221.90 | 150 | 4.46% | 0 | $ - | $ 221.90 |
| JETY | Dec-09 | 6,058 | $ 70,203.83 | $ 11.59 | 57,697.07 | $ 20.81 | 82% | $ 14,178.67 | 25% | $ 1,885.82 | 175 | $ 2,167.76 | 2.80% | 6 | $ 106.13 | 3,286 | 0.22% | 0 | | $ 106.13 |
| GrandTotal | Dec-09 | 6,701 | $ 87,725.76 | $ 13.09 | $ 71,524.17 | #### | 82% | $14,940.87 | 21% | $ 3,406.80 | 189 | $ 2,466.62 | 2.82% | 28 | $ 328.03 | 3,436 | 0.86% | 0 | $ - | $ 328.03 |
| AE Checking | Jan-10 | 338 | $ 8,976.07 | $ 26.56 | 5,511.46 | $ 30.96 | 61% | $ 1,093.34 | 20% | $ 606.26 | 102 | $ 2,123.57 | 30.00% | 3 | $ 82.83 | 160 | 78.09% | 136 | $ 3,426.79 | $ 3,509.62 |
| JETY | Jan-10 | 9,058 | $ 198,798.23 | $ 21.95 | 68,639.50 | $ 22.20 | 35% | $ 17,512.32 | 26% | $ 6,863.96 | 144 | $ 1,707.24 | 0.95% | 31 | $ 669.05 | 5,966 | 1.00% | 0 | | $ 669.05 |
| GrandTotal | Jan-10 | 9,396 | $ 207,774.30 | $ 22.11 | $ 74,150.96 | #### | 36% | $18,605.66 | 25% | $ 7,470.22 | 246 | $ 3,830.81 | 2.62% | 34 | $ 751.88 | 6,126 | 5.20% | 136 | $ 3,426.79 | $ 4,178.67 |
| AE Checking | Feb-10 | 8 | $ 253.20 | $ 31.65 | (66.50) | $ 16.63 | -26% | $ 16.42 | -25% | $ - | 0 | $ - | 0.00% | | $ - | 12 | 0.00% | 0 | $ - | $ - |
| JETY | Feb-10 | 19,532 | $ 431,077.81 | $ 22.07 | 191,512.79 | $ 22.94 | 44% | $ 35,402.10 | 18% | $ 19,151.29 | 438 | $ 9,640.86 | 2.24% | 100 | $ 2,249.08 | 11,184 | 1.88% | 57 | $ 1,530.79 | $ 3,779.87 |
| GrandTotal | Feb-10 | 19,540 | $ 431,071.81 | $ 22.07 | $ 191,446.29 | #### | 44% | $35,418.52 | 19% | $ 19,151.29 | 438 | $ 9,640.86 | 2.24% | 100 | $ 2,249.08 | 11,196 | 1.88% | 57 | $ 1,530.79 | $ 3,779.87 |
| AE Checking | Mar-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Mar-10 | 20,604 | $ 475,802.84 | $ 23.09 | 224,565.95 | $ 24.10 | 47% | $ 37,558.45 | 17% | $ 22,458.64 | 557 | $ 13,423.83 | 2.70% | 272 | $ 6,796.87 | 11,286 | 3.39% | 44 | $ 1,121.55 | $ 7,918.42 |
| GrandTotal | Mar-10 | 20,604 | $ 475,802.84 | $ 23.09 | $ 224,565.95 | #### | 47% | $37,558.45 | 17% | $ 22,458.64 | 557 | $ 13,423.83 | 2.70% | 272 | $ 6,796.87 | 11,286 | 3.39% | 44 | $ 1,121.55 | $ 7,918.42 |
| AE Checking | Apr-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Apr-10 | 24,493 | $ 579,151.37 | $ 23.65 | 245,579.69 | $ 25.44 | 42% | $ 52,114.53 | 21% | $ 24,568.26 | 1015 | $ 25,822.37 | 4.14% | 447 | $ 10,933.59 | 14,840 | 5.79% | 112 | $ 2,460.60 | $ 13,394.19 |
| GrandTotal | Apr-10 | 24,493 | $ 579,151.37 | $ 23.65 | $ 245,579.69 | #### | 42% | $52,114.53 | 21% | $ 24,568.26 | 1015 | $ 25,822.37 | 4.14% | 447 | $ 10,933.59 | 14,840 | 5.79% | 112 | $ 2,460.60 | $ 13,394.19 |
| AE Checking | May-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | May-10 | 29,834 | $ 689,424.46 | $ 23.11 | 278,123.65 | $ 24.58 | 40% | $ 58,465.80 | 21% | $ 27,812.48 | 1350 | $ 33,188.98 | 4.53% | 396 | $ 9,219.00 | 18,521 | 4.46% | 108 | $ 1,930.08 | $ 11,149.08 |
| GrandTotal | May-10 | 29,834 | $ 689,424.46 | $ 23.11 | $ 278,123.65 | #### | 40% | $58,465.80 | 21% | $ 27,812.48 | 1350 | $ 33,188.98 | 4.53% | 396 | $ 9,219.00 | 18,521 | 4.46% | 108 | $ 1,930.08 | $ 11,149.08 |
| AE Checking | Jun-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Jun-10 | 20,045 | $ 463,431.15 | $ 23.12 | 203,917.92 | $ 25.42 | 44% | $ 38,582.25 | 19% | $ 20,400.91 | 905 | $ 23,002.08 | 4.51% | 250 | $ 5,944.83 | 12,022 | 4.86% | 140 | $ 2,420.50 | $ 8,365.33 |
| GrandTotal | Jun-10 | 20,045 | $ 463,431.15 | $ 23.12 | $ 203,917.92 | #### | 44% | $38,582.25 | 19% | $ 20,400.91 | 905 | $ 23,002.08 | 4.51% | 250 | $ 5,944.83 | 12,022 | 4.86% | 140 | $ 2,420.50 | $ 8,365.33 |
| AE Checking | Jul-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Jul-10 | 17,006 | $ 398,444.95 | $ 23.43 | 167,752.34 | $ 25.47 | 42% | $ 33,329.97 | 20% | $ 16,775.22 | 690 | $ 17,572.36 | 4.06% | 284 | $ 6,836.67 | 10,419 | 4.62% | 20 | $ 420.37 | $ 7,257.04 |
| GrandTotal | Jul-10 | 17,006 | $ 398,444.95 | $ 23.43 | $ 167,752.34 | #### | 42% | $33,329.97 | 20% | $ 16,775.22 | 690 | $ 17,572.36 | 4.06% | 284 | $ 6,836.67 | 10,419 | 4.62% | 20 | $ 420.37 | $ 7,257.04 |
| AE Checking | Aug-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Aug-10 | 17,943 | $ 437,243.73 | $ 24.37 | 176,024.96 | $ 26.06 | 40% | $ 34,744.50 | 20% | $ 17,604.32 | 827 | $ 21,553.54 | 4.61% | 327 | $ 7,953.80 | 11,189 | 5.17% | 22 | $ 628.30 | $ 8,582.10 |
| GrandTotal | Aug-10 | 17,943 | $ 437,243.73 | $ 24.37 | $ 176,024.96 | #### | 40% | $34,744.50 | 20% | $ 17,604.32 | 827 | $ 21,553.54 | 4.61% | 327 | $ 7,953.80 | 11,189 | 5.17% | 22 | $ 628.30 | $ 8,582.10 |
| AE Checking | Sep-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Sep-10 | 13,108 | $ 306,726.51 | $ 23.40 | 139,873.21 | $ 24.94 | 46% | $ 25,267.50 | 18% | $ 13,987.33 | 446 | $ 11,124.01 | 3.40% | 336 | $ 7,853.42 | 7,500 | 6.21% | 12 | $ 293.16 | $ 8,146.58 |
| GrandTotal | Sep-10 | 13,108 | $ 306,726.51 | $ 23.40 | $ 139,873.21 | #### | 46% | $25,267.50 | 18% | $ 13,987.33 | 446 | $ 11,124.01 | 3.40% | 336 | $ 7,853.42 | 7,500 | 6.21% | 12 | $ 293.16 | $ 8,146.58 |
| AE Checking | Oct-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Oct-10 | 9,644 | $ 223,336.15 | $ 23.16 | 110,476.72 | $ 24.94 | 49% | $ 18,011.81 | 16% | $ 11,047.69 | 435 | $ 10,848.17 | 4.51% | 188 | $ 4,359.65 | 5,214 | 4.58% | 15 | $ 448.97 | $ 4,808.62 |
| LandMark | Oct-10 | 16,447 | $ 812,400.57 | $ 49.40 | 244,088.60 | $ 43.74 | 30% | $ 26,271.70 | 11% | $ 6,463.76 | 0 | $ - | 0.00% | 914 | $ 45,690.86 | 10,867 | 16.38% | 0 | $ - | $ 45,690.86 |
| GrandTotal | Oct-10 | 26,091 | $ 1,035,736.72 | $ 39.70 | $ 354,565.32 | #### | 34% | $44,283.51 | 12% | $ 17,511.45 | 435 | $ 10,848.17 | 1.67% | 1102 | $50,050.51 | 16,081 | 11.16% | 15 | $ 448.97 | $50,499.48 |
| AE Checking | Nov-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Nov-10 | 6,462 | $ 149,301.32 | $ 23.10 | 80,395.49 | $ 24.77 | 54% | $ 11,358.75 | 14% | $ 8,039.52 | 242 | $ 5,993.75 | 3.74% | 90 | $ 2,137.56 | 3,216 | 4.81% | 66 | $ 2,729.73 | $ 4,867.29 |
| LandMark | Nov-10 | 33,822 | $ 1,413,632.65 | $ 41.80 | 644,317.92 | $ 54.01 | 46% | $ 53,040.65 | 8% | $ - | 0 | $ - | 0.00% | 1848 | $ 91,746.00 | 21,893 | 15.49% | 0 | $ - | $ 91,746.00 |
| GrandTotal | Nov-10 | 40,284 | $ 1,562,933.97 | $ 38.80 | $ 724,713.41 | #### | 46% | $64,399.40 | 9% | $ 8,039.52 | 242 | $ 5,993.75 | 0.60% | 1938 | $93,883.56 | 25,109 | 13.21% | 66 | $ 2,729.73 | $96,613.29 |
| AE Checking | Dec-10 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Dec-10 | 23,481 | $ 1,049,900.87 | $ 44.71 | 569,769.83 | $ 47.55 | 54% | $ 46,081.79 | 8% | $ 56,973.38 | 1215 | $ 57,770.59 | 5.24% | 2,029 | $ 98,816.01 | 11,498 | 17.82% | 106 | $ 5,116.48 | $103,932.49 |
| LandMark | Dec-10 | 24,225 | $ 831,920.13 | $ 34.34 | 385,648.03 | $ 40.19 | 46% | $ - | 0% | $ - | 860 | $ 34,562.04 | 3.55% | 1104 | $ 54,958.99 | 14,629 | 11.50% | 0 | $ - | $ 54,958.99 |
| GrandTotal | Dec-10 | 47,706 | $ 1,881,821.00 | $ 39.45 | $ 955,413.02 | #### | 51% | $46,081.79 | 5% | $ 56,973.38 | 2075 | $ 92,332.58 | 4.35% | 3133 | #### | 26,127 | 15.01% | 106 | $ 5,116.48 | #### |
| AE Checking | Jan-11 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Jan-11 | 16,262 | $ 662,544.60 | $ 40.74 | 369,064.92 | $ 46.55 | 56% | $ 31,351.60 | 8% | $ 36,897.40 | 942 | $ 43,846.53 | 5.79% | 1,002 | $ 47,676.90 | 8,333 | 13.82% | 94 | $ 4,274.13 | $ 51,951.03 |
| LandMark | Jan-11 | 7,336 | $ 147,401.80 | $ 20.09 | 89,934.68 | $ 41.81 | 61% | $ 7,821.18 | 9% | $ - | 122 | $ 5,100.90 | 1.66% | 464 | $ 22,679.23 | 5,185 | 21.57% | 0 | $ - | $ 22,679.23 |
| GrandTotal | Jan-11 | 23,598 | $ 809,946.40 | $ 34.32 | $ 458,999.60 | #### | 57% | $39,172.78 | 9% | $ 36,897.40 | 1064 | $ 48,947.43 | 4.51% | 1466 | $70,356.13 | 13,518 | 15.48% | 94 | $ 4,274.13 | $74,630.26 |
| AE Checking | Feb-11 | - | $ - | #DIV/0! | - | #DIV/0! | #### | $ - | #### | $ - | 0 | $ - | 0.00% | | $ - | - | #DIV/0! | 0 | $ - | $ - |
| JETY | Feb-11 | 44,742 | $ 1,778,218.06 | $ 39.74 | 950,992.14 | $ 38.93 | 53% | $ 77,621.45 | 8% | $ 95,099.22 | 2339 | $ 91,058.24 | 5.23% | 2,125 | $ 102,923.52 | 20,314 | 9.34% | 156 | $ 7,514.56 | $110,438.08 |
| LandMark | Feb-11 | 4,871 | $ 113,460.73 | $ 23.29 | 73,152.51 | $ 24.75 | 64% | $ 7,015.30 | 10% | $ - | 72 | $ 1,781.79 | 1.48% | 14 | $ 699.86 | 1,915 | 0.47% | 0 | $ - | $ 699.86 |
| GrandTotal | Feb-11 | 49,613 | $ 1,891,678.79 | $ 38.13 | #### | #### | 54% | $84,636.75 | 8% | $ 95,099.22 | 2411 | $ 92,840.03 | 4.86% | 2139 | #### | 22,229 | 8.38% | 156 | $ 7,514.56 | #### |
| | | | | | | | | | | | | | | | | | | | | |
| **12/09 - 02/11** | | | | | | | | | | | | | | | | | | | | |
| AE Checking | | 989 | $ 26,751.20 | | $ 19,272.06 | | | $ 1,871.96 | | $ 2,127.24 | 116 | $ 2,422.43 | | 25 | $ 304.73 | 322 | | 136 | $ 3,426.79 | $ 3,731.52 |
| JETY | | 278,272 | $ 7,913,605.88 | | $ 3,834,381.34 | | | $ 531,581.49 | | $ 379,565.44 | 11,720 | $ 368,720.27 | | 7,883 | $ 314,476.08 | 154,788 | | 952 | $ 30,889.22 | $ 345,365.30 |
| LandMark | | 86,701 | $ 3,318,815.88 | | $ 1,437,141.74 | | | $ 94,148.83 | | $ 6,463.76 | 1,054 | $ 41,444.73 | | 4,344 | $ 215,774.94 | 54,489 | | - | $ - | $ 215,774.94 |
| **GrandTotal** | | #### | #### | | #### | | | #### | | #### | 12,252 | #### | | #### | #### | #### | | 1,088 | #### | #### |

Exhibit 35

**HB**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FILED
NOV 1 9 2012
MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. **12    6500** |
| | : | |
| FIRST BANK OF DELAWARE, | : | |
| | : | |
| Defendant. | : | |

## C I V I L   C O M P L A I N T

Plaintiff, the United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and Joel M. Sweet, Susan Dein Bricklin, and Judith A. Amorosa, Assistant United States Attorneys for the same district, alleges as follows:

1.      This is a civil action by the United States of America against First Bank of Delaware ("First Bank of Delaware" or the "Bank").

2.      From 2009 to 2011, First Bank of Delaware engaged in a scheme to defraud consumers by originating electronic-payment transactions knowing, or by remaining willfully blind to the fact, that the consumer authorizations for the transactions had not been obtained, or had been obtained by dishonest merchants using fraud, trickery, and deceit.

3.      First Bank of Delaware originated more than two million debit transactions – worth more than a hundred million dollars – on behalf of third-party payment processors in cahoots with fraudulent Internet and telemarketer merchants, and directly with other fraudulent merchants.

4.     First Bank of Delaware was at all relevant times under obligations pursuant to federal statutes and regulations, including but not limited to the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., Section 326 of the USA Patriot Act, 31 U.S.C. § 5318, and regulations including 31 C.F.R. § 103.11 et seq. (2009) (amended 31 C.F.R. § 1020 et seq. (2011)), to know the entities to whom it provided access to the banking system, and to have established procedures to prevent the Bank from providing banking system access to parties engaged in fraud against consumers. First Bank of Delaware ignored and violated these obligations.  As a consequence, First Bank of Delaware and the merchants and third-party payment processors for whom First Bank of Delaware originated fraud-tainted transactions caused significant losses to consumers.

## I.
## JURISDICTION AND VENUE

5.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1345 (United States as plaintiff).

6.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because defendant First Bank of Delaware operates and maintains its management offices and its operations center in this district, and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this district.  First Bank of Delaware conducts business within this district.

## II.
## PARTIES

7.     Plaintiff is the United States of America.

8.     Defendant is First Bank of Delaware, a corporation established under the laws of Delaware.  First Bank of Delaware's primary location for all business activity is 50 South 16th Street, Philadelphia, PA 19102.  This location also is where all of the Bank's senior officers have

primary offices, and where the Bank's operations center is located.  First Bank of Delaware also maintains an office at 1000 Rocky Run Parkway, Wilmington, Delaware.

9.  As of December, 31 2011, First Bank of Delaware had more than $200 million in assets and shareholder equity in excess of $40 million.

10.  Initially, the Bank's business model was more closely aligned with a high yielding consumer finance company than with a traditional community bank.  The Bank offered a variety of consumer products, including credit and banking services, short-term consumer installment loans, credit and prepaid card products.

11.  In or about late 2009, First Bank of Delaware developed an electronic payment program ("E-Payment Program") through which it originated electronic credit and debit transactions on behalf of third-party payment processors and merchants.

12.  First Bank of Delaware's Chief Executive Officer at all relevant times hereto was Alonzo J. Primus.  At various times Primus also served in additional senior management positions at the Bank.

13.  In addition to Primus, officers of the Bank with responsibility for implementation and/or oversight of its E-Payments Program include:  Sian Bastable, Vice President and Director of E-Payments Program;  Lisa Vandercook, Chief Risk and Compliance Officer; and Daniel Mignogna, Executive Vice President and Chief Operating Officer.

14.  During the past several years, the Better Business Bureau's rating for First Bank of Delaware – on a scale of A to F – was an F.  The ratings have been based on numerous consumer complaints, particularly concerning billing and collections.

15.     First Bank of Delaware has had a troubling history of regulatory actions.  On or about October 9, 2008, First Bank of Delaware agreed to the imposition of a Consent Order as a result of adverse findings by the Bank's regulator, the Federal Deposit Insurance Corporation ("FDIC"), concerning the operation of the Bank.

16.     On or about December 29, 2011, First Bank of Delaware agreed to another FDIC Consent Order.  The FDIC's findings specifically addressed the Bank's origination of electronic payments for third-party payment processors, suspected fraudulent merchants, and money services businesses.  The FDIC required First Bank of Delaware to terminate its electronic payments program, including any and all services, products, and/or relationships involving payment processing by or through an automated clearing house, the origination and/or processing of remotely created checks, and/or merchant acquisition.

17.     On May 2, 2012, First Bank of Delaware announced publicly its intention to sell its assets to another financial institution and to cease banking operations by the end of 2012.  On October 23, 2012, the Bank's shareholders' approved the Bank's dissolution.

### III.
### THE FINANCIAL INSTITUTIONS REFORM, RECOVERY AND ENFORCEMENT ACT

18.     The United States seeks civil penalties under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

19.     In 1989, Congress enacted FIRREA as part of a comprehensive legislative plan to reform and strengthen the banking system and the federal deposit insurance system that protects the public from bank failures.  Toward that end, FIRREA authorizes civil enforcement of

enumerated criminal predicate offenses – as established by a preponderance of the evidence – that affect financial institutions and certain government agencies.

20.     There are several predicate criminal offenses that can form the basis of liability under FIRREA.  See 12 U.S.C. § 1833a(c) (Title 18, Sections 215, 656, 657, 1005, 1006, 1007, 1014, 1344; Sections 287, 1001, 1032, 1341, and 1343, affecting a federally insured financial institution; and Title 15, Section 645(a)).

21.     The criminal offense relevant to this case is 18 U.S.C. § 1343 – Wire Fraud, affecting a federally-insured financial institution.  Section 1343 proscribes the use of a "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ."

22.     The knowledge element of a wire fraud charge can be satisfied with evidence that a defendant "deliberately closed his eyes to what otherwise would have been obvious to him." United States v. Leahy, 445 F.3d 634, 652 (3d Cir. 2006).

23.     FIRREA's penalty provisions provide that the United States may recover civil penalties (paid to the United States Treasury) of up to $1 million per violation, or, for a continuing violation, up to $1 million per day or $5 million, which ever is less.  12 U.S.C. § 1833a(b)(1)-(2).  The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.  12 U.S.C. § 1833a(b)(3).

24.     The United States alleges that First Bank of Delaware violated 18 U.S.C. § 1343 affecting a federally-insured financial institution, that the Bank is civilly liable under FIRREA,

and that the United States is entitled to recover as a civil penalty an amount equal to the losses of the consumers victimized by First Bank of Delaware and the third-party payment processors and fraudulent merchants to whom the Bank provided access to consumers' bank accounts.

## IV.
## THE ESSENTIAL ROLE OF BANKS IN
## MASS MARKET CONSUMER FRAUD SCHEMES

25.     Mass market consumer fraud refers to schemes directed at large groups of individuals most often facilitated through the Internet, by telemarketers, and through United States Postal Service mail.

26.     Senior citizens are the most common victims of mass market fraud schemes, such as fraudulent telemarketing.  According to the AARP, the National Association of Attorneys General, and the Federal Trade Commission, the majority of fraudulent telemarketing victims are age sixty-five or older.

27.     Mass market consumer fraud generally involves a scheme that uses deceptive and misleading offers for products and services to induce unsuspecting consumers to provide personal payment information, such as a credit card number or a bank account number.

28.     Once in possession of consumers' personal payment information, the scammer – referred to here as the fraudulent merchant – must access the banking system to gain access to the consumer's money.

29.     Fraudulent merchants, however, cannot directly access the national banking payment system.  To take consumers' money, a fraudulent merchant must establish a relationship with a bank.  The bank must agree to originate debit transactions through the national banking system by which money will be withdrawn from consumers' bank accounts and transferred to the fraudulent merchant's bank account.

30.     Banks value their reputations and generally do not want to appear to be doing business with fraudulent merchants.  For this reason, banks often will not agree to provide access to the national banking system directly to a merchant with a dubious background and suspicious, high risk business practices.

31.     To overcome this hurdle and gain access to the national banking system and consumers' accounts, fraudulent merchants often engage third-party payment processors to establish a relationship with a bank.  A third-party payment processor serves as an intermediary between the fraudulent merchant and the bank.  Through this relationship, a bank can profit from the fees it receives from the third-party payment processor and the fraudulent merchant, while avoiding a direct relationship with the fraudulent merchant and the scrutiny that such a relationship would draw to the bank.

32.     A bank is required by law to take steps to enable it to form a reasonable belief that it knows the nature of it clients and their businesses.  Mandated Know Your Customer ("KYC") rules are designed to assure that a bank understands the business and character of its clients to whom it is allowing access to the national banking system.  Similarly, banks are required to have effective compliance programs to prevent illegal use of the banking system by the bank's clients.  See Bank Secrecy Act, 31 U.S.C. § 5311 et seq., and implementing regulations.

33.     Banks such as First Bank of Delaware are required to conduct meaningful investigations of new clients at the time of the opening of an account.  Before opening a new account for a new client, a bank is required to have in place a Customer Identification Program ("CIP") that is appropriate for its size and type of business, and that includes certain minimum requirements.  Banks are required to have a CIP incorporated into the bank's Bank Secrecy

Act/Anti-Money Laundering compliance program. The CIP is intended to enable the bank to form a reasonable belief that it knows the true identity of each of its customers. A CIP must include account opening procedures that specify identifying information obtained from each customer. A CIP is required to include reasonable and practical risk-based procedures for verifying the identity of each client. See 31 C.F.R. § 103.121 (2009) (amended 31 C.F.R. § 1020.220 (2011))

34.     By conducting a meaningful KYC analysis, including an assessment of the client's customer base and product offerings, a bank such as First Bank of Delaware was required to collect information sufficient for the bank to determine whether a client posed a threat of criminal or other improper conduct. See Federal Financial Institutions Examination Council Bank Secrecy/Anti-Money Laundering Examination Manual (2006) at 21 (information required to be collected includes purpose of the account, actual and anticipated activity in the account, the nature of the client's business, the client's location, and the types of products and services the client intended to offer).

35.     The banking industry is aware that there is significant risk in originating transactions for third-party processors, particularly where a bank does not have a direct relationship with the merchants for whom it is originating the transactions. The banking industry also knows that fraudulent merchants attempt to frustrate banks' KYC efforts by using third-party payment processors to establish indirect relationships with banks.

36.     Federal bank regulators issued additional explicit warnings to the banking industry about the risk of payment processor relationships in 2008, after Wachovia Bank agreed to settle class action litigation and a regulatory action in connection with alleged consumer fraud. Wachovia Bank had originated transactions for several third-party payment processors and

-8-

scores of fraudulent telemakers causing more than $160 million in consumer losses, resulting in a criminal prosecution of that bank.

37.     By the time First Bank of Delaware began to originate electronic transactions for third-party payment processors and fraudulent merchants, the FDIC already had warned banks that third-party payment processors and merchants with high rates of returned transactions may indicate fraud against consumers.  The FDIC explained to banks:

> Financial institutions that initiate transactions for payment processors should implement systems to monitor for higher rates of returns or charge backs, which often are evidence of fraudulent activity.  High levels of [transactions] returned as unauthorized or due to insufficient funds can be an indication of fraud.

FDIC Guidance of Payment Processor Relationships (FDIC FIL-127-2008) (November 7, 2008).

38.     The FDIC further stated that banks should take affirmative steps to assure that they are not abetting consumer fraud by taking additional steps, including the following: (a) monitor all transaction returns (unauthorized returns and total returns); (b) review third-party payment processor promotional materials to determine its target clientele; (c) determine whether the third-party payment processor resells its services to other entities; (d) review the third-party payment processor's policies and procedures to determine adequacy of merchant due diligence; (e) review main lines of business and return volumes for third-party payment processor's merchants; (f) require that the third-party payment processor provide the bank with information about its merchants to enable the bank to assure that the merchant is operating a legitimate business.  Id.; see also FDIC Guidance for Managing Third-Party Risk (FIL-44-2008) (June 2008).

39.     By the time First Bank of Delaware began to originate electronic transactions for third-party payment processors and fraudulent merchants, the Office of the Comptroller of the

Currency ("OCC") had warned the banking industry of the risks in providing banking services to third-party payment processors on behalf of telemarketers and other merchant clients.  See Payment Processor, Risk Management Guidance (OCC-2008-12) (April 24, 2008).  The OCC specifically warned banks to implement a risk management program that included procedures for monitoring processor information such as merchant data, transaction volume, and charge-back history.

40.     By the time First Bank of Delaware began to originate electronic transactions for third-party payment processors and fraudulent merchants, the Federal Financial Institutions Examination Council ("FFIEC") had already for several years been warning the banking industry that third-party payment processors pose a significant risk of consumer fraud.  FFIEC, which comprises all of the federal bank regulatory agencies and is empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions, advised:

> Banks with third party payment processor customers should be aware of the heightened risk of unauthorized returns and use of services by higher-risk merchants.  Some higher-risk merchants routinely use third parties to process their transactions because of the difficulty they have in establishing a direct bank relationship. These entities might include certain mail order and telephone order companies, telemarketing companies, illegal online gambling operations, online payday lenders, businesses that are located offshore, and adult entertainment businesses.  Payment processors pose greater money laundering and fraud risk if they do not have an effective means of verifying their merchant clients' identities and business practices.  Risks are heightened when the processor does not perform adequate due diligence on the merchants for which they are originating payments.

Bank Secrecy Act Anti-Money Laundering Examination Manual:  Third-Party Payment

Processors – Overview (2010).[1]

>    **A.**    **ACH Debits and Remotely-Created Checks:  Payment Instruments**
>         **Favored By Third-party Payment Processors and Their Fraudulent**
>         **Merchants.**

41.    Automated Clearing House ("ACH") debit transactions and remotely-created

checks ("RCCs') are two of the primary transaction instruments used by mass market fraudulent

merchants to take money from consumers' bank accounts.

42.    ACH is an electronic network for financial transactions in the United States.

ACH processes large volumes of transactions, both credits into accounts and debits out of

accounts, for merchants.  The rules and regulations governing the ACH network are established

by NACHA (formerly the National Automated Clearing House Association) and the Federal

Reserve.

---

[1]  At the time First Bank of Delaware originated fraud-tainted transactions on behalf of third-party payment processors and merchants, regulatory guidance to banks was clear and unambiguous.  Since then, regulators have reemphasized past guidance.  For example, the FDIC issued "Payment Processor Relationships – Revised Guidance" (FIL-3-2012) (January 31, 2012) ("*Financial institutions that fail to adequately manage [third-party payment processor] relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices*" (italics in original); see also "Managing Risks in Third-Party Payment Processor Relationships," FDIC Supervisory Insights Journal (Summer 2011).

Similarly, the Financial Crimes Enforcement Network of the Department of the Treasury ("FinCEN"), which is charged with protecting the nation's financial system from money laundering and terrorist financing, recently issued an Advisory that further emphasized the risks arising from bank relationships with third-party payment processors.  The Advisory highlights the need for banks to conduct due diligence of processors and their merchants, to pay close attention to return and chargeback rates, and the need for banks to assure that processors have obtained all necessary state licenses, registrations, and approvals.  See "Risk Associated with Third-Party Payment Processors," (FIN-2012-A010) (October 22, 2012), www.fincen.gov/statutes_regs/guidance/html/FIN-2012-A010.html.

43.     An RCC is a check created not by the account holder but rather by a third-party using the account holder's name and bank account information.[2] Unlike ordinary checks, RCCs are not signed by the account holder. In place of the account holder's signature, an RCC contains a statement claiming that the customer has authorized the check. Often an RCC will have a legend stating something similar to "Authorized By Your Depositor No Signature Required Reference # XXXXXX."

44.     RCCs are notorious in the banking industry and in the consumer protection community as instruments of fraud. In a 2005 letter to the Board of Governors of the Federal Reserve System, the Attorneys General of 35 states jointly urged that RCCs be eliminated from the banking system. The Attorneys General explained that RCCs are "used to perpetrate fraud on consumers" by causing the withdrawal of money from consumers' bank accounts without authorization.

45.     From 2009 to 2011, First Bank of Delaware originated more than $138 million in RCC transactions on behalf of merchants and third-party payment processors.

46.     To execute valid ACH and RCC debit transactions, an initiating merchant must provide to its own bank: (1) a consumer's bank routing number; (2) a consumer's bank account number; and (3) proof that the consumer authorized the transaction.

47.     This case concerns First Bank of Delaware's knowledge – or willful blindness to the fact – that the ACH debit and RCC transactions that it originated for its merchants and third-party processors were not based on consumer authorizations, but instead were based on fraud.

---

[2] RCC's also are referred to as "demand drafts," "preauthorized drafts," "electronic RCCs," "electronic payment orders, remotely-created payment orders," "electronic checks," and "check 21 e-checks."

**B.      High Return or Chargeback Rates Are a Red Flag That A Bank's Client Merchant Is Defrauding Consumers.**

48.      A rejected ACH debit or RCC transaction is referred to in the banking industry as a "return" or a "chargeback." A return or chargeback reflects a transaction that was rejected by the consumer or the consumer's bank and was thus not successful in taking funds from the account of the consumer. A return "rate" refers to number of returned items compared to the number of originated transactions during a particular time period.

49.      High return rates are not absolute proof of fraud; rather, they are a red flag that a merchant's practices may be deceptive or otherwise dishonest. High return rates trigger a duty by the bank and the third-party payment processor to inquire into the reasons for the high rate of returns, and specifically whether the merchant is engaged in fraud.

50.      ACH debits and RCCs may be rejected for a number of reasons, including lack of authorization by the consumer, insufficient funds in the consumer's account, or a closed account. "Unauthorized" returns expressly reflect a consumer having denied that he or she authorized a transaction. Other stated return reasons similarly reflect unauthorized or suspicious transactions requiring inquiry and investigation. For example, returned RCCs stamped "Refer to Maker" are widely known in the banking industry to reflect inadequate consumer authorization or to be otherwise suspicious. Likewise, high rates of returns for reasons such as "closed account" can reasonably suggest that consumers were forced to close their bank accounts to protect themselves from further unauthorized withdrawals. High rates of returns for "insufficient funds" may be evidence that prior unauthorized withdrawals have depleted a consumer's bank account. Accordingly, high rates of total returns (as opposed to only unauthorized returns) may indicate potential fraud and must trigger inquiry.

-13-

51.     ACH debit transaction return rates are relatively easy to monitor electronically because the transactions are processed through the clearing houses.  Under the applicable NACHA rules, a bank or a merchant must take corrective action where a merchant's unauthorized return transaction rate for ACH debits exceeds 1 percent.

52.     RCCs returned transactions are not monitored electronically and there is no threshold for corrective action.  Banks therefore must analyze return transaction rates for the RCCs that it submits into the national banking system, and consider the returned transaction rate in the context of the fact that the return rate for all checks transacted through the national banking system is only one half of one percent (.5 percent).

## V.
## FIRST BANK OF DELAWARE ENGAGED IN WIRE FRAUD BY PROCESSING RCC AND ACH TRANSACTIONS THAT IT KNEW WERE BASED ON FRAUD AGAINST CONSUMERS

53.     Many banks heeded the guidance of federal bank regulators and law enforcement and scrutinized their relationships with third-party payment processors and high-risk merchants to protect consumers from fraud and to protect themselves from reputational, regulatory, and legal risk.

54.     First Bank of Delaware was not one of those banks.  On the contrary, First Bank of Delaware recognized that enormous profits could be reaped by originating electronic transactions on behalf of fraudulent merchants directly and through third-party payment processors.  For First Bank of Delaware, the potential profits outweighed the fraud risk to consumers.

55.    First Bank of Delaware engaged in wire fraud by processing RCC and ACH transactions that it knew were based on fraud against consumers, or by remaining willfully blind to that fact. This was not surprising in light of the Bank's history.

56.    First Bank of Delaware's business practices have become the subject of law enforcement and consumer protection agencies' actions for years. For example, on April 26, 2007, the State of California filed an action against First Bank of Delaware alleging that First Bank of Delaware and others engaged in unlawful and deceptive business practices to avoid California laws regulating the provision of payday loans and other types of short-term consumer loans to California customers. See The People of the State of California v. Check 'N Go of California, Inc., et al., Superior Count of California, County of San Francisco, Civil Action No. 07-462779.

57.    On or about June 10, 2008, the FDIC initiated an enforcement action against First Bank of Delaware and other financial institutions in connection with the marketing of sub-prime credit cards in violation of the Federal Trade Commission Act. The FDIC and the State Bank Commissioner of Delaware found deficiencies in the Bank's management, board participation, strategic planning, oversight of third parties, and compliance management system and audit program. As previously alleged, in a Consent Order dated on or about October 9, 2008, First Bank of Delaware was required to terminate third-party lending programs and to substantially increase its board of directors and management oversight of its business. The FDIC also required First Bank of Delaware to establish an account in the amount of $700,000 to ensure the availability of restitution to its consumer victims, and to pay a $304,000 civil money penalty to the United States Treasury.

-15-

58.     Forced to end lucrative predatory activities, First Bank of Delaware looked to develop alternative revenue streams that would provide high financial returns, and considered businesses such as electronic payment services, prepaid credit cards, and check cashing operations.

59.     By June 2009, First Bank of Delaware had decided to develop what it called an "E-Payments Program" that it anticipated would generate fee income from the origination of electronic payments. The E-Payments Program would have three primary components: (1) originating RCC transactions; (2) originating ACH transactions; and (3) credit card merchant acquisition.

60.     First Bank of Delaware recognized that the E-Payments Program business model would involve high risk to the Bank. The Bank specifically knew that it would be providing RCC transaction services to high risk Internet merchants. In fact, Chief Executive Officer Primus and Chief Risk and Compliance Officer Vandercook repeatedly informed the Bank's Board of Directors that the Bank would have a "robust oversight process" to protect against that risk. The oversight process was to include due diligence of third-party payment processors and merchants, monitoring of the "volume of net returns" of transactions, and a variety of other regular monitoring practices. Primus also announced the creation of an E-Payments Program Risk Committee, which he said would be comprised of officers of the Bank.

61.     In 2010, First Bank of Delaware agreed to originate debit transactions for third-party payment processors Landmark Clearing, Inc. ("Landmark Clearing"), Automated Electronic Checking, Inc. ("AEC"), Check Site, Inc. ("Check Site"), and Check 21.com, LLC ("Check 21"). The Bank's Board of Directors had been informed that Vandercook was deeply involved in the due diligence investigations of these four third-party payment processors.

-16-

62.     In recognition of the risk, the Bank included numerous provisions in its contracts with the third-party processors addressing return rates for RCCs. The contracts included provisions that if any of the merchant returns of "unauthorized," "fraud," or any other category of "unauthorized" return exceeded one (1) percent of originated volumes, at the sole discretion of the Bank, the Bank could retain money in the processor's reserve accounts. Further, unauthorized return activity above certain thresholds could result in termination and/or suspension of RCC processing, in the Bank's sole discretion.

63.     By May 10, 2010, according to Board of Director Meeting minutes, the Bank had developed a strategy to grow its E-Payments Program. First Bank of Delaware anticipated that its revenue from its E-Payments Program would grow from $150,000 in 2010 to $2,000,000 in 2011 – an increase of more than 1,300 percent.

64.     By this time, however, the Bank already knew that its E-Payment Program was under the scrutiny of regulators because its return transaction rate was extremely high, and that the high return rates indicated that the Bank was originating fraud-tainted transactions. In May 2010, a Federal Reserve official wrote to First Bank of Delaware stating:

> [A] return rate of 10% (which is on its face significantly in excess
> of industry norms) would likely be regarded by bank supervisory
> agencies and/or law enforcement agencies as prima facie evidence
> that your bank knew or should have known that your [third-party
> payment processors and/or merchants] had engaged in fraudulent
> activities. Whether a return rate of 10% might expose your bank
> to potential liability is an issue that we urge you to consider
> carefully in consultation with your legal counsel.

65.     In August 2010, First Bank of Delaware originated more than $4.9 million in debit transactions for Landmark Clearing, more than $7 million in debit transactions for Check

-17-

Site, and more than $1.2 million in debit transactions for Check 21. First Bank of Delaware also originated more than $1.5 million in transactions for a merchant known as Monster Rewards.

66.     First Bank of Delaware recognized that high return rates on RCC transactions were a red flag warning of risk to the Bank. Primus informed the Bank's Board of Directors in August 2010 that the Bank would perform "high level monitoring of any merchant" with an unauthorized return rate of 2 percent or more, and that a risk committee would review merchants with high return rates, as well as "monitor return reasons, customer calls and any complaints to determine whether merchants should be terminated."

67.     By October 2010, Executive Vice President and Chief Operating Officer Mignogna informed the Bank's Board of Directors that ACH transaction volume had reached $100 million per month, and that RCC volume had reached $10 million per month. Mignogna further stated that the Bank had terminated merchants for high unauthorized return rates and complaints, and that the Bank was "constantly monitoring return and chargeback rates to ensure we manage risk in the portfolio."

68.     Despite the Bank officers' assurances to the Board of Directors regarding the Bank's purported robust compliance plan, third-party payment processors Landmark Clearing, Check Site, Check 21, and AEC had aggregate return rates on RCC transactions exceeding 50 percent. Indeed, often the return rates were significantly higher than 50 percent. By comparing a single month's originated transactions to the same month's returned items to achieve a return rate, in December 2010 AEC processing for ZaZaPay had a return rate of 81 percent. In the same month Landmark Clearing processing for Platinum Online Group had a return rate of 84 percent. In September 2010, Check 21 processing for Complete Family Coverage had a return

-18-

rate of 84 percent. And in August 2010, Check Site processing for Belfort Capital Ventures had a return rate of 57 percent.

69.     For one or more months between April 2010 and March 2011, the same third-party payment processors also had unauthorized return rates well above two percent for some of their merchants – exceeding the Bank's stated threshold for merchant termination. For example, in June, July and August, 2010, Check 21's merchant Web Savers had unauthorized return rates of 7.28 percent, 6.36 percent, and 10.24 percent, respectively, yet the Bank did not terminate Web Savers in accordance with its stated policy.

70.     On January 14, 2011, the Bank's Board of Directors learned at an FDIC exit interview that the FDIC had grave concerns about the Bank's E-Payments Program. The Board of Directors ordered the Bank's officers to disclose additional facts about the E-Payments Program. The Board of Directors thereafter concluded that the Bank's underwriting of its merchants and third-party payment processors had not been adequate, that certain merchants experienced very high return rates, and – in an extraordinary example of understatement – that some merchants "offer products whose value to the consumer could be questioned."

71.     In January 2011, Primus informed the Board of Directors that by February 28, 2011, the Bank would terminate certain high risk merchants that represented 90 percent of the Bank's RCC transaction volume. In fact, the Bank did not terminate most of the fraudulent merchants until late-Spring 2011.

72.     The remaining components of the Bank's E-Payments Program – ACH debit transactions and merchant acquiring – also experienced similar problems. A review of First Bank of Delaware's merchant acquiring program conducted in January 2011 revealed significant material failures by the Bank in conducting due diligence and monitoring. As a result of the

-19-

Bank's relationship with merchant LeanSpa, LLC, which markets a supposed weight-loss supplement, the Bank was required to pay VISA more than $1.8 million in chargeback fees. First Bank of Delaware finally terminated LeanSpa in April 2011 due to excessive chargebacks.

73.     First Bank of Delaware provided banking services to at least four third-party payment processors, each of which provided services to a substantial number of merchants with extremely high return rates on consumer transactions. First Bank of Delaware earned a substantial profit from these relationships. For third-party payment processor Landmark, First Bank of Delaware earned a fee of $1.00 for each returned transaction, and $2.00 for each return transaction identified as unauthorized. The higher fee for returned transaction identified as unauthorized recognized the greater risk to the Bank associated with initiating transactions for merchants engaged in fraud.

74.     First Bank of Delaware processed RCCs for these third-party payment processors despite red flags warning that the consumer authorizations supporting the transactions were not genuine, or were induced through fraud. These red flags include (but are not limited to) the high aggregate return rates experienced by these processors for their RCC transactions – a plain indication that the merchants were not honest with consumers.

75.     First Bank of Delaware knew that:

        a.      Landmark Clearing initiated more than 950,000 RCC transactions for an aggregate dollar amount of more than $57.2 million during the time period April 2010 to March 2011. The aggregate return rate for these transactions was more than 53 percent on a transaction basis, and more than 60 percent on a dollar basis.

        b.      Check Site initiated more than 1.2 million RCC transactions for an aggregate dollar amount of more than $46.7 million during the time period May 2010 to March

2011. The aggregate return rate for these transactions was more than 55 percent on a transaction basis, and more than 42 percent on a dollar basis.

      c.     Check 21 initiated more than 353,000 RCC transactions for an aggregate dollar amount of more than $15.4 million during the time period April 2010 to March 2011. The aggregate return rate for these transactions was more than 55 percent on a transaction basis, and more than 56 percent on a dollar basis.

      d.     AEC initiated more than 126,000 RCC transactions for an aggregate dollar amount of more than $4.2 million during the time period September 2010 to March 2011. The aggregate return rate for these transactions was more than 55 percent on a transaction basis, and more than 59 percent on a dollar basis.

      76.     These return rates are significant in that they reveal that more than half of the withdrawal transactions that First Bank of Delaware originated on behalf of third-party payment processors were rejected by consumers or by consumers' banks.

      77.     The government alleges that the Bank – through its officers Primus, Vandercook, Bastable and Mignogna – knew that the merchants for whom First Bank of Delaware processed transactions were engaged in consumer fraud.

      78.     First Bank of Delaware created internal policies, and included contract provisions in its agreements with third-party processors and merchants, that required due diligence and monitoring of high return rates. Rather than implement these policies and provisions – which would have required the termination of merchant processing and the loss of revenue for First Bank of Delaware – First Bank of Delaware consciously ignored its own policies.

      79.     First Bank of Delaware failed to conduct due diligence, and it ignored extraordinarily high return rates, so that it could continue to provide banking services for

obviously fraudulent merchants and their accomplice third-party payment processors. First Bank of Delaware ignored information that plainly revealed that merchants or third-party payment processors were engaged in fraud.

## VI.
## FIRST BANK OF DELAWARE ENGAGED IN WIRE FRAUD AGAINST CONSUMERS WITH A LARGE NUMBER OF THIRD-PARTY PAYMENT PROCESSORS AND MERCHANTS

80.     First Bank of Delaware processed payments for at least four third-party payment processors and more than 40 merchant clients. Following is merely a sample of the third-party payment processors and merchants with whom First Bank of Delaware engaged in wire fraud against consumers.

### A.     Landmark Clearing

81.     First Bank of Delaware engaged in wire fraud by providing third-party payment processor Landmark Clearing and its fraudulent merchants access to the national banking system to further a scheme to take money illegally from consumers' accounts.

82.     On or about January 6, 2010, First Bank of Delaware entered into a written agreement with third-party payment processor Landmark Clearing of 5340 Legacy Drive, Plano, Texas. The agreement provided that First Bank of Delaware would process RCC transactions for Landmark Clearing and its merchant clients.

83.     Landmark Clearing agreed to pay First Bank of Delaware 25 cents for each credit or debit transaction, $2 for each unauthorized return, and $1 for each other return.

84.     Disregarding its obligation to conduct due diligence on merchants for whom it is providing access to the national banking system, First Bank of Delaware abdicated virtually all of its responsibilities to Landmark Clearing, agreeing that Landmark Clearing would have

-22-

"primary responsibilities with respect to the granting, extension or continuance of service to any [m]erchant" for whom First Bank of Delaware would originate RCC transactions.

85.     On December 15, 2011, the FTC filed a complaint against third-party payment processor Landmark Clearing and its officers Larry Wubbena and Eric Loehr. The FTC alleged that "since at least November 2008" (which includes the time period when the Bank was originating RCC transactions for Landmark Clearing) Landmark debited consumer bank accounts on behalf of its merchants, despite substantial evidence that consumers had not authorized debits to their bank accounts. Landmark Clearing consented to a permanent injunction. See FTC v. Landmark Clearing, Inc., et al., Civil Action No. 4:11-CV-00826 (E.D. Tex.).

86.     First Bank of Delaware used the Internet and telephones to communicate across state lines for the purpose of transferring information between itself and Landmark Clearing to further their common scheme to defraud consumers, and to conspire to obtain money by means of false or fraudulent pretenses, representations, or promises.

### B.     Direct Benefits Group

87.     First Bank of Delaware engaged in wire fraud by providing merchant Direct Benefits Group access to the national banking system to further a scheme to take money illegally from consumers' accounts.

88.     Direct Benefits Group was a merchant of Landmark Clearing and Check 21. Direct Benefits purported to offer consumers a discount program for savings on a variety of consumer goods and services.

89.     During 2010 and 2011, First Bank of Delaware originated more than $11.9 million in RCC transactions (more than 254,000 transactions) on behalf of Direct Benefits

-23-

Group. In many months during this period, the return rate for Direct Benefits transactions was over 60 percent.

90.     First Bank of Delaware was aware that Direct Benefits was cheating consumers, or it remained willfully blind to that fact. The owner of Direct Benefits, Kyle Wood, was an officer of a company, City West Advantage, Inc., that had previously been the subject of a 2008 FTC complaint alleging violations related to deceptive telemarketing sales calls and the unauthorized use of RCCs. City West Advantage was the subject of a July 2009 final judgment and order for permanent injunction in a case brought by the FTC. First Bank of Delaware had a duty to know these facts before providing Direct Benefits Group access to the national banking system and consumers' bank accounts.

91.     First Bank of Delaware continued to process for Direct Benefits Group until at least March 2011.

92.     On August 19, 2011, the FTC obtained a federal court preliminary injunction against Direct Benefits Group, LLC, its owner Kyle Wood, and other defendants. The FTC had alleged that "since at least September 2009" – which includes the period when the Bank was originating RCC transactions for Direct Benefits Group – Direct Benefits Group debited consumers' bank accounts without their knowledge or consent after Direct Benefits Group had collected financial information from consumers who were seeking payday loans. The court found that Direct Benefits Group had engaged in misleading and deceptive conduct against consumers and therefore entered asset restraints and appointed a permanent receiver. See FTC v. Direct Benefits Group, LLC, et al., Civil Action No. 6:11-CV-01186 (M.D. Fla.).

93.     First Bank of Delaware used the Internet and telephones to communicate across state lines for the purpose of transferring information between itself and Landmark Clearing

-24-

and/or Direct Benefits Group to further their common scheme to defraud consumers, and to conspire to obtain money by means of false or fraudulent pretenses, representations, or promises.

### C. The ZaaZoom Companies and their Processors

94.     First Bank of Delaware engaged in wire fraud by providing merchants ZaaZoom Solutions ("ZaaZoom") and ZaZaPay access to the national banking system to further a scheme to take money illegally from consumers' accounts.

95.     Between May 2010 and March 2011, First Bank of Delaware processed electronic RCC payments for ZazaPay, a company purporting to offer various online marketing services. First Bank of Delaware processed for ZazaPay through several payment processors, including AEC and a chain of two third-party payment processors – the transactions were processed through two payment processors, including Check Site.

96.     Despite the already high return rates generated by ZazaPay through these two payment processors, First Bank of Delaware then agreed to simultaneously process electronic RCC payments for Zaazoom Solutions, a company related to ZazaPay, through yet another payment processor, Landmark. First Bank of Delaware provided banking services to ZaaZoom Solutions despite knowing that it was under scrutiny for potential unfair and deceptive trade practices.

97.     ZaaZoom Solutions was a merchant of Landmark Clearing. ZaaZoom purported to offer online advertising services. First Bank of Delaware began to originate RCC transactions for ZaaZoom in April 2010. During an eleven month period, the Bank originated more than $14.8 million in RCC transactions (more than 460,000 transactions) on behalf of ZaaZoom. The return rate for ZaaZoom transactions was over 51 percent. First Bank of Delaware continued to originate RCC transactions for ZaaZoom until at least February, 2011.

-25-

98.     Consumer plaintiffs in a class action lawsuit filed in 2011 allege that Zaazoom lured victims into applying for payday loans on internet websites and, in cahoots with First Bank of Delaware, used the applicants' personal banking information to take money from their accounts without authorization.  See Marsh v. Zaazoom Solutions, LLC., et al., Civil Action No. 11-5226(N.D. Cal.).

99.     First Bank of Delaware monthly generated reports  that indicated  ZaZaPay's return rate for the transactions it processed from September 2010 through February 2011. During that time the reports indicated that for the transactions processed through AEC the unauthorized return rate ranged from less than 1 percent for the first month to 4.3 percent.  The overall return rate was approximately 56 percent.  ZaZaPay also processed through Checksite from May 2010 through February 2011. With Checksite their unauthorized return rate ranged from less than 1 percent during the first month to 6.72 percent.  Their total return rate for the transactions processed through Checksite was approximately 57 percent.  Despite its own policies and procedures,  First Bank of Delaware did not stop providing ZaZaPay access to the banking system until after February 2011.

100.     First Bank of Delaware used the Internet and telephones to communicate across state lines for the purpose of transferring information between itself and third-party payment processors Landmark, AEC and Check Site, and/or their merchants Zaazoom and ZaZaPay, to further their common scheme to defraud consumers, and to conspire to obtain money by means of false or fraudulent pretenses, representations, or promises.

**D.     Membership Services, d/b/a Monster Rewards**

101.    First Bank of Delaware engaged in wire fraud by providing merchant Membership Services, d/b/a Monster Rewards, access to the national banking system to further a scheme to take money illegally from consumers' accounts.

102.    First Bank of Delaware provided ACH and RCC transactions on behalf of Monster Rewards. Early in 2010, NACHA informed First Bank of Delaware that Monster Rewards exceeded applicable thresholds for ACH unauthorized returns.

103.    In response, in April 2010, First Bank of Delaware intentionally transitioned Monster Rewards from the ACH payment system – where it was under NACHA scrutiny – to an RCC payment platform, where it would be policed – if at all – only by First Bank of Delaware itself. During the following eleven months, First Bank of Delaware processed more than $14.1 million in RCC transactions (approximately 226,310 transactions) for Monster Rewards. Of that amount, approximately $9.6 million  (approximately 161,024 transactions) was returned, for a return rate of more than 71 percent.

104.    Moreover, First Bank of Delaware provided Monster Rewards access to consumers' bank accounts knowing that the FTC had brought an action against the owners of Monster Rewards, and that the FTC had obtained a federal court permanent injunction against the owners of Monster Rewards.

105.    First Bank of Delaware used the Internet and telephones to communicate across state lines for the purpose of transferring information between itself and Monster Rewards and its agents to further their common scheme to defraud consumers, and to conspire to obtain money by means of false or fraudulent pretenses, representations, or promises.

-27-

### E.    Check 21

106.    First Bank of Delaware engaged in wire fraud by providing third-party payment processor Check 21, and some of its merchants, access to the national banking system to further a scheme to take money illegally from consumers' accounts.

107.    Check 21 processed payments through First Bank of Delaware for merchant Web Savers.  Web Savers had an unauthorized return rate exceeding 5 percent for five consecutive months from June to October 2010.  Similarly, Check 21 merchant Super Club Savings had an unauthorized return rate exceeding 5 percent for six consecutive months from September 2010 to February 2011.

108.    First Bank of Delaware used the Internet and telephones to communicate across state lines for the purpose of transferring information between itself and third-party payment processor Check 21 to further their common scheme to defraud consumers, and to conspire to obtain money by means of false or fraudulent pretenses, representations, or promises.

### F.    LeanSpa, LLC

109.    First Bank of Delaware engaged in wire fraud by providing merchant LeanSpa, LLC, access to the national banking system to further a scheme to take money illegally from consumers' accounts.

110.    On or about November 14, 2011, the FTC and the State of Connecticut obtained an ex parte restraining order against LeanSpa, LLC, an entity marketing and selling purported weight-loss and colon cleanse products, its owner Boris Mizhen, and other related defendants. In a complaint, the FTC and Connecticut alleged that from "at least September 2010" – which included the period when the Bank was processing Lean Spa's transactions – Lean Spa used deceptive practices to lure consumers to their websites, used deceptive trial offers to induce

-28-

consumers to provide credit or debit card information, automatically enrolled consumers in continuity plans where consumers were charged every month and made it difficult for the consumers to cancel these recurring monthly shipments and receive refunds.  See FTC and State of Connecticut v. LeanSpa, LLC, Civil Action No. 3:11-CV-1715 (D. Conn.).  First Bank of Delaware was processing up to $1 million per month for LeanSpa by October 2010.  In November 2010, First Bank of Delaware agreed to increase LeanSpa's transaction volume to $1.75 million in transaction payments per month.  One month later, in December 2010, the Bank again increased LeanSpa's permissible volume to $5 million per month.

111.    First Bank of Delaware used the Internet and telephones to communicate across state lines for the purpose of transferring information between itself and LeanSpa to further their common scheme to defraud consumers, and to conspire to obtain money by means of false or fraudulent pretenses, representations, or promises.

### G.    Other Fraudulent Merchants

112.    First Bank of Delaware provided banking system access to Michael Moneymaker and Daniel DeLaCruz and their related companies.  On March 28, 2011, the FTC charged Moneymaker and DeLaCruz and their four companies – including Belfort Capital Ventures and Dynamic Online Solutions – with unfairly and deceptively billing consumers without their consent and not providing promised refunds in violation of federal law.  Specifically, the FTC charged that "since at least August 2009" – which includes the period during which the Bank processed their transactions – the defendants in that case used personal information obtained from consumers as part of payday loan applications to create RCCs in a scheme to charge recurring fees to consumers without the consumers' authorization.  See FTC v. Michael Bruce Moneymaker, et al., Civil Action No. 2:11-CV-00461 (D. Nev.).  The defendants in that case

acknowledged they "acquired consumers' bank account information when those consumers applied for payday loans online and then, without consumers' consent, debited their bank accounts." Id., Stipulated Order for Injunction and Monetary Judgment, at ¶ 5.

113.    Starting in 2010, First Bank of Delaware processed payment for Belfort Capital Ventures and Dynamic Online Solutions – two of the companies charged in the FTC's complaint.  It processed for both these companies through the third-party processor Check Site, and both of these companies had extraordinarily high returns.

114.    Consumer losses arising from the conduct alleged above exceeded $15 million.

## FIRST CAUSE OF ACTION
## FOR CIVIL PENALTIES UNDER FIRREA

115.    The government incorporates by reference paragraphs 1 through 114 as if fully set forth in this paragraph.

116.    By virtue of the conduct described above, and for the purpose of profiting from fees generated for itself by that conduct, First Bank of Delaware unlawfully engaged in a scheme and artifice to defraud consumers, using interstate mail carriers and interstate wire, in violation of the wire fraud statute, 18 U.S.C. § 1343.  First Bank of Delaware knew of the criminal conduct described herein, or remained willfully blind to the criminal conduct.

117.    This scheme to defraud has affected numerous federally insured financial institutions, including the banks of the consumer victims from whom money was taken without authorization.

118.    Accordingly, First Bank of Delaware is liable to the United States for civil penalties as authorized under 12 U.S.C. § 1833a(b).

**WHEREFORE,** the United States requests judgment against defendant First Bank of Delaware, as follows:

        a.      A judgment imposing a civil penalty against First Bank of Delaware up to the maximum amount allowed by law;

        b.      Such further relief as the Court deems just.

        Respectfully,

ZANE DAVID MEMEGER
United States Attorney

MARGARET L. HUTCHINSON
Assistant United States Attorney
Chief, Civil Division

JOEL M. SWEET
Assistant United States Attorney

SUSAN DEIN BRICKLIN
Assistant United States Attorney

JUDITH A. AMOROSA
Assistant United States Attorney
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Tel.  215-861-8200
Fax. 215-861-8618

Dated:  November 19, 2012

-31-

Exhibit 36

BEST IMAGE AVAILABLE

NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
750 FIRST STREET NE SUITE 1100
WASHINGTON, D.C. 20002
(202) 326-6016
(202) 408-6998
http://www.naag.org

LYNNE M. ROSS
*Executive Director*

PRESIDENT
WILLIAM H. SORRELL
*Attorney General of Vermont*

PRESIDENT-ELECT
STEPHEN CARTER
*Attorney General of Indiana*

VICE PRESIDENT
THURBERT BAKER
*Attorney General of Georgia*

IMMEDIATE PAST PRESIDENT
BILL LOCKYER
*Attorney General of California*

May 9, 2005

Jennifer J. Johnson, Secretary
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, DC 20551

Re:    Docket No. R-1226 (Proposed Amendment to Regulation CC/
Remotely Created Checks)

Dear Ms. Johnson:

We, the undersigned Attorneys General ("the Attorneys General"), submit the following comments to the Board of Governors of the Federal Reserve System ("the Board") in connection with the Board's pending proposal to amend Regulation CC with respect to demand drafts.[1] In brief, the Attorneys General take the position that demand drafts are frequently used to perpetrate fraud on consumers; that such drafts should be eliminated in favor of electronic funds transfers that can serve the same payment function; that if demand drafts are to continue to be used, the proposed originating-bank warranty of authorization should augment, not supplant, the existing receiving bank warranty; that demand drafts should be mandatorily marked as such; and that serious consideration should be given to extending the midnight deadline for returning unauthorized items to 60 days, as long as the ACH system is not adversely affected. Each of these points is discussed in turn below.

---

[1] Throughout these comments, unsigned paper drafts ostensibly bearing some statement reflecting drawer authorization (whether actually given or not) are referred to as "demand drafts," the term most commonly used by state law enforcement agencies. Such instruments are called "remotely created checks" in the Board's notice of proposed rulemaking.

## 1. *Unauthorized demand drafts are often used to perpetrate fraud on consumers.*

In recent years, fraudulent telemarketers and others engaged in consumer fraud have increasingly relied on bank debits to obtain money from consumers. The Federal Trade Commission (FTC) reports that 25 percent of all fraud complaints received by that agency in 2004 involved a bank debit—up 40 percent from the previous year.[2]

In late 2003, the National Automated Clearing House Association ("NACHA") quoted its President as saying that "[m]any banks, as well as law enforcement and consumer protection agencies, are indicating that telemarketers have switched to using demand drafts now that they understand how easily their ACH payments can be traced."[3]

The Office of the Comptroller of the Currency describes these two scenarios in which demand drafts are used to facilitate telemarketing fraud:

> **Example 1:** The criminal calls a consumer and announces that the consumer has won a cash prize. The criminal explains that, to deposit the prize into the "winner's" account, he or she needs the account information. Once the consumer provides the account information, the criminal prepares demand drafts and withdraws funds from the account. (A common variant is for the criminal to offer the consumer something for sale, such as a magazine subscription, in order to get the necessary account information.)

> **Example 2:** A representative of a criminal organization contacts potential credit card users and promises to arrange for them to get VISA or MasterCard credit cards. The representative asks for checking account information to issue the card and, when the information is provided, prepares demand drafts against the consumers' accounts.[4]

Anecdotal evidence from a number of states suggests that demand drafts employed by those engaged in fraud are a major problem for consumers. North Carolina reports having received many consumer complaints about unauthorized demand drafts, which have increased over time. Unfortunately, as is true in other states, much of the available data does not distinguish between demand drafts and other types of bank account debits.

One of the features of bank debits that makes them an ideal method of siphoning

---

[2] *Compare* FTC, National and State Trends in Fraud & Identity Theft, January-December 2004 at 7, *with* National and State Trends in Fraud & Identity Theft, January-December 2003 at 7.

[3] *Unauthorized ACH Telephone Payments Down 88%; Telemarketers Switching to Demand Drafts*, ELECTRONIC PAYMENTS JOURNAL, Nov./Dec. 2003, at 7 (quoting NACHA President Elliott C. McEntee).

[4] Office of the Comptroller of the Currency, *Check Fraud: A Guide to Avoiding Losses.*

money from consumers is that the ability of third parties to debit individuals' bank accounts without authorization appears not to be widely known. Unlike access to credit card numbers, which is commonly viewed as creating the risk of an unauthorized charge, the fact that a stranger can pull money out of a person's bank account using only the numbers at the bottom of his or her check is not commonly understood. "The surprise for many consumers is that withdrawals from their checking accounts can happen on a one-time basis, with no prior authorization."[5] Back in 1996, even the FTC was surprised to learn about this.[6]

The harm that can befall consumers due to unauthorized demand drafts is illustrated by the case of Elizabeth C., a resident of North Carolina:

> Ms. C. is an 86-year-old woman confined to an assisted living care facility. She receives $640 in social security income, which is used to pay for her medical expenses. According to her daughter, Ms. C. received an unsolicited phone call at the care center in February 2004. Apparently, Ms. C. gave the telemarketer her bank account number and draft authorization to receive what the telemarketer claimed to be a "medical discount prescription" card. On February 23, 2004, $399 was withdrawn from Ms. C.'s bank account by demand draft.

> Within a matter of months, Ms. C's checking account was subject to 11 unauthorized demand drafts by unknown entities totaling $3,885. According to the victim and her daughter, Ms. C. received only the February 2004 telephone call from a telemarketer. Ms. C's daughter closed and reopened a new bank account for her mother in October 2004.

> Unfortunately, soon after her daughter closed her checking account, scammers misled Ms. C. by mailing her a form letter requesting her new checking account number. Again, from October 2004 to March 2005, Ms. C. was subject to unauthorized demand drafts, totaling $3,330.

> Over the past year, Ms. C.'s daughter has closed and reopened a new account for her mother twice, and yet third parties have still obtained unauthorized access to her checking account.

> The victim's daughter recently has obtained Power of Attorney over her mother's financial affairs and has been required to open a separate bank account under her own name to protect her mother's meager monthly SSN income from unauthorized demand draft charges.

---

[5] *Demand Draft Fraud*, Prepared Statement of the FTC presented by Jodie Bernstein, Director of the Bureau of Consumer Protection, before the House Banking Committee (Apr. 15, 1996); *see also* Consuelo Lauda Kertz & Lisa Boardman Burnette, *Telemarketing Tug-of-War: Balancing Telephone Information Technology and the First Amendment with Consumer Protection and Privacy*, 43 SYR. L. REV. 1029, 1056 (1992) (describing telemarketers' ruse of obtaining consumers' check account numbers ostensibly to verify a prize or sale).

[6] *Id.*

A review of the demand drafts has revealed that many of the debits were initiated by the same entities using different merchant names and employing multiple third-party processors.

There are many stories like Ms. C.'s, and what is more, complaints about unauthorized bank debits are believed to be grossly underreported, perhaps because of the lack of public awareness of this type of bank account vulnerability. For example, in 2004, after the Vermont Attorney General's Office received a complaint from the adult daughter of a senior citizen concerning an unauthorized $398 demand draft, state investigators uncovered some 100 unreported drafts by the same originator totaling $40,000—a ratio of 100 to 1.

The *Pharmacycards.com* case being litigated by the FTC is another example.[7] There, defendants used stolen corporate and individual identity documents to establish relationships with U.S.-based payment processors. The defendants then proceeded to initiate $10 million in unauthorized demand draft debits from more than 90,000 consumers' accounts, $139 at a time. Apparently, no consumer provided his or her bank account information to the defendants. The source of the bank account information is unclear. Even though over 50,000 of the transactions were cancelled or returned, more than $1 million was wired to Cyprus before the scheme was shut down.

Consumers are not the only victims of unauthorized demand drafts. In January 2003, a bank in Vermont that had opened an account for a Canadian aggregator—who served as a middleman man for cross-border telemarketers—received a delivery of more than 700 demand drafts totaling some $230,000, which were deposited in the aggregator's account. In the process the bank itself suffered a loss of $10,500.

Similarly, a January 2002 survey by the Community Bankers of Wisconsin found that consumers in that state had lost $2.8 million and financial institutions $1.75 million during the previous year.[8] In response to the same survey, one community bank monitored every third-party draft for a 16-month period, 2,032 drafts in all, and called account holders for which the bank did not have written authorization; *73%* of the drafts were returned as unauthorized.[9]

---

[7] See *FTC v. 3rd Union Card Services, Inc., d/b/a Pharmacycards.com*, No. CV-S-04-0712-RCJ-RJJ (D. Nev. May 24, 2004) (Complaint for Injunction and Other Equitable Relief).

[8] Memorandum to the Wisconsin State Senate re Support of LRB-4416/2 (Jan. 28, 2002).

[9] *Id.* Comments filed by banks in connection with the current rulemaking echo these concerns. *See, e.g.*, comments of Patti Conrad, TowneBank/Security Officer (Mar. 9, 2005) ("Fraud activity has increased so much over the past two-three years on these paper drafts, and customer account information is easily compromised."); Sterling J.U. Laffitte, President, The Exchange Bank (Mar. 9, 2005) ("I am thrilled that you proposed a remedy to the ever increasing problem of these paper drafts. It has become highly abusive and these con artist[s] seem to often prey on the elderly."); Greg Messer, Operations Supervisor, Bank of Frio Canyon (Mar. 9, 2005) ("We at the Bank of Frio Canyon agree that fraud by paper drafts is becoming an increasingly serious issue that has touched us as well."); Carol Clausen, Vice President and Cashier, American State Bank (Mar. 14, 2005) ("We see many of our customers being hurt with this type of scamming going on and it seems to be increasing all the time."); Phil Menhusen, Executive Vice President,

There are several factors besides lack of consumer awareness that make demand drafts a useful tool in the fraudulent telemarketer's arsenal. One is the ease with which demand drafts can be created. Such drafts can be printed using software and ink that can be ordered over the Internet, or contracted out to companies that will print the checks for a fee.[10] As one processor puts it,

> Bank drafts or checks are used by merchants who cannot establish an ACH merchant account because they may operate in a high-risk [sic] industry. ... Our system is **very easy to use**. You simply upload a file of your transactions to our online gateway. We perform verification, "scrub the file," print the checks, deposit the checks, clear the funds and wire your funds to you. What could be easier?[11]

A second feature of demand drafts favoring their use by those engaged in fraud is the fact that the perpetrator, or his processors, does not need to have special access to the banking system, such as is required to process ACH debits. A processor can deposit the drafts to his own bank account and wire the funds to the originator, or send the drafts to the originator or the originator's bank for deposit.

Moreover, since it is impossible to distinguish demand drafts from regular checks, it is difficult, if not impossible, to track the drafts, whether in real time or retrospectively. The potential for spotting national patterns of high returns, and thus taking preventive or systemic law enforcement action is undermined as a consequence.[12]

---

State Exchange Bank (Mar. 17, 2005) ("Unscrupulous tele-marketers and identity thieves are currently able to deposit unsigned checks into their accounts with impunity."). *See also* a comment more critical of the banking system itself from Rod Lueders, Vice President, Morgan Federal Bank (Mar. 8, 2005) ("It is obvious some banks cater to the telephone and internet scam industry and knowing provide the conduit to enable these thieves to succeed.")

[10] *See, e.g.,* the websites of CheckMaster 2000, <http://www.checkmaster.com> (Apr. 5, 2005) (offering "MICR check printing packages" and estimating cost of printing drafts at less than two cents each); Accelerated Payment Systems, Inc., <http://www.acceleratedpayment.com/pac.htm> (Mar. 28, 2005) (offering to print demand drafts).

[11] National EFT, <http://nationaleft.com/bankdrafts.html> (Mar. 28, 2005).

[12] Legal restrictions with respect to demand drafts initiated by telemarketers exist, but are limited. At the federal level, the FTC's Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(3), requires express verifiable authorization, but that may involve no more than (1) a recorded verification, which will omit any deceptive initial call, and which is often ambiguous as to the consumer's authorization; or (2) an after-the-call written confirmation sent to the consumer, whose non-existence is difficult for the consumer to prove. It appears that only one state has a more rigorous requirement: Vermont's Consumer Fraud Act, 9 V.S.A. § 2464(b)(2), requiring prior written authorization by the consumer for any telemarketing-initiated demand draft, and effective July 1, 2004, imposing strict liability on parties that process drafts without such authorization. *See* <http://www.leg.state.vt. us/docs/legdoc.cfm?URL=/docs/2006/bills/passed/H-162.htm.> Contrast these limited and geographically-isolated restrictions with NACHA's broad ban on ACH debits initiated as the result of an outbound telemarketing call to a person with whom the caller has no existing business relationship.

Finally, it is not uncommon for consumers to encounter difficulty obtaining a recredit to their bank account when—if at all—they discover an unauthorized demand draft.[13] Barriers include unclear or restrictive time frames for requesting a return, uninformed or hostile bank tellers, and the lack of incentives—or the existence of disincentives—to the receiving bank's initiating the return process.[14]

### 2. Demand drafts should be eliminated unless the business community can demonstrate their necessity to the national economy.

The Board is seeking comment on the prevalence and uses of remotely created checks. Unfortunately, the Attorneys General have not been able to identify any reliable source of "hard" data that would be responsive to this question. However, anecdotal evidence suggests that demand drafts are used by legitimate businesses to only a limited extent at this time.

Specifically, in 1996, the FTC declined to require written authorization for demand drafts by telemarketers as part of its Telemarketing Sales Rule because information provided to the agency "tended to refute the proposition that demand drafts are characteristic solely of deceptive telemarketers."[15] In its explanation for the decision, the FTC said that commenters had noted that Fortune 500 companies and other businesses "characterized by quick turn-around transactions now use demand drafts because they recognize that not everyone has a credit card."[16] The FTC specifically cited as examples of businesses that use demand drafts two of the baby Bells, GEICO, Citicorp, Telecheck, Equifax, Bank of America, Discover Card, Dun and Bradstreet, Olan Mills, and First of America Bank.[17]

However, it turns out that now, nine years after the FTC rulemaking, some of these same companies do *not* use demand drafts, or use them to a limited or reduced extent.[18] This change may be explained by the fact that the ACH system now serves as

---

[13] *See* Christopher M. Grengs & Edward S. Adams, *Contracting Around Finality: Transforming Price v. Neal from Dictate to Default*, 89 MINN. L. REV. 163, 186 (2004) (noting that payor bank can claim that account holder's negligence led to unauthorized debit; "The resulting, strong-form conclusion is that, 'consumers can virtually never enforce their rights against a bank because it will simply be too expensive to do so.'" (quoting Mike Mills, *FCC Proposes Clampdown On 900-Number Services*, CONG. Q. WKLY. REP. (Mar. 16, 1991) at 664)).

[14] *See, e.g.,* Uniform Commercial Code § 4-406(c), requiring that as a condition of successfully asserting lack of authorization against the payor bank, the customer must exercise "reasonable promptness" in examining his or her bank statement and "promptly" notify the bank—without any further specification of how long the customer has to discharge those obligations.

[15] 60 Fed. Reg. 43842-01, 43849 (1995).

[16] *Id.*

[17] *Id. n.80.*

[18] Telephone calls from Vermont Investigator Rose Hayes to Laura Carden, Chief Financial Officer, Olan Mills (Apr. 11, 2005) (company no longer uses demand drafts); to Ed Gross, Director, Treasurer's Office, GEICO (Apr. 11, 2005) (currently 4% of company's payments are by demand draft, but that percentage is

an adequate substitute for businesses and consumers wanting to debit bank accounts remotely.

The importance of this issue to the pending rulemaking is clear: if demand drafts are not commonly used, or if there is a ready substitute for them, then one approach to addressing demand draft fraud is to eliminate the use of the drafts entirely. That would be consistent with the course chosen by the Canadian Payments Association ("CPA"), which, effective January 1, 2004, prohibited pre-authorized debits, including demand drafts, which are not supported by an underlying written authorization.[19] According to the CPA, inquiries directed to its major members indicate that the ban has been very successful in two ways: demand drafts are not showing up in the Canadian banking system; and there has been no complaint about the ban from companies that may have used these instruments in the past, such as bill collectors and payday lenders.[20]

The Board has the authority to prohibit demand drafts under the Expedited Funds Availability Act, 12 U.S.C. § 4008(c)(1). That subsection states, "In order to carry out the provisions of this chapter, the Board of Governors of the Federal Reserve System shall have the responsibility to regulate—(A) *any* aspect of the payment system, including the receipt, payment, collection, or clearing of checks; and (B) *any related function of the payment system with respect to checks*." (Emphasis added.)[21]

### 3. Originating banks as well as receiving banks should bear warranty liability.

---

expected to drop to less than 1% as ACH debits are required); to Richard Goerss, Corporate Vice President and Regulatory Counsel, Equifax (Apr. 12, 2005) (company has sold its collections business and does not use demand drafts); to Kim Smith, Director of Banking Relations and Credit Policy, Verizon (Apr. 12, 2005) (company does not use demand drafts); David Sloboden, Vice President, Legal, Litigation and Human Resources, Dun & Bradstreet (Apr. 13, 2005) (before the sale of its collections department, Dun & Bradstreet used demand drafts, but it does not use them now); telephone call from Vermont Assistant Attorney General Elliot Burg to James Swift, Vice President and Assistant General Counsel, *Discover Financial Service, Inc.* (Apr. 12-13, 2005) (demand drafts represent 2% of credit card payments; company would prefer to use ACH, but for the need under Regulation E to obtain written authorization from consumers who are making more than two payments); email from Sheri L. Mullane, Assistant General Counsel, Bank of America to Investigator Rose Hayes (Apr. 14, 2005) (bank uses demand drafts in approximately 4% of its transactions). First of America Bank was bought out by two other banks and no longer exists. Efforts to obtain comparable information from CitiGroup and Telecheck were unsuccessful.

[19] CPA, Rule H1 (Pre-Authorized Debits (PADs)) §2. ("Any debit issued by a payee, such as a one-time debit, that is not supported by an underlying pre-authorized written agreement is not permitted under this rule.") A "pre-authorized debit" is a payment item issued by a payee that is drawn on the account of a payor held by a processing institution. § 5(i).

[20] Telephone call from Doug Kreviazuk, Vice-President, Policy and Research, CPA, to Elliot Burg, Vermont Assistant Attorney General (Apr. 7, 2005).

[21] If the business community does demonstrate a legitimate need for demand drafts in some situations, the Board may also wish to consider permitting such drafts *only* where an account holder has expressly authorized his or her bank to accept them for purposes of debiting the account, in combination with requiring originating banks to warrant authorization and mandating a special MICR identifier (see section 4 of the text).

In the event that the Board does not undertake to prohibit the use of demand drafts, it should clarify that the imposition of warranty liability on the originating bank with respect to the drawer's authorization for a demand draft is *in addition to* the comparable warranty liability now borne by the receiving/drawee bank. That is, updating the rule of *Price v. Neal*[22] should not mean that consumers have no direct recourse from their own bank for unauthorized demand drafts.

This clarification is particularly important because of the possibility that banks—for instance, foreign banks not subject to the Board's rules—could occupy the role of originating financial institution. If the originating bank cannot be compelled to make the consumer whole, then as between the consumer and the consumer's bank (assuming lack of authorization and prompt notification by the account holder), the bank is in the better position to protect itself.

Otherwise, a national standard requiring originating banks to warrant that demand drafts are authorized is unquestionably better for consumers than a state-by-state approach. At present, originating banks in most states[23] are not subject to a warranty-of-authorization obligation, which can create a disincentive for consumers' banks to recredit their customers' accounts, since they (the consumers' banks) may end up absorbing the loss.

In a related vein, the Board should consider extending the benefits of the proposed warranties (or clarifying that the warranties extend) to the *drawer*, so that the account holder would have a regulatory warranty claim against his or her own bank. The existence of this claim would enhance the incentives for the payor bank, in a close case, to make its customer whole and pursue the warranties "upstream" to the depository bank.

As for the question of whether there should be a distinction drawn between consumer and non-consumer accounts, the better view is to reject such a distinction. For one thing, having to identify accounts as falling into one category or the other can be logistically difficult. For another, at least in some states, businesses can be considered "consumers" for some purposes[24] and should, in those contexts, receive no less protection than individual consumers.

### 4. *Demand drafts should be specially marked as such.*

The Board has asked whether demand drafts should be specially marked in the MICR line. It is true, as the Board notes, that those initiating or processing an unauthorized draft are unlikely to comply with such a requirement. For this reason, consideration should also be given to ways of optically or otherwise recognizing demand

---

[22] 97 Eng. Rep. 871 (K.B. 1762).

[23] This reference is to the banks in all but the 14 states that have amended their Uniform Commercial Codes to create such a warranty obligation.

[24] *See, e.g.,* 9 Vt. Stat. Annot. § 2451a(a).

drafts based on their unsigned nature. If there were ways of tracking demand drafts similar to the methods available for ACH debits, that would be beneficial to law enforcement agencies.

### 5. *Extension of the midnight deadline.*

The Board has also asked for comment on whether the midnight deadline for returning items as provided for in the UCC[25] should be extended—for example, to 60 days, as is the case with ACH transactions. If the Board determines that the ACH system has not been adversely affected by its longer deadline—that legitimate commerce has not been impeded by permitting returns for unauthorized electronic debits for a considerably longer time than with respect to paper drafts—then serious consideration should be given to applying at least an 60-day return period to demand drafts. If a receiving bank has the option of returning an unauthorized demand draft to the originating bank, rather than pursuing a potentially more expensive and uncertain warranty claim, that should make it easier for consumers to recover funds lost due to fraud.[26]

We appreciate this opportunity to comment on the proposed rule, and thank you for your consideration of our views. If you have questions about these comments, please feel free to contact Elliot Burg, Vermont Assistant Attorney General, at (802) 828-2153; Erin Leahy, Ohio Assistant Attorney General, at (614) 752-4730; or Dennis Cuevas, NAAG Consumer Protection Project Manager and Counsel, at (202) 326-6019.

Sincerely,

Malaetasi M. Togafau
Attorney General of American Samoa

Terry Goddard
Attorney General of Arizona

Mike Beebe
Attorney General of Arkansas

Bill Lockyer
Attorney General of California

---

[25] *See* UCC §§ 4-301 and 4-302.

[26] Many of the comments filed by bankers in response to this rulemaking support extension of the deadline to 60 days. *See, e.g.*, comments of Lucy Jones, Executive Vice President, Western National Bank (Mar. 15, 2005); Stacey Adkins, Assistant Vice President, Hebron Savings Bank (Mar. 25, 2005); Beverly F. Rutherford, Vice President/Compliance, Virginia Credit Union (Mar. 30, 2005); Carlton Cowan, Fraud Prevention Officer, The Bank of Edwardsville (Mar. 18, 2005).

John W. Suthers
Attorney General of Colorado

Richard Blumenthal
Attorney General of Connecticut

M. Jane Brady
Attorney General of Delaware

Robert J. Spagnoletti
Attorney General of the
District of Columbia

Stephen H. Levins
Executive Director
Office of Consumer Protection of Hawaii[*]

Lisa Madigan
Attorney General of Illinois

Tom Miller
Attorney General of Iowa

Gregory D. Stumbo
Attorney General of Kentucky

Charles C. Foti, Jr.
Attorney General of Louisiana

G. Steven Rowe
Attorney General of Maine

J. Joseph Curran, Jr.
Attorney General of Maryland

Tom Reilly
Attorney General of Massachusetts

Mike Hatch
Attorney General of Minnesota

Jim Hood
Attorney General of Mississippi

[*]Of the states listed, Hawaii is not represented by its Attorney General. Hawaii is represented by its Office of Consumer Protection, an agency which is not a part of the state Attorney General's Office, but which is statutorily authorized to represent the State of Hawaii in consumer protection actions. For the sake of simplicity, the entire group will be referred to as the "Attorneys General," and such designation as it pertains to Hawaii, refers to the Executive Director of the State of Hawaii Office of Consumer Protection.

Mike McGrath
Attorney General of Montana

Jon Bruning
Attorney General of Nebraska

Brian Sandoval
Attorney General of Nevada

Kelly A. Ayotte
Attorney General of New Hampshire

Patricia A. Madrid
Attorney General of New Mexico

Eliot Spitzer
Attorney General of New York

Roy Cooper
Attorney General of North Carolina

Wayne Stenehjem
Attorney General of North Dakota

Jim Petro
Attorney General of Ohio

W. A. Drew Edmondson
Attorney General of Oklahoma

Hardy Myers
Attorney General of Oregon

Thomas W. Corbett, Jr.
Attorney General of Pennsylvania

Patrick C. Lynch
Attorney General of Rhode Island

Henry D. McMaster
Attorney General of South Carolina

Lawrence E. Long
Attorney General of South Dakota

Paul G. Summers
Attorney General of Tennessee

William H. Sorrell
Attorney General of Vermont

Rob McKenna
Attorney General of Washington

Darrell V. McGraw, Jr.
Attorney General of West Virginia

Peg Lautenschlager
Attorney General of Wisconsin

Exhibit 37

**AMBER KRISTI MARSH** and **STACIE EVANS,** individually and on behalf of a class of similarly situated persons,

Plaintiffs,

v.

**ZAAZOOM SOLUTIONS, LLC**, *et al.*,

Defendants.

## 50-State Survey of Negligence and Conversion Law

# TABLE OF CONTENTS

SUMMARY OF LOCATION OF CLASS MEMBERS ............................................................1

SUMMARY OF CONVERSION LAW ................................................................................3

SUMMARY OF NEGLIGENCE LAW ..............................................................................6

ALABAMA – CONVERSION SUMMARY ..........................................................................9

ALASKA – CONVERSION SUMMARY .............................................................................10

ARIZONA – CONVERSION SUMMARY ...........................................................................12

ARKANSAS - CONVERSION SUMMARY .........................................................................14

CALIFORNIA – CONVERSION SUMMARY ......................................................................16

COLORADO – CONVERSION SUMMARY .......................................................................18

CONNETICUT – CONVERSION SUMMARY ....................................................................20

DELAWARE – CONVERSION SUMMARY .......................................................................22

DISTRICT OF COLUMBIA – CONVERSION SUMMARY....................................................24

FLORIDA – CONVERSION SUMMARY ...........................................................................26

GEORGIA – CONVERSION SUMMARY ...........................................................................28

HAWAII – CONVERSION SUMMARY .............................................................................30

IDAHO – CONVERSION SUMMARY ...............................................................................32

ILLINOIS – CONVERSION SUMMARY ............................................................................34

INDIANA – CONVERSION SUMMARY ............................................................................36

IOWA – CONVERSION SUMMARY .................................................................................38

KANSAS – CONVERSION SUMMARY .............................................................................40

KENTUCKY – CONVERSION SUMMARY ........................................................................42

LOUISIANA – CONVERSION SUMMARY ........................................................................44

MAINE – CONVERSION SUMMARY ...............................................................................46

MARYLAND- CONVERSION SUMMARY ........................................................................48

MASSACHUSSETTS – CONVERSION SUMMARY ............................................................50

MICHIGAN – CONVERSION SUMMARY ........................................................................51

MINNESOTA – CONVERSION SUMMARY.......................................................................53

MISSISSIPPI – CONVERSION SUMMARY .......................................................................54

MISSOURI – CONVERSION SUMMARY ..........................................................................56

MONTANA – CONVERSION SUMMARY .........................................................................58

NEBRASKA – CONVERSION SUMMARY ........................................................................60

NEVADA – CONVERSION SUMMARY ...................................................................................62

NEW HAMPSHIRE – CONVERSION SUMMARY ...................................................................64

NEW JERSEY – CONVERSION SUMMARY............................................................................66

NEW MEXICO – CONVERSION SUMMARY .........................................................................68

NEW YORK – CONVERSION SUMMARY..............................................................................70

NORTH CAROLINA – CONVERSION SUMMARY ...............................................................72

NORTH DAKOTA – CONVERSION SUMMARY ...................................................................73

OHIO – CONVERSION SUMMARY ........................................................................................75

OKLAHOMA – CONVERSION SUMMARY............................................................................76

OREGON – CONVERSION SUMMARY ..................................................................................77

PENNSYLVANIA – CONVERSION SUMMARY ....................................................................78

RHODE ISLAND – CONVERSION SUMMARY .....................................................................79

SOUTH CAROLINA – CONVERSION SUMMARY ...............................................................80

SOUTH DAKOTA – CONVERSION SUMMARY ...................................................................82

TENNESSEE – CONVERSION SUMMARY............................................................................84

TEXAS – CONVERSION SUMMARY .....................................................................................86

UTAH – CONVERSION SUMMARY .......................................................................................88

VERMONT – CONVERSION SUMMARY ...............................................................................90

VIRGINIA – CONVERSION SUMMARY ................................................................................92

WASHINGTON – CONVERSION SUMMARY .......................................................................94

WEST VIRGINIA – CONVERSION SUMMARY ....................................................................95

WISCONSIN – CONVERSION SUMMARY ............................................................................96

WYOMING – CONVERSION SUMMARY ..............................................................................97

ALABAMA – NEGLIGENCE SUMMARY ..............................................................................99

ALASKA – NEGLIGENCE SUMMARY ................................................................................101

ARIZONA – NEGLIGENCE SUMMARY ..............................................................................103

ARKANSAS - NEGLIGENCE SUMMARY............................................................................105

CALIFORNIA – NEGLIGENCE SUMMARY ........................................................................107

COLORADO – NEGLIGENCE SUMMARY ..........................................................................109

CONNETICUT – NEGLIGENCE SUMMARY .......................................................................111

DELAWARE – NEGLIGENCE SUMMARY ..........................................................................113

DISTRICT OF COLUMBIA – NEGLIGENCE SUMMARY ..................................................115

FLORIDA – NEGLIGENCE SUMMARY ...............................................................................117

GEORGIA – NEGLIGENCE SUMMARY................................................................119

HAWAII – NEGLIGENCE SUMMARY ...............................................................121

IDAHO – NEGLIGENCE SUMMARY..................................................................123

ILLINOIS – NEGLIGENCE SUMMARY .............................................................125

INDIANA – NEGLIGENCE SUMMARY .............................................................127

IOWA – NEGLIGENCE SUMMARY....................................................................130

KANSAS – NEGLIGENCE SUMMARY ..............................................................132

KENTUCKY – NEGLIGENCE SUMMARY.........................................................134

LOUISIANA – NEGLIGENCE SUMMARY ........................................................136

MAINE – NEGLIGENCE SUMMARY ................................................................139

MARYLAND- NEGLIGENCE SUMMARY ........................................................141

MASSACHUSSETTS – NEGLIGENCE SUMMARY ..........................................143

MICHIGAN – NEGLIGENCE SUMMARY .........................................................145

MINNESOTA – NEGLIGENCE SUMMARY ......................................................147

MISSISSIPPI – NEGLIGENCE SUMMARY .......................................................149

MISSOURI – NEGLIGENCE SUMMARY ..........................................................151

MONTANA – NEGLIGENCE SUMMARY .........................................................153

NEBRASKA – NEGLIGENCE SUMMARY ........................................................155

NEVADA – NEGLIGENCE SUMMARY.............................................................157

NEW HAMPSHIRE – NEGLIGENCE SUMMARY ............................................159

NEW JERSEY – NEGLIGENCE SUMMARY .....................................................161

NEW MEXICO – NEGLIGENCE SUMMARY ...................................................164

NEW YORK – NEGLIGENCE SUMMARY ........................................................166

NORTH CAROLINA – NEGLIGENCE SUMMARY ..........................................168

NORTH DAKOTA – NEGLIGENCE SUMMARY ..............................................170

OHIO – NEGLIGENCE SUMMARY...................................................................172

OKLAHOMA – NEGLIGENCE SUMMARY .....................................................174

OREGON – NEGLIGENCE SUMMARY ............................................................176

PENNSYLVANIA – NEGLIGENCE SUMMARY...............................................178

RHODE ISLAND – NEGLIGENCE SUMMARY ...............................................181

SOUTH CAROLINA – NEGLIGENCE SUMMARY..........................................183

SOUTH DAKOTA – NEGLIGENCE SUMMARY ..............................................185

TENNESSEE – NEGLIGENCE SUMMARY .......................................................187

TEXAS – NEGLIGENCE SUMMARY ....................................................................189
UTAH – NEGLIGENCE SUMMARY ...................................................................192
VERMONT – NEGLIGENCE SUMMARY................................................................194
VIRGINIA – NEGLIGENCE SUMMARY ...............................................................196
WASHINGTON – NEGLIGENCE SUMMARY .........................................................198
WEST VIRGINIA – NEGLIGENCE SUMMARY ......................................................200
WISCONSIN – NEGLIGENCE SUMMARY ............................................................202
WYOMING – NEGLIGENCE SUMMARY ..............................................................204

# SUMMARY OF LOCATION OF CLASS MEMBERS

| State | Number of Class Members |
|---|---|
| Alabama | 3296 |
| Alaska | 378 |
| Arizona | 551 |
| Arkansas | 1552 |
| California | 11920 |
| Colorado | 2428 |
| Connecticut | 1135 |
| Delaware | 597 |
| District of Columbia | 339 |
| Florida | 9017 |
| Georgia | 4191 |
| Hawaii | 520 |
| Idaho | 572 |
| Illinois | 4174 |
| Indiana | 3007 |
| Iowa | 929 |
| Kansas | 1201 |
| Kentucky | 1903 |
| Louisiana | 3701 |
| Maine | 378 |
| Maryland | 3555 |
| Massachusetts | 1474 |
| Michigan | 267 |
| Minnesota | 1353 |
| Mississippi | 1985 |
| Missouri | 2782 |
| Montana | 314 |

| | |
|---|---|
| Nebraska | 697 |
| Nevada | 1138 |
| New Hampshire | 421 |
| New Jersey | 3497 |
| New Mexico | 736 |
| New York | 192 |
| North Carolina | 5936 |
| North Dakota | 217 |
| Ohio | 4951 |
| Oklahoma | 1458 |
| Oregon | 937 |
| Pennsylvania | 6448 |
| Rhode Island | 264 |
| South Carolina | 1777 |
| South Dakota | 309 |
| Tennessee | 2713 |
| Texas | 13394 |
| Utah | 1014 |
| Vermont | 204 |
| Virginia | 3133 |
| Washington | 2185 |
| West Virginia | 0 |
| Wisconsin | 2225 |
| Wyoming | 286 |

**SUMMARY OF CONVERSION LAW**

| State | Conversion Is Wrongful Detention of Another's Property | Money Is Subject to Conversion | No Bad Faith or Intent Required Other than Intent to Possess Property | Damages Equal to Value of Converted Property | Joint and Several Liability[1] |
|-------|------|------|------|------|------|
| AL | X | X | X | X | X |
| AK | X | X | X | X |  |
| AZ | X | X | X | X | X |
| AR | X | X | X | X | X |
| CA | X | X | X | X | X |
| CO | X | X | X | X | X |
| CT | X | X | X | X | X |
| DE | X | X | X | X | X |
| DC | X | X | X | X | X |
| FL | X | X | X | X | X |
| GA | X | X | X | X | X |
| HI | X | X | X | X | X |
| ID | X | X | X | X | X |
| IL | X | X | X | X | X |
| IN | X | X | X | X | X |
| IA | X | X | X | X | X |

---

[1] This column addresses whether there is joint and several liability for conversion against Jack Henry & Associates, Inc. based on the facts alleged by Plaintiffs in the operative complaint. While most states have adopted comparative fault statutes that apportion liability among tortfeasors, there are often statutory or common law exceptions to the general apportionment rule. In particular, most states provide an exception to comparative fault and several liability where the tortfeasors act in concert to commit the misconduct. Here, Plaintiffs have alleged that Jack Henry engaged in the intentional tort of conversion in concert with the other Defendants. Please see the state-specific discussions for a more detailed explanation as to why or why not joint and several liability applies here.

| State | Conversion Is Wrongful Detention of Another's Property | Money Is Subject to Conversion | No Bad Faith or Intent Required Other than Intent to Possess Property | Damages Equal to Value of Converted Property | Joint and Several Liability[1] |
|---|---|---|---|---|---|
| KS | X | X | X | X | X |
| KY | X | X | X | X | |
| LA | X | X | X | X | X |
| ME | X | X | X | X | X |
| MD | X | X | X | X | X |
| MA | X | X | X | X | X |
| MI | X | X | X | X | |
| MN | X | X | X | X | X |
| MS | X | X | X | X | X |
| MO | X | X | X | X | X |
| MT | X | X | X | X | X |
| NE | X | X | X | X | X |
| NV | X | X | X | X | X |
| NH | X | X | X | X | X |
| NJ | X | X | X | X | [See Analysis] |
| NM | X | X | X | X | X |
| NY | X | X | X | X | X |
| NC | X | X | X | X | X |
| ND | X | X | X | X | X |
| OH | X | X | X | X | X |
| OK | X | X | X | X | |
| OR | X | X | X | X | X |
| PA | X | X | X | X | X |
| RI | X | X | X | X | X |

| State | Conversion Is Wrongful Detention of Another's Property | Money Is Subject to Conversion | No Bad Faith or Intent Required Other than Intent to Possess Property | Damages Equal to Value of Converted Property | Joint and Several Liability[1] |
|---|---|---|---|---|---|
| SC | X | X | X | X | X |
| SD | X | X | X | X | [See Analysis] |
| TN | X | X | X | X | X |
| TX | X | X | X | X | X |
| UT | X | X | X | X | X |
| VT | X | X | X | X | X |
| VA | X | X | X | X | X |
| WA | X | X | X | X | X |
| WV | X | X | X | X | X |
| WI | X | X | X | X | X |
| WY | X | X | X | X | X |

## SUMMARY OF NEGLIGENCE LAW

| State | Negligence Is a Breach of Duty to Use Reasonable Care | Duty of Care is Based on Foreseeability and Policy Factors | Person Who Undertakes Affirmative Action Assumes Duty of Care | Actual Causation Is Determined by "Substantial Factor" or "But For" Analysis[2] | Joint and Several Liability[3] |
|---|---|---|---|---|---|
| AL | X | X | X | X | X |
| AK | X | X | X | X | |
| AZ | X | X | X | X | |
| AR | X | X | X | X | |
| CA | X | X | X | X | X |
| CO | X | X | X | X | |
| CT | X | X | X | X | |
| DE | X | X | X | X | X |
| DC | X | X | X | X | X |
| FL | X | X | X | X | |
| GA | X | X | X | X | |
| HI | X | X | X | X | |
| ID | X | X | X | X | X |
| IL | X | X | X | X | X |
| IN | X | X | X | X | X |

---

[2] This column also addresses whether courts in the State address "proximate causation" as an act or omission that is a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred.

[3] This column analyzes whether there would be joint and several liability between Defendants First National Bank of Central Texas and Jack Henry based on the facts alleged in the operative complaint, regardless of the intentional misconduct of the ZaaZoom Defendants.

| State | Negligence Is a Breach of Duty to Use Reasonable Care | Duty of Care is Based on Foreseeability and Policy Factors | Person Who Undertakes Affirmative Action Assumes Duty of Care | Actual Causation Is Determined by "Substantial Factor" or "But For" Analysis[2] | Joint and Several Liability[3] |
|---|---|---|---|---|---|
| IA | X | X | X | X | [See Analysis] |
| KS | X | X | X | X | |
| KY | X | X | X | X | |
| LA | X | X | X | X | |
| ME | X | X | X | X | X |
| MD | X | X | X | X | X |
| MA | X | X | X | X | X |
| MI | X | X | X | X | |
| MN | X | X | X | X | [See Analysis] |
| MS | X | X | X | X | |
| MO | X | X | X | X | X |
| MT | X | X | X | X | X |
| NE | X | X | X | X | X |
| NV | X | X | X | X | |
| NH | X | X | X | X | [See Analysis] |
| NJ | X | X | X | X | [See Analysis] |
| NM | X | X | X | X | |
| NY | X | X | X | X | X |
| NC | X | X | X | X | X |
| ND | X | X | X | X | |
| OH | X | X | X | X | [See Analysis] |

| State | Negligence Is a Breach of Duty to Use Reasonable Care | Duty of Care is Based on Foreseeability and Policy Factors | Person Who Undertakes Affirmative Action Assumes Duty of Care | Actual Causation Is Determined by "Substantial Factor" or "But For" Analysis[2] | Joint and Several Liability[3] |
|---|---|---|---|---|---|
| OK | X | X | X | X | |
| OR | X | X | X | X | |
| PA | X | X | X | X | [See Analysis] |
| RI | X | X | X | X | X |
| SC | X | X | X | X | X |
| SD | X | X | X | X | [See Analysis] |
| TN | X | X | X | X | X |
| TX | X | X | X | X | X |
| UT | X | X | X | X | |
| VT | X | X | X | X | |
| VA | X | X | X | X | X |
| WA | X | X | X | X | |
| WV | X | X | X | X | X |
| WI | X | X | X | X | [See Analysis] |
| WY | X | X | X | X | |

**ALABAMA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property. *See Knight v. John Knox Manor, Inc.*, 92 So. 3d 111, 120 (Ala. Civ. App. 2012).

2. **Conversion of Money**

   a. Generally, an action for conversion of money will not lie unless the money is specific and capable of identification. *See SouthTrust Bank v. Donely*, 925 So. 2d 934, 939-40 (Ala. 2005).

3. **Necessary Intent for Conversion**

   a. Every unlawful intermeddling with the goods of another is a conversion, and it is no defense to an action by the true owner that the person so receiving the goods was ignorant of its title. *See Moore v. Stephens*, 31 Ala. App. 446, 447, 18 So. 2d 577, 578 (Ct. App. 1944).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of compensatory damages in cases of conversion is the value of the property at the time of conversion, plus interest. *See Driver v. Hice*, 618 So. 2d 129, 131-32 (Ala. Civ. App. 1993).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Under Alabama law governing joint and several liability, a tort-feasor whose misconduct proximately contributes in causing an injury may be held liable for the entire resulting loss. *See Holcim (US), Inc. v. Ohio Cas. Ins. Co.*, 38 So. 3d 722, 729 (Ala. 2009).

   b. The Alabama Supreme Court found that evidence supported joint and several judgment for conversion claim. *See Lyons v. Williams*, 567 So. 2d 1280, 1281 (Ala. 1990).

**ALASKA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. To establish a conversion claim, a plaintiff must prove that it had a possessory interest in the property, that the defendants intentionally interfered with the plaintiff's possession, and that the defendants' acts were the legal cause of the plaintiff's loss of property. *See St. Paul Church, Inc. v. Bd. of Trustees of Alaska Missionary Conference of United Methodist Church, Inc.*, 145 P.3d 541, 558 (Alaska 2006).

2. **Conversion of Money**

   a. Alaska has recognized an action for conversion where the allegedly converted property is money. *See Burseth v. Weyerhaeuser Mortgage Co., Inc.*, No. S-5075, 1993 WL 13563649, at *5 (Alaska Oct. 13, 1993).

3. **Necessary Intent for Conversion**

   a. The Alaska Supreme Court has explained that claims exist for both willful and innocent conversion exist, and in the case of innocent conversion, the plaintiff is limited to market value of the converted property. *See Alaska Placer Co. v. Lee*, 553 P.2d 54, 57 (Alaska 1976).

4. **Damages Recoverable for Conversion Claim**

   a. Damages in a conversion action are generally the item's value at the time of conversion plus interest. *See Carver v. Quality Inspection & Testing, Inc. (I)*, 946 P.2d 450, 456 (Alaska 1997).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Alaska Stat. Ann. §09.17.080 provides: "(a) In all actions involving fault of more than one person, including third-party defendants and persons who have settled or otherwise been released, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating (1) the amount of damages each claimant would be entitled to

recover if contributory fault is disregarded; and (2) the percentage of the total fault that is allocated to each claimant, defendant, third-party defendant, person who has been released from liability, or other person responsible for the damages unless the person was identified as a potentially responsible person, the person is not a person protected from a civil action under AS 09.10.055, and the parties had a sufficient opportunity to join that person in the action but chose not to . . ."

b.  Alaska Stat. Ann. § 09.17.900 provides, "[i]n this chapter, "fault" includes acts or omissions that are in any measure negligent, reckless, or intentional toward the person or property of the actor or others, or that subject a person to strict tort liability. . . ."

## ARIZONA - CONVERSION

1.  **Definition of Conversion/Elements of Conversion**

    a.  Conversion is any act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with his rights therein. *See Scott v. Allstate Ins. Co.*, 553 P.2d 1221, 1225 (Az. 1976).

2.  **Conversion of Money**

    a.  Money can be the subject of a conversion action if the funds can be described, identified or segregated and there is an obligation to treat the funds in a specific manner. Arizona law recognizes that a party can bring a conversion action for converting the proceeds of a check. *See Koss Corp. v. Am. Exp. Co.*, 309 P.3d 898, 914 (Az. Ct. App. 2013).

3.  **Necessary Intent for Conversion**

    a.  Neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are the gist of the action. *See Scott v. Allstate Ins. Co.*, 553 P.2d 1221, 1225 (Az. 1976).

4.  **Damages Recoverable for Conversion Claim**

    a.  The measure of damages for conversion is the value of the property wrongfully taken and held, plus damages for wrongful detention. *See Phelps v. Melton*, 482 P.2d 905, 906 (Az. 1971).

5.  **Joint and Several Liability/Comparative Fault for Conversion Claim**

    a.  Ariz. Rev. Stat. Ann. §12-2506 provides, "[i]n an action for personal injury, property damage or wrongful death, the liability of each defendant for damages is several only and is not joint, except as otherwise provided in this section. Each defendant is liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be entered against the defendant for that amount. To determine the amount of judgment to be entered against each defendant, the trier of fact shall multiply

the total amount of damages recoverable by the plaintiff by the percentage of each defendant's fault, and that amount is the maximum recoverable against the defendant. [¶] D. The liability of each defendant is several only and is not joint, except that a party is responsible for the fault of another person, or for payment of the proportionate share of another person, if any of the following applies: 1. Both the party and the other person were acting in concert."

b. "Acting in concert" means entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively taking part in that intentional tort. Acting in concert does not apply to any person whose conduct was negligent in any of its degrees rather than intentional. A person's conduct that provides substantial assistance to one committing an intentional tort does not constitute acting in concert if the person has not consciously agreed with the other to commit the intentional tort. Ariz. Rev. Stat. Ann. §12-2506.

c. Moreover, the Arizona Court of Appeals found, that "fault" does not include intentional torts, and thus "[w]e disagree that the trial court erred by denying the comparative fault instruction directed towards Strawberry. Conversion and utility tampering, as alleged in this case, are intentional acts." *Strawberry Water Co. v. Paulsen*, 207 P.3d 654, 662 (Ct. App. 2008).

# ARKANSAS - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is a common-law tort action for the wrongful possession or disposition of another's property. To establish liability for the tort of conversion, a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owners' rights. *See McQuillan v. Mercedes-Benz Credit Corp.*, 961 S.W.2d 729, 732 (Ark. 1998).

2. **Conversion of Money**

   a. Anything which is the subject of property and is of a personal nature is the subject of conversion, and so a bank draft may be converted. *See Hooten v. State for Use of Cross Cnty.*, 178 S.W. 310, 313 (1915).

3. **Necessary Intent for Conversion**

   a. Intent required to commit conversion is not conscious wrongdoing but rather an intent to exercise dominion or control over the goods in a way inconsistent with the plaintiff's rights. *See Durham v. Smith*, 374 S.W.3d 799, 805 (2010).

4. **Damages Recoverable for Conversion Claim**

   a. Proper measure of damages in a conversion action is the fair market value of the property at the time and place of conversion. *See Durham v. Smith*, 374 S.W.3d 799, 805 (2010).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Ark. Code Ann. §16-55-201 provides, "[i]n any action for personal injury, medical injury, property damage, or wrongful death, the liability of each defendant for compensatory or punitive damages shall be several only and shall not be joint. (b)(1) Each defendant shall be liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of

fault."

b. Ark. Code Ann. §16-55-205 provides, "(a) Notwithstanding § 16-55-201, a party is responsible for the fault of another person or entity or for payment of the proportionate share of another person or entity if both the party and the other person or entity were acting in concert or if the other person or entity was acting as an agent or servant of the party. (b)(1) As used in this section, "acting in concert" means entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively taking part in that intentional tort. (2) "Acting in concert" does not mean the act of any person or entity whose conduct was negligent in any degree other than intentional."

# CALIFORNIA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. *See Los Angeles Fed. Credit Union v. Madatyan*, 209 Cal. App. 4th 1383, 1387 (2012).

2. **Conversion of Money**

   a. Money can be the subject of an action for conversion if a specific sum capable of identification is involved. *See Avidor v. Sutter's Place, Inc.*, 212 Cal. App. 4th 1439, 1452 (2013).

3. **Necessary Intent for Conversion**

   a. Conversion is a strict liability tort. *See Los Angeles Fed. Credit Union v. Madatyan*, 209 Cal. App. 4th 1383, 1387 (2012).

4. **Damages Recoverable for Conversion Claim**

   a. The detriment caused by the conversion of personal property is presumed to be first, the value of the property at the time of the conversion. Civ. Code §3336.

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. With respect to economic damages, codefendants are jointly and severally liable, but with respect to noneconomic damages, liability is several but not joint, and thus, any reduction in a damages award to reflect comparative fault is applied only to noneconomic damages. *See Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1322 n.20 (2013), opinion modified on denial of reh'g, No. B232315, 2013 WL 6192658 (Cal. Ct. App. Nov. 27, 2013).

   b. In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant

in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount.  Cal. Civ. Code §1431.2.

## COLORADO - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. A 'conversion' is defined to be any act of the defendant inconsistent with the plaintiff's right of possession, or subversive of his right of property. *See Kinney v. Keith*, 128 P.3d 297, 315 (Colo. Ct. App. 2005). In an action for conversion, the plaintiff's case is ownership, possession, taking, and conversion. *See McLagan v. Granato*, 252 P. 348, 415 (1927).

2. **Conversion of Money**

   a. An action will lie for the conversion of money where there is an obligation to return or otherwise particularly treat specific money. *See Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. Ct. App. 2008).

3. **Necessary Intent for Conversion**

   a. The tort of conversion does not require that a tortfeasor act with the specific intent to permanently deprive the owner of his or her property. *See Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1199 (Colo. Ct. App. 2009).

4. **Damages Recoverable for Conversion Claim**

   a. Damages for conversion are based upon property's fair market value at time and place of the conversion, plus interest thereon. *See Employers' Fire Ins. Co. v. W. Guar. Fund Servs.*, 924 P.2d 1107, 1111 (Colo. Ct. App. 1996).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Colo. Rev. Stat. Ann. §13-21-111.5 provides, "(1) In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss, except as provided in subsection (4) of this section. [¶] (4) Joint liability shall be imposed on two or more persons who consciously conspire and deliberately pursue a common plan or design to commit a tortious

act. Any person held jointly liable under this subsection (4) shall have a right of contribution from his fellow defendants acting in concert. A defendant shall be held responsible under this subsection (4) only for the degree or percentage of fault assessed to those persons who are held jointly liable pursuant to this subsection (4)."

# CONNECTICUT - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

    a. To establish a prima facie case of conversion, the plaintiff must demonstrate that: (1) the property at issue belonged to the plaintiff; (2) the defendants deprived the plaintiff of that property for an indefinite period of time; (3) the defendants' conduct was unauthorized; and (4) the defendants' conduct harmed the plaintiff. *See Stewart v. King*, 994 A.2d 308, 316 (2010).

2. **Conversion of Money**

    a. Money can be subject to conversion, but the plaintiffs must establish legal ownership or right to possession of specifically identifiable moneys. *See Deming v. Nationwide Mut. Ins. Co.*, 905 A.2d 623, 640 (2006).

3. **Necessary Intent for Conversion**

    a. Statutory theft is distinguishable from conversion in that statutory theft requires intent to deprive another of his property, while conversion requires owner to be harmed by defendant's conduct; therefore, statutory theft requires plaintiff to prove additional element of intent over and above what he or she must demonstrate to prove conversion. *See Rana v. Terdjanian,* 46 A.3d 175, 185-86 (2012).

4. **Damages Recoverable for Conversion Claim**

    a. The general rule recognized in numerous decisions in Connecticut is that the measure of damages in conversion is the value of the goods at the date of the conversion. *See Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co., Inc.*, 477 A.2d 988, 996-97 (1984).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

    a. Conn. Gen. Stat. Ann. §52-572h provides, "[i]n a negligence action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, if the damages are determined to be

proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for such party's proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section."

b.  However, "[b]y its own terms, the comparative negligence statute [§ 52–572h] applies only to 'causes of action based on negligence.'" *Bhinder v. Sun Co., Inc.*, 717 A.2d 202, 207 (1998).

**DELAWARE - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it." *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009).

2. **Conversion of Money**

   a. An action for conversion of money will lie only where there is an obligation to return the identical money delivered by the plaintiff to the defendant. *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 890 (Del. Ch. 2009).

3. **Necessary Intent for Conversion**

   a. Conversion is always an intentional exercise of dominion or control over the chattel. Mere Non-Feasance or negligence, without such an intent, is not sufficient for a conversion. If the actor has the intent to do the act exercising dominion or control, however, he is not relieved from liability by his mistaken belief that he has possession of the chattel or the right to possession or that he is privileged to act. *See Stickney v. Goldstein*, No. CIV.A. 1997-10-011, 2002 WL 31999358, *11 (Del. Com. Pl. Mar. 14, 2002).

4. **Damages Recoverable for Conversion Claim**

   a. It is generally recognized that the measure of damages for conversion is the value of the chattel at the time of the conversion. *See Segovia v. Equities First Holdings, LLC*, No. CIV.A.06C09-149-JRS, 2008 WL 2251218, at *21 (Del. Super. Ct. May 30, 2008).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Delaware has long recognized that when the tortious acts of two or more persons concur in producing a single indivisible injury, such persons are jointly and severally liable, though there was no common duty, common design, or concerted action. The joint and several liability of two codefendants entitles the plaintiff to

seek recovery from either or both of the defendants, provided that total recovery does not exceed the full amount of damages. *See Campbell v. Robinson*, No. 06C-05-176PLA, 2007 WL 1765558, at *2 (Del. Super. June 19, 2007).

**DISTRICT OF COLUMBIA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. The essence of a conversion is a wrongful taking or a wrongful retention of property after a rightful possession. *See Shehyn v. D.C.*, 392 A.2d 1008, 1012 (D.C. 1978).

2. **Conversion of Money**

   a. The DC Court of Appeals analyzed *Citibank, N.A. v. Warner*, 449 N.Y.S.2d 822 (N.Y.Sup.Ct.1981) in deciding conversion of money case, and finding that while conversion of money claim could be viable it was not in the specific case where the alleged converter acted in good faith in believing that the money was his. *See Chase Manhattan Bank v. Burden*, 489 A.2d 494, 495 (D.C. 1985).

   b. An earlier DC Courts of Appeals decision found that a firm wrongfully converted money. *See Mearns v. Chatard*, 47 App. D.C. 257, 262 (D.C. 1918).

3. **Necessary Intent for Conversion**

   a. Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. *See Blanken v. Harris, Upham & Co., Inc.*, 359 A.2d 281, 283 (D.C. 1976).

   b. In a conversion claim, the motive or intent of the taker as to his right to the property is irrelevant. *See Langley Fed. Credit Union v. Harp*, 471 F. Supp. 565, 574 (D.D.C. 1979).

4. **Damages Recoverable for Conversion Claim**

   a. The usual and traditional measure of damages for conversion of property is the fair market value of the property at the time of the conversion. *See Trustees of Univ. of D.C. v. Vossoughi*, 963 A.2d 1162, 1175 (D.C. 2009).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Ordinarily, when two tortfeasors jointly contribute to harm to a plaintiff, both are

potentially liable to the injured party for the entire harm.  *See Nat'l Health Labs., Inc. v. Ahmadi*, 596 A.2d 555, 557 (D.C. 1991).

b.  If two or more tortfeasors produce a single injury, the plaintiff may sue each one for the full amount of the damage and hold the defendants severally liable; but the plaintiff can obtain only a single recovery, and each defendant will be entitled to a credit for any sum that the plaintiff has collected from the other defendant.  *See Leiken v. Wilson*, 445 A.2d 993, 999 (D.C. 1982).

# FLORIDA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. A conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time. *See* Mayo v. Allen, 973 So. 2d 1257, 1258 (Fla. Dist. Ct. App. 2008).

2. **Conversion of Money**

   a. Withdrawal of funds from a bank account may form the basis of an action for conversion "if the specific money in question can be identified. *See Joseph v. Chanin*, 940 So. 2d 483, 486 (Fla. Dist. Ct. App. 2006).

3. **Necessary Intent for Conversion**

   a. Conversion may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action. *See Seymour v. Adams*, 638 So. 2d 1044, 1047 (Fla. Dist. Ct. App. 1994).

4. **Damages Recoverable for Conversion Claim**

   a. As a general proposition, the owner of property which has been converted is entitled to fair value at the time and place of the conversion, with interest. *Christopher Adver. Grp., Inc. v. R & B Holding Co., Inc.*, 883 So. 2d 867, 871 (Fla. Dist. Ct. App. 2004).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Fla. Stat. Ann. §768.81 provides, "[i]n a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability.

   b. In action against car rental company for negligence in failing to warn of dangers of driving in certain areas, permitting jury to apportion fault between company and nonparty who committed intentional torts against customers was error; comparative fault statute generally governing negligence cases did not apply

because action was based upon an intentional tort. *See Stellas v. Alamo Rent-A-Car, Inc.*, 702 So. 2d 232, *passim* (Fla. 1997).

**GEORGIA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Under Georgia law, conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. *See Nash v. United Bank-Thomaston*, 734 S.E.2d 238, 241 (Ga. Ct. App. 2012).

   b. Ga. Code Ann. §51-10-1 provides, "[t]he owner of personalty is entitled to its possession. Any deprivation of such possession is a tort for which an action lies."

2. **Conversion of Money**

   a. Although OCGA § 51-10-1 refers only to personalty, there can be a conversion of specific money as well as chattels. However, the plaintiff must show that the money converted comprises a specific and identifiable sum. *See Levenson v. Word*, 668 S.E.2d 763, 766 (Ga. Ct. App. 2008) aff'd, 686 S.E.2d 236 (Ga. 2009).

3. **Necessary Intent for Conversion**

   a. It is immaterial, for purposes of the tort of conversion, that the dominion over the personal property of another was exercised in good faith or by accident. *See Both v. Frantz*, 629 S.E.2d 427, 431 (Ga. Ct. App. 2006).

4. **Damages Recoverable for Conversion Claim**

   a. In an action for conversion, the measure of damages set forth in statute permitting plaintiff to recover as damages (O.C.G.A. § 44-12-152) amount of highest value which plaintiff is able to prove existed between time of conversion and trial applies only when the property continues to be unlawfully detained. *See Lamb v. Salvage Disposal Co. of Georgia*, 535 S.E.2d 258, 261 (Ga. Ct. App. 2000).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Except as provided in Code Section 51-12-33, where an action is brought jointly against several persons, the plaintiff may recover damages for an injury caused by

any of the defendants against only the defendant or defendants liable for the injury. Ga. Code Ann. § 51-12-31.

b. Where an action is brought against more than one person for injury to person or property, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the persons who are liable according to the percentage of fault of each person. Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution. Ga. Code Ann. §51-12-33.

c. However, in all cases, a person who maliciously procures an injury to be done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury. Ga. Code Ann. §51-12-30.

d. Thus, if the plaintiff is not partly responsible for the injury, joint tortfeasors are equally liable for the judgment, regardless of their relative degree of responsibility. *See Rust Int'l Corp. v. Greystone Power Corp.*, 133 F.3d 1378, 1382 (11th Cir. 1998).

## HAWAII - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion encompasses the following acts: (1) A taking from the owner without his consent; (2) an unwarranted assumption of ownership; (3) an illegal use or abuse of the chattel; and (4) a wrongful detention after demand. *See Freddy Nobriga Enterprises, Inc. v. State, Dep't of Hawaiian Home Lands*, 295 P.3d 993, 999 (Haw. Ct. App. 2013).

2. **Conversion of Money**

   a. The U.S. District Court for Hawaii found that where a plaintiff sought damages against defendant for conversion of $70,000, the plaintiff was entitled to damages of $70,000, which was the amount of cash that the defendant had converted. *See Gold Refinery, LLC v. Aloha Island Gold, LLC*, No. CV 11-00522 SOM-RLP, 2014 WL 692907, at *7 (D. Haw. Feb. 21, 2014). In a separate case, the same court noted, "[i]ndeed, the courts have repeatedly held that corporate officers who use corporate monies to pay for personal expenses are liable for conversion." *Fisher v. Cooper*, No. CIV. 09-00232 JMS-LE, 2009 WL 5177768, at *3 (D. Haw. Dec. 30, 2009) *report and recommendation adopted,* CIV.09-00232 JMS/LEK, 2010 WL 533025 (D. Haw. Feb. 16, 2010).

3. **Necessary Intent for Conversion**

   a. Conversion does not require wrongful intent. *Freddy Nobriga Enterprises, Inc. v. State, Dep't of Hawaiian Home Lands*, 295 P.3d 993, 999-1000 (Haw. Ct. App. 2013).

4. **Damages Recoverable for Conversion Claim**

   a. In conversion cases, the measure of damages ordinarily would be the fair reasonable value of the property at the time of the conversion. *See Tsuru v. Bayer*, 25 Haw. 693, 699 (1920).

**5. Joint and Several Liability/Comparative Fault for Conversion Claim**

    a. Haw. Rev. Stat. § 663-10.9 provides that "[j]oint and several liability for joint tortfeasors as defined in section 663-11 is abolished except in the following circumstances: . . . For the recovery of economic and noneconomic damages against joint tortfeasors in actions involving: (A) Intentional torts."

# IDAHO - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Three elements are required for a claim of conversion: (1) that the charged party wrongfully gained dominion of property; (2) that property is owned or possessed by plaintiff at the time of possession; and (3) the property in question is personal property. *See Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010).

2. **Conversion of Money**

   a. Money may be the subject of conversion, but only if it is shown that the money at all times belonged to the plaintiff and that the defendant converted it to his own use. *See Karimi v. 401 N. Wabash Venture, LLC*, 952 N.E.2d 1278, 1285 (Idaho Ct. App. 2011).

3. **Necessary Intent for Conversion**

   a. Intent is not a necessary element for conversion—all which is required is that the defendant exercised dominion or control over the property of another. *See Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Idaho 1999).

4. **Damages Recoverable for Conversion Claim**

   a. The proper measure of damages for wrongful taking of personal property is the reasonable value of its use, with interest, during the period of detention. *See Weaver v. Pac. Fin. Loans*, 487 P.2d 939, 941 (Idaho 1971).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. A party shall be jointly and severally liable for the fault of another person or entity or for payment of the proportionate share of another party where they were acting in concert or when a person was acting as an agent or servant of another party. As used in this section, "acting in concert" means pursuing a common plan or design which results in the commission of an intentional or reckless tortious act. Idaho Code Ann. §6-803.

   b. The law seems to be well settled that, where several people actively participate in

any manner in the commission of a tort, not only the actual actor or assailant is liable but all others who aid, abet, counsel or encourage the wrongdoer by words, gestures, looks or signs are equally liable with him to the injured person. *See Todd v. Sullivan Const. LLC*, 191 P.3d 196, 203 (Idaho 2008).

**ILLINOIS - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the wrongful possession or disposition of another's property as if it were one's own; an act or series of acts or willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property. *See In re Karavidas*, 999 N.E.2d 296, 309 (Ill. 2013).

2. **Conversion of Money**

   a. The subject of conversion must be an identifiable object. Money may be the subject of conversion when if it is shown that the money at all times belonged to the plaintiff and that the defendant converted it to his own use. See *Karimi v. 401 N. Wabash Venture, LLC*, 952 N.E.2d 1278, 1285 (Ill. App. Ct. 2011).

3. **Necessary Intent for Conversion**

   a. Although conversion is considered an intentional tort because it requires an intentional exercise of dominion or control over a chattel, it does not require proof of malice, culpability, or conscious wrongdoing. *See Martel Enterprises v. City of Chicago*, 584 N.E.2d 157, 159 (Ill. Ct. App. 1991). Relief in an action for conversion may be had without establishing malice, culpability or conscious wrongdoing. Thus, knowledge is not an element of the cause of action. *See Douglass v. Wones*, 458 N.E.2d 514, 519 (Ill. Ct. App. 1983).

4. **Damages Recoverable for Conversion Claim**

   a. Generally, the measure of damages for conversion of personal property is the market value of the property at the time and place of conversion plus legal interest. *See Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 284 (Ill. Ct. App. 2009).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. 735 ILCS 5/2-1117 provides, "except as provided in Section 2-1118, in actions on

account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be severally liable for all other damages. Any defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants except the plaintiff's employer, shall be jointly and severally liable for all other damages."

b. Thus, it is a well-established principle in Illinois law, that where a plaintiff's injuries are separable, defendants are not jointly and severally liable for the damages. However, "where defendants, albeit sharing no common purpose or duty, and failing to act in concert, nevertheless acted concurrently to produce an indivisible injury to the plaintiff," the defendants are joint tortfeasors. *See Auten v. Franklin*, 942 N.E.2d 500, 509 (Ill. Ct. App. 2010).

c. Section 2-1117 requires, as a threshold matter, that the liability of the tortfeasors which is at issue be capable of being legally apportioned. If the liability cannot be legally apportioned, then section 2-1117 never comes into play. We have noted that it is legally impossible to apportion liability among tortfeasors who act in concert. Logically, therefore, section 2-1117 cannot apply to cases where the tortfeasors act in concert to cause a plaintiff's injury. *See Woods v. Cole*, 693 N.E.2d 333, 337 (Ill. 1998).

# INDIANA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's. *See Schrenker v. State*, 919 N.E.2d 1188, 1194 (Ind. Ct. App. 2010).

2. **Conversion of Money**

   a. Our cases make clear that money may be the subject of an action for conversion where it is capable of being identified as a special chattel. The money must be a determinate sum with which the defendant was entrusted to apply to a certain purpose. *See Bowden v. Agnew*, 2 N.E.3d 743, 750 (Ind. Ct. App. Jan. 9, 2014).

3. **Necessary Intent for Conversion**

   a. Mens rea, however, is not an element of tortious conversion under Indiana law. *See Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 564 (7th Cir. 2011). Rather, a plaintiff need only demonstrate that the defendant exerted unauthorized control over the plaintiff's property. *See MNW, LLC v. Mega Auto Grp., Inc.*, 884 F. Supp. 2d 740, 765 (N.D. Ind. 2012).

4. **Damages Recoverable for Conversion Claim**

   a. As a general rule, damages in an action for conversion are measured by the fair market value of the property calculated at the time of conversion with interest from that date. *See Chaiken v. Eldon Emmor & Co., Inc.*, 597 N.E.2d 337, 344 (Ind. Ct. App. 1992).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. If the percentage of fault of the claimant is not greater than fifty percent (50%) of the total fault, the jury shall then determine the total amount of damages the claimant would be entitled to recover if contributory fault were disregarded. The

jury next shall multiply the percentage of fault of each defendant by the amount of damages determined under subdivision (3) and shall enter a verdict against each defendant (and such other defendants as are liable with the defendant by reason of their relationship to a defendant) in the amount of the product of the multiplication of each defendant's percentage of fault times the amount of damages as determined under subdivision (3). *See* Ind. Code Ann. §34-51-2-8.

b. Moreover, Indiana's comparative fault statute applies to intentional torts. *See Becker v. Fisher*, 852 N.E.2d 46, 48 (Ind. Ct. App. 2006).

c. However, joint liability may be established if the acts of various tortfeasors through cooperation or in concert accomplish a particular wrong. Additionally, joint liability may be premised upon independent acts that combine to produce a single injury. *Nance v. Miami Sand & Gravel, LLC*, 825 N.E.2d 826, 835 (Ind. Ct. App. 2005).

## IOWA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the intentional exercise of control over property which so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel. *See State v. Hollinrake*, 608 N.W.2d 806, 808 (Iowa Ct. App. 2000).

2. **Conversion of Money**

   a. The Iowa Supreme Court found that a car salesman had converted buyer incentives (money) that he had received by purchasing used cars for dealership at auctions. *See Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999).

3. **Necessary Intent for Conversion**

   a. Conversion only requires intentional dispossession; it does not contemplate the actor's motivation. *State v. Hollinrake*, 608 N.W.2d 806, 809 (Iowa Ct. App. 2000). Although the tort includes an intent element, it is an intent to exercise dominion or control. The converter's good faith, ignorance of the owner's true rights, mistake, or the owner's negligence are irrelevant. *See Towe Farms, Inc. v. Cent. Iowa Prod. Credit Ass'n*, 528 F. Supp. 500, 506 (S.D. Iowa 1981).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages in an action for conversion ordinarily is the fair and reasonable market value at the time and place of taking. Generally, interest is allowed from the date of conversion. *See F.S. Credit Corp. v. Shear Elevator, Inc.*, 377 N.W.2d 227, 234-35 (Iowa 1985).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Iowa Code Ann. §668.4 provides that "[i]n actions brought under this chapter, the rule of joint and several liability shall not apply to defendants who are found to bear less than fifty percent of the total fault assigned to all parties. However, a

defendant found to bear fifty percent or more of fault shall only be jointly and severally liable for economic damages and not for any noneconomic damage awards."

b.  However, Iowa's Comparative Fault Act does not extinguish joint and several liability when the defendants acted in concert or where one defendant gave substantial assistance to another defendant.  *See Reilly v. Anderson*, 727 N.W.2d 102, 109 (Iowa 2006).

c.  Moreover, Iowa's Comparative Fault Act does not apply to intentional torts.  *See Catipovic v. Peoples Cmty. Health Clinic, Inc.*, 239 F. Supp. 2d 917 (N.D. Iowa 2003).

# KANSAS - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a.  Conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.  *See Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005).

2. **Conversion of Money**

   a. An action will not lie for conversion of a debt.  However, an action of conversion will lie when there is an obligation to return identical money.  *See V.C. Video, Inc. v. Nat'l Video, Inc.*, 755 F. Supp. 962, 968 (D. Kan. 1990); *see also Carmichael v. Halstead Nursing Ctr., Ltd.*, 701 P.2d 934 (Kan. 1985) (finding that action may be maintained for conversion of checks, including resulting from an unauthorized endorsement).

3. **Necessary Intent for Conversion**

   a. Conversion is a strict liability tort. The required intent is shown by the use or disposition of property belonging to another, and knowledge or ignorance as to ownership of the property is irrelevant.  *See Bank v. Parish*, 264 P.3d 491, 498 (Kan. Ct. App. 2011) aff'd, 104,316, 2014 WL 265557 (Kan. Jan. 24, 2014); *Watkins v. Layton*, 324 P.2d 130, 134 (Kan. 1958) (finding that if mortgagee fails to account for proceeds of sale he/she is liable in conversion).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for conversion of personal property is the value of the property at the time and place of the conversion.  *See Davis v. Odell*, 729 P.2d 1117, 1125 (Kan. 1986).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Kan. Stat. Ann. §60-258a(d) provides, "When the comparative negligence of the parties is an issue and recovery is permitted against more than one party, each party is liable for that portion of the total dollar amount awarded as damages to a

claimant in the proportion that the amount of that party's causal negligence bears to the amount of the causal negligence attributed to all parties against whom recovery is permitted."

b. However, the Kansas comparative fault statute has done nothing to change common-law rule of joint and several liability for defendants in intentional tort actions. *See Gray v. City of Kansas City, Kan.*, 603 F. Supp. 872, 876 (D. Kan. 1985).

## KENTUCKY - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. The elements necessary to prove a conversion claim established in case law are: (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property. *See Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005).

2. **Conversion of Money**

   a. While a conversion action may be maintained for the recovery of money physically taken by Defendant from Plaintiff's possession, a conversion action will not lie to enforce a mere obligation to pay. *See James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 827 (E.D. Ky. 2013).

3. **Necessary Intent for Conversion**

   a. Motive and good faith are immaterial in an action for conversion. *See In re Heflin*, 326 B.R. 696, 701 (Bankr. W.D. Ky. 2005); *Urban v. Lansing's Adm'r*, 239 Ky. 218, 39 S.W.2d 219, 220-21 (1931).

4. **Damages Recoverable for Conversion Claim**

   a. The traditional measure of damages for the conversion or destruction of personal property is the fair market value of the property at the time and place of the loss, with interest, in the discretion of the jury, from the time of the conversion. *See*

*Amlung v. Bankers Bond Co.*, 411 S.W.2d 689, 693 (Ky. 1967).

**5. Joint and Several Liability/Comparative Fault for Conversion Claim**

    a.   Liability among joint tortfeasors is no longer joint and several, but is several only; and because the liability is several as to each joint tortfeasor, it is necessary to apportion a specific share of the total liability to each of them, whether joined in the original complaint or by third-party complaint, and the several liability of each joint tortfeasor with respect to the judgment is limited by the extent of his/her fault. *See Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 779 (Ky. 2000); Ky. Rev. Stat. Ann. §411.182.

## LOUISIANA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion. A conversion is committed when any of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel. *See New Orleans Jazz & Heritage Found., Inc. v. Kirksey*, 40 So. 3d 394, 405-06 (La. Ct. App. 2010).

2. **Conversion of Money**

   a. The Louisiana Court of Appeals found that the transfer by a bank of $2,000 from a customer's account to bank's account after customer deposited $2,000 cashier's check given to him by bank after customer complained that $2,000 had been withdrawn from his account and gave bank affidavit of forgery constituted conversion. *See Labbe v. Premier Bank*, 618 So. 2d 45, 47 (La. Ct. App. 1993); *see also Whitley v. Manning*, 623 So. 2d 100, 105 (La. Ct. App. 1993) (finding that "the defendant not only knew of the conversion but in fact converted a substantial amount of money from the plaintiffs").

3. **Necessary Intent for Conversion**

   a. Issues of fault, intent, negligence, knowledge or ignorance, and/or good faith are not involved in actions for tortious conversion. *See Duhon v. Briley*, 117 So. 3d 253, 261 (2013).

4. **Damages Recoverable for Conversion Claim**

   a. The general rule is that the measure of damages for a tortious conversion consists

of the value of the property wrongfully appropriated plus interest. *See Ortego v. Ortego*, 471 So. 2d 1106, 1110 (La. Ct. App. 1985).

**5. Joint and Several Liability/Comparative Fault for Conversion Claim**

a. La. Civ. Code Ann. art. 2324 provides, "A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable."

**MAINE - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. The necessary elements to make out a claim for conversion are: (1) a showing that the person claiming that his property was converted has a property interest in the property; (2) that he had the right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for its return that was denied by the holder. *See Withers v. Hackett*, 714 A.2d 798, 800 (Me. 1998).

2. **Conversion of Money**

   a. Money may be the subject of an action in conversion and it is not necessary to identify the money specifically. Rather, a description of the money in general terms will be sufficient, so long as it is identified with as much reasonable certainty as the nature of the case will permit. *See Williams v. Williams*, 90 A. 500, 501 (Me. 1914).

3. **Necessary Intent for Conversion**

   a. The converter need not intend any conscious wrongdoing, but need only act with an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. *See Mitchell v. Allstate Ins. Co.*, 36 A.3d 876, 880 (Me. 2011).

4. **Damages Recoverable for Conversion Claim**

   a. The traditional measure of damages in a conversion action is the value of the property at the time of the unlawful conversion. *See Doughty v. Sullivan*, 661 A.2d 1112, 1122 (Me. 1995).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. When two tort-feasors cause a single injury through their independent tortious acts, the victim has the option to recover full damages from either or both. *See Peerless Div., Lear Siegler, Inc. v. U.S. Special Hydraulic Cylinders Corp.*, 742

A.2d 906, 909 (Me. 1999).

b.  Me. Rev. Stat. tit. 14, §156 provides in part, "In a case involving multiparty defendants, each defendant is jointly and severally liable to the plaintiff for the full amount of the plaintiff's damages."

# MARYLAND - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind. The physical act is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004).

2. **Conversion of Money**

   a. The general rule is that monies are intangible and, therefore, not subject to a claim for conversion. An exception to this rule exists, however, if the monies alleged to have been converted are specific, segregated or identifiable funds. *See Lasater v. Guttmann,* 5 A.3d 79, 88 (Md. Ct. Spec. App. 2010).

3. **Necessary Intent for Conversion**

   a. Although having the intent to exercise dominion or control over another's property is a necessary element of an action for conversion, a defendant is liable nonetheless for conversion if he, she, or it acted in good faith and lacked any consciousness of wrongdoing, as long as the act is an interference with the owner's control of the property. *See Nickens v. Mount Vernon Realty Grp., LLC*, 54 A.3d 742, 757 (Md. 2012).

4. **Damages Recoverable for Conversion Claim**

   a. Damages for conversion are measured by the fair market value of the property at the time and place of the conversion. *See Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 685 (Md. Ct. Spec. App. 2012).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. The concept of a "joint tort-feasor" is derived from the notion that a single injury can result from the joint actions of two or more individuals, who, putting aside defenses, may be jointly and severally liable. Each individual is severally liable

for the entire damage, regardless of whether the conduct of one directly caused more or less injury compared to that of another, because they acted together with a common purpose resulting in responsibility for the common injury.  *See Mercy Med. Ctr. v. Julian*, 56 A.3d 147, 150 (Md. 2012).

# MASSACHUSETTS - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. The elements of conversion require that a defendant be proved to have intentionally or wrongfully exercised acts of ownership, control or dominion over personal property to which he has no right of possession at the time. *See Bleicken v. Stark*, 813 N.E.2d 572, 576 (Mass. App. Ct. 2004).

2. **Conversion of Money**

   a. Money may be the subject of conversion. *See In re Hilson*, 863 N.E.2d 483, 491 (Mass. 2007).

3. **Necessary Intent for Conversion**

   a. There is no requirement that the one converting property be shown to have had the intent to deprive permanently the rightful owner of its use and enjoyment, as in stealing. *See In re Hilson*, 863 N.E.2d 483, 491 (Mass. 2007).

4. **Damages Recoverable for Conversion Claim**

   a. Fair market value at the time and place of the conversion is the usual measure of damages for a wrongful seizure of property. *See Clapp v. Haynes*, 414 N.E.2d 359, 362 (Mass. App. Ct. 1980).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Under Massachusetts' current system of joint and several liability, a plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages. *See Shantigar Found. v. Bear Mountain Builders*, 804 N.E.2d 324, 332 (Mass. 2004).

   b. Massachusetts' comparative negligence law, G.L. c. 231, § 85, is irrelevant to the apportionment of liability among joint tortfeasors. *See Mitchell v. Hastings & Koch Enterprises, Inc.*, 647 N.E.2d 78, 84 (Mass. Ct. App. 1995).

# MICHIGAN - CONVERSION

1.  **Definition of Conversion/Elements of Conversion**

    a.  Common law conversion is any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein. *See Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603 (Mich. Ct. App. 1999).

2.  **Conversion of Money**

    a.  To support an action for conversion of money, the defendant "must have obtained the money without the owner's consent to the creation of a debtor-creditor relationship" and "must have had an obligation to return the specific money entrusted to his care." *See Lawsuit Fin., L.L.C. v. Curry*, 683 N.W.2d 233, 240 (2004).

    b.  However, it is not necessary that the money be specifically earmarked for its return. *See Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc.*, 178 Mich. App. 570, 444 N.W.2d 210 (1989).

3.  **Necessary Intent for Conversion**

    a.  Though the tort is an intentional tort because the converter's acts are willful, one can also commit this tort while being unaware of the plaintiff's property interest *See Lawsuit Fin., L.L.C. v. Curry*, 683 N.W.2d 233, 240 (Mich. Ct. App. 2004).

4.  **Damages Recoverable for Conversion Claim**

    a.  The measure of damages for the conversion of personal property is the value of the property at the time of the conversion. *See Willis v. Ed Hudson Towing, Inc.*, 311 N.W.2d 776, 778 (Mich. Ct. App. 1981).

5.  **Joint and Several Liability/Comparative Fault for Conversion Claim**

    a.  Mich. Comp. Laws Ann. §600.2956 provides, "Except as provided in section 6304, in an action based on tort or another legal theory seeking damages for

personal injury, property damage, or wrongful death, the liability of each defendant for damages is several only and is not joint."

**MINNESOTA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use and possession. *See Thomas B. Olson & Associates, P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 920 (Minn. Ct. App. 2008).

2. **Conversion of Money**

   a. Under Minnesota law, money can be considered tangible personal property for purposes of establishing conversion claim. *See Cummins Law Office, P.A. v. Norman Graphic Printing Co. Ltd.*, 826 F. Supp. 2d 1127 (D. Minn. 2011).

3. **Necessary Intent for Conversion**

   a. The innocent misapplication or deprivation of property owned by another is in the law no less a conversion because such was done innocently or in ignorance. *See Herrmann v. Fossum*, 364 N.W.2d 501, 503 (Minn. Ct. App. 1985).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages in a conversion case is generally the value of the property at the time of the conversion plus interest from that time. *See McKinley v. Flaherty*, 390 N.W.2d 30, 33 (Minn. Ct. App. 1986).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Minn. Stat. Ann. §604.02 provides, "[w]hen two or more persons are severally liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that the following persons are jointly and severally liable for the whole award: (1) a person whose fault is greater than 50 percent; (2) two or more persons who act in a common scheme or plan that results in injury; (3) a person who commits an intentional tort . . ."

**MISSISSIPPI - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. To establish the tort of conversion, a plaintiff must show a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand. *See Stevens v. Smith*, 71 So. 3d 1230, 1233 (Miss. Ct. App. 2011).

2. **Conversion of Money**

   a. The Mississippi Court of Appeals found that a sibling's removal of money from a joint savings account shared with two other siblings constituted conversion. *Stevens v. Smith*, 71 So. 3d 1230, 1233 (Miss. Ct. App. 2011).

3. **Necessary Intent for Conversion**

   a. The intent required does not have to be that of a wrongdoer. *See Stevens v. Smith*, 71 So. 3d 1230, 1233 (Miss. Ct. App. 2011).

4. **Damages Recoverable for Conversion Claim**

   a. In a conversion action, the measure of damages is the value of the property at the time and place of the conversion. *Cmty. Bank, Ellisville, Mississippi v. Courtney*, 884 So. 2d 767, 775 (Miss. 2004).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Miss. Code. Ann. §85-5-7 provides "[i]n any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault."

   b. However, "fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent. Miss. Code. Ann. §85-5-7.

   c. Moreover, Miss. Code. Ann. §85-5-7(4) provides, "joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly

and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert."

**MISSOURI - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. The elements of a claim for conversion are: (1) the plaintiff owned the property or was entitled to possess it; (2) the defendant took possession of the property with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession. *See Herron v. Barnard*, 390 S.W.3d 901, 909 (Mo. Ct. App. 2013).

2. **Conversion of Money**

   a. An action for conversion does not generally lie for the wrongful taking of money. *See Kingfisher Hospitality, Inc. v. Behmani*, 335 S.W.3d 486, 500 (Mo. Ct. App. 2011). Nevertheless, money can be an appropriate subject of conversion when it can be described or identified as a specific chattel. As an example, an action for conversion may lie to claim the deposit of money made before the purchase of a vehicle. Similarly, misappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion. *See In re Estate of Boatright*, 88 S.W.3d 500, 506 (Mo. Ct. App. 2002).

3. **Necessary Intent for Conversion**

   a. To establish conversion, it is not essential to prove that the defendant acted with wrongful motive or intent. *See Moore Equip. Co. v. Callen Const. Co., Inc.*, 299 S.W.3d 678, 682 (Mo. Ct. App. 2009).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for the conversion is the fair market value of the property at the time and place of the conversion. *See Sleepy Hollow Ranch LLC v. Robinson,* 373 S.W.3d 485, 498 (Mo. Ct. App. 2012).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Joint and several liability is recognized in Missouri to allocate the financial burden of harm among the parties at fault in causing the plaintiff's injuries. Joint

or concurrent tort-feasors are severally, as well as jointly, answerable to the injured party for the full amount of the injuries. The injured party may sue all or any of the joint or concurrent tort-feasors and obtain a judgment against all or any of them.   Unless the damage caused by each of such concurrent or joint tort-feasors is clearly separable each is liable for the entire damage.   *See Gramex Corp. v. Green Supply, Inc.*, 89 S.W.3d 432, 439-40 (Mo. 2002).

## MONTANA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. A plaintiff alleging a claim of conversion must establish the following four elements: (1) property ownership by the plaintiff; (2) plaintiff's right of possession of the property; (3) defendant's unauthorized control over the property; and (4) damages. *See Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, 343 (Mont. 2013).

2. **Conversion of Money**

   a. An action lies for the conversion of money, if sufficiently described. *See Kramlich v. Tullock*, 84 Mont. 601, 277 P. 411, 414 (Mont. 1929).

3. **Necessary Intent for Conversion**

   a. The Montana Supreme Court found that it was not necessary for the plaintiff to allege and prove that the defendant was actuated by malice and acted without probable cause in interfering with the plaintiff's use of its property. *See Interstate Nat. Bank v. McCormick*, 67 Mont. 80, 214 P. 949, 951 (Mont. 1923).

4. **Damages Recoverable for Conversion Claim**

   a. The detriment caused by the wrongful conversion of personal property is presumed to be: (a) the value of the property at the time of its conversion with the interest from that time or, when the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict without interest, at the option of the injured party; and (b) a fair compensation for the time and money properly expended in pursuit of the property. *See* Mont. Code Ann. §27-1-320.

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Mont. Code Ann. §27-1-703 provides, "Each party against whom recovery may be allowed is jointly and severally liable for the amount that may be awarded to the claimant but has the right of contribution from any other person whose

negligence may have contributed as a proximate cause to the injury complained of."

b.  In the absence of proof that an injury is divisible, the defendant is jointly and severally liable for the plaintiff's entire injury pursuant to the indivisible injury rule.  *See Truman v. Montana Eleventh Judicial Dist. Court*, 68 P.3d 654, 659 (2003).

c.  The rule is well settled in Montana that, 'if the concurrent negligence of two or more persons causes an injury to a third person, they are jointly and severally liable, and the injured person may sue them jointly or severally, and recover against one or all.  *See Panasuk v. Seaton*, 277 F.  Supp. 979, 980 (D. Mont. 1968).

**NEBRASKA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is any unauthorized or wrongful act of dominion exerted over another's property which deprives the owner of his property permanently or for an indefinite period of time. *See Brook Valley Ltd. P'ship v. Mut. of Omaha Bank*, 825 N.W.2d 779, 787 (Neb. 2013).

2. **Conversion of Money**

   a. Trover may be maintained for every species of personal property which is the subject of private ownership, including money, bank bills, notes, and bonds. *See State v. Omaha Nat. Bank*, 59 Neb. 483, 81 N.W. 319, 320 (1899); *see also Draemel v. Rufenacht, Bromagen & Hertz, Inc.*, 223 Neb. 645, 656, 392 N.W.2d 759, 766 (Nev. 1986) (finding that the plaintiff had a sufficient interest in the money to permit him to maintain an action for conversion).

3. **Necessary Intent for Conversion**

   a. In Nebraska it has been determined that a taking and destruction of chattel property constitute a conversion of the property, even though the taker acts in good faith. *See Bowles v. Brannagan*, 60 F. Supp. 897, 899 (D. Neb. 1945); *Stough v. Stefani*, 19 Neb. 468, 27 N.W. 445, 446 (1886).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for conversion is the market value of the converted property at the time of the conversion. *See Chadron Energy Corp. v. First Nat. Bank of Omaha*, 221 Neb. 590, 603, 379 N.W.2d 742, 750 (1986).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Under Nebraska common law, an act wrongfully done by the joint agency or cooperation of several persons, or done contemporaneously by them without concert, renders them liable jointly and severally. Under such joint and several liability, either tort-feasor may be held liable for the entire damage, and a plaintiff

need not join all tort-feasors as defendants in an action for damages. Where the joint tort-feasors do not act as part of a common enterprise or plan, § 25–21,185.10 alters the common law by limiting a plaintiff's recovery of noneconomic damages from any one tort-feasor to that tort-feasor's proportionate liability in an "action involving more than one defendant." *See Lackman v. Rousselle*, 257 Neb. 87, 95, 596 N.W.2d 15, 21-22 (1999).

b. Neb. Rev. Stat. § 25-21,185.10 provides, "In an action involving more than one defendant when two or more defendants as part of a common enterprise or plan act in concert and cause harm, the liability of each such defendant for economic and noneconomic damages shall be joint and several. [¶] In any other action involving more than one defendant, the liability of each defendant for economic damages shall be joint and several and the liability of each defendant for noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of negligence, and a separate judgment shall be rendered against that defendant for that amount."

# NEVADA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Under Nevada law, conversion occurs when a tortfeasor takes possession, sells the property, and pockets the proceeds of the sale, or makes an unjustified claim of title to property that causes actual interference with the owner's rights of possession therein. *See In re USA Commercial Mortgage Co.*, 802 F. Supp. 2d 1147, 1164 (D. Nev. 2011).

2. **Conversion of Money**

   a. In Nevada, a defendant's wrongful dominion over a plaintiff's money is sufficient for a conversion claim, even when no personal property is involved. *See Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1171 (9th Cir. 2012).

3. **Necessary Intent for Conversion**

   a. Liability for conversion is predicated upon an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge. *See Dynamic Transit v. Trans Pac. Ventures*, 291 P.3d 114, 118 (Nev. 2012).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for wrongful conversion of property is the value of the property at the time of conversion, with legal interest from the date of conversion to the date of rendering judgment. *See Dixon v. S. Pac. Co.*, 172 P. 368, 370 aff'd, 42 Nev. 73, 177 P. 14 (Nev. 1918).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Nev. Rev. Stat. Ann. §41.141 provides that "Where recovery is allowed against more than one defendant, except as otherwise provided in subsection 5, each defendant is severally liable to the plaintiff only for that portion of the judgment which represents the percentage of negligence attributable to that defendant. [Subsection 5]: This section does not affect the joint and several liability, if any,

of the defendants in an action based upon: . . (b) An intentional tort; . . . (d) The concerted acts of the defendants . . ."

b. To be jointly and severally liable under NRS 41.141(5)(d)'s concert of action exception, the defendants must have agreed to engage in conduct that is inherently dangerous or poses a substantial risk of harm to others. Mere joint negligence, or an agreement to act jointly, does not suffice. *See GES, Inc. v. Corbitt*, 117 Nev. 265, 271, 21 P.3d 11, 15 (2001).

**<u>NEW HAMPSHIRE - CONVERSION</u>**

1. **Definition of Conversion/Elements of Conversion**

   a. Under New Hampshire law, conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. *See Eckel Indus., Inc. v. Primary Bank*, 26 F. Supp. 2d 313, 319 (D.N.H. 1998).

2. **Conversion of Money**

   a. The New Hampshire Supreme Court upheld a trial court's verdict for conversion of money. See *Anctil v. Du Pont*, 79 A.2d 11 (N.H. 1951).

3. **Necessary Intent for Conversion**

   a. A party can be liable for conversion without having a hostile intent, or a desire to do any harm. *See Thompson v. Forest*, 614 A.2d 1064, 1067 (N.H. 1992).

4. **Damages Recoverable for Conversion Claim**

   a. The ordinary measure of damages is the value of the property at the time of conversion with interest to the date of judgment. *See Kenerson v. Morgan Guar. Trust Co.*, 889 F. Supp. 523, 528-29 (D.N.H. 1995).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. N.H. Rev. Stat. Ann. §507:7-e provides that in all cases the Court shall enter a judgment against each party liable on the basis of the rules of joint and several liability, except that if any party shall be less than 50 percent at fault, then that party's liability shall be several and not joint and he shall be liable only for the damages attributable to him. However, in where parties are found to have knowingly pursued or taken active part in a common plan or design resulting in the harm, grant judgment against all such parties on the basis of the rules of joint and several liability.

   b. The legislature intended the mental state of "knowingly" as a limited exception

restoring common law joint liability for all those who, in pursuit of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit. *See Goudreault v. Kleeman*, 965 A.2d 1040, 1056 (N.H. 2009).

# NEW JERSEY - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights. *See LaPlace v. Briere*, 962 A.2d 1139, 1144 (N.J. Super. Ct. App. Div. 2009).

2. **Conversion of Money**

   a. Although conversion claims normally involve chattel, money may be the subject of conversion claims as well. *See N. Haledon Fire Co. No. 1 v. Borough of N. Haledon*, 42 A.3d 901, 910 (N.J. Super. Ct. App. Div. 2012).

3. **Necessary Intent for Conversion**

   a. A party need not knowingly or intentionally act wrongfully for a conversion to occur. *See One Step Up, Ltd. v. Sam Logistic, Inc.*, 17 A.3d 826, 833 (N.J. Super. Ct. App. Div. 2011).

4. **Damages Recoverable for Conversion Claim**

   a. Damages for conversion include: (a) the exchange value of the subject matter or the plaintiff's interest therein at the time and place of the conversion or destruction, (b) the amount of any further loss suffered as the result of the deprivation, and (c) interest from the time at which the value is fixed or compensation for the loss of use. *See Bayer v. Airlift Int'l, Inc.*, 268 A.2d 548, 552 (N.J. Super. Ct. Ch. Div. 1970).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. N.J. Stat. Ann. §2A:15-5.3 provides, "Except as provided in subsection d. of this section, the party so recovering may recover as follows: a. The full amount of the damages from any party determined by the trier of fact to be 60% or more responsible for the total damages. . . c. Only that percentage of the damages directly attributable to that party's negligence or fault from any party determined

by the trier of fact to be less than 60% responsible for the total damages."

b. The Comparative Negligence Act encompasses not only negligence, but also strict liability intentional torts, and wanton conduct. Thus, the Comparative Negligence Act extends beyond negligence to other kinds of fault. *See Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 608-09, 691 A.2d 350, 367 (1997).

c. However, where a plaintiff who suffers a unitary harm at the hands of multiple defendants, the plaintiff is relieved of the burden of proving apportionment because joint liability is the usual concomitant of concurrent negligence. In that case, the plaintiff may collect damages from the defendants jointly and severally unless the defendants can apportion the harm. *See Reichert v. Vegholm*, 840 A.2d 942, 949 (N.J. Super. Ct. App. Div. 2004).

**NEW MEXICO - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made. *See Muncey v. Eyeglass World, LLC*, 289 P.3d 1255, 1262 (N.M. Ct. Appl. 2012).

2. **Conversion of Money**

   a. The New Mexico Supreme Court found that where the administrator of trust fund had no authority to endorse checks for deposit and collection with defendant-bank, and where the defendant bank accepted the checks and collected them from drawee banks, the defendant bank was liable to the trust fund in conversion of the funds identified in the checks. *See Cooper v. Bank of N. M.*, 398, 423 P.2d 431 (N.M. 1996); *see also, McNeill v. Rice Eng'g & Operating, Inc.*, 70 P.3d 794, 800 (N.M. Ct. App. 2003) (reversing lower court's decision dismissing conversion of money claim).

3. **Necessary Intent for Conversion**

   a. The New Mexico Court of Appeals found that a plaintiff had established conversion without establishing any bad faith, and then went on to examine the defendant's bad faith in connection with the punitive damages analysis. *See Aragon v. Gen. Elec. Credit Corp.*, 557 P.2d 572, 575 (N.M. Ct. App. 1976).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for conversion is the value of the property at the time of conversion plus interest. *See Sec. Pac. Fin. Servs., a Div. of Bank of Am., FSB v. Signfilled Corp.*, 956 P.2d 837, 842 (N.M. Ct. App. 1998).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. In causes of action to which several liability applies, any defendant who

establishes that the fault of another is a proximate cause of a plaintiff's injury shall be liable only for that portion of the total dollar amount awarded as damages to the plaintiff that is equal to the ratio of such defendant's fault to the total fault attributed to all persons, including plaintiffs, defendants and persons not party to the action.  The doctrine imposing joint and several liability shall apply: (1) to any person or persons who acted with the intention of inflicting injury or damage; (2) to any persons whose relationship to each other would make one person vicariously liable for the acts of the other, but only to that portion of the total liability attributed to those persons . . . or (4) to situations not covered by any of the foregoing and having a sound basis in public policy.  *See* N.M. Stat. Ann. §41-3A-1.

**NEW YORK - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. To establish a cause of action for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights. *See Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 938 N.Y.S.2d 138, 138-39 (N.Y. App. Div. 2012).

2. **Conversion of Money**

   a. An action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question. *See Lucker v. Bayside Cemetery*, 979 N.Y.S.2d 8, 17 (N.Y. App. Div. 2013).

3. **Necessary Intent for Conversion**

   a. Good faith and lack of knowledge is simply not a defense to conversion. *See Parker v. P & N Recovery of New York, Inc.*, 348, 697 N.Y.S.2d 462, 467 (N.Y. Civ. Ct. 1999).

4. **Damages Recoverable for Conversion Claim**

   a. The usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest. *See Palermo v. Taccone*, 913 N.Y.S.2d 859, 862 (N.Y. App. Div. 2010).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. New York law contains an apportionment rule that applies to "non-economic" damages. N.Y. C.P.L.R. 1601 (McKinney).

   b. Moreover, where a plaintiff seeks damages for intentional tort against multiple intentional tort-feasors, defendants may not invoke statute limiting liability of persons jointly liable. *See Siler v. 146 Montague Associates*, 652 N.Y.S.2d 315 (N.Y. App. Div. 1997).

c. Moreover, when two or more tortfeasors act concurrently or in concert to produce a single injury, they may be held jointly and severally liable. *See Palermo v. Taccone*, 913 N.Y.S.2d 859, 862 (N.Y. App. Div. 2010).

## NORTH CAROLINA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is defined as: (1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owner. *See Day v. Rasmussen*, 629 S.E.2d 912, 914 (N.C. Ct. App. 2006).

2. **Conversion of Money**

   a. The general rule is that money may be the subject of an action for conversion only when it is capable of being identified and described. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 750 (N.C. 2012).

3. **Necessary Intent for Conversion**

   a. The defendant may be liable for conversion where he has exercised control, although he may be unaware of the existence of the rights with which he interferes. Under North Carolina law, even if a Defendant rightfully comes into possession of the goods, a conversion occurs when the rightful owner demands return of the goods and the Defendant refuses. *See Madey v. Duke Univ.*, 336 F. Supp. 2d 583, 600 (M.D.N.C. 2004).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for wrongful conversion is the fair market value of the chattel at the time and place of conversion, plus interest. *See United Leasing Corp. v. Guthrie*, 666 S.E.2d 504, 508 (N.C. Ct. App. 2008).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Joint and several liability is allowed when (1) defendants have acted in concert to commit a wrong that caused an injury; or (2) defendants, even without acting in concert, have committed separate wrongs that still produced an indivisible injury. *See GE Betz, Inc. v. Conrad*, 752 S.E.2d 634, 650 (N.C. Ct. App. 2013).

**NORTH DAKOTA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion consists of a tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner. *See McColl Farms, LLC v. Pflaum*, 837 N.W.2d 359, 367 (N.D. 2013).

2. **Conversion of Money**

   a. An action may lie for the conversion of money where there is an obligation to keep intact or deliver the specific money in question and where such money can be identified or described. It is not essential to the maintenance of the action, however, that the money be earmarked. *See Butts v. InterSecurities, Inc.*, No. 3:07-CV-53, 2008 WL 901822, at *6-7 (D.N.D. Mar. 31, 2008); *see also In re Lacina*, 162 B.R. 267, 273 (Bankr. D.N.D. 1993) (finding that North Dakota's conversion law applies to instruments).

3. **Necessary Intent for Conversion**

   a. Conversion does not require bad intent on the part of the converter, but only an intent to control or interfere with an owner's rights to use to an actionable degree. *See Doeden v. Stubstad*, 755 N.W.2d 859, 864 (N.D. 2008). North Dakota courts have long recognized that conversion does not require that the defendant assert dominion over the property for his own benefit; rather, the defendant need only interfere with the owner's interests to a sufficient degree. *See Wilkinson v. United States*, 564 F.3d 927, 931 (8th Cir. 2009).

4. **Damages Recoverable for Conversion Claim**

   a. North Dakota Code §32-03-23 creates a presumption that the detriment caused by the conversion equals the value of the property. *See Buri v. Ramsey*, 693 N.W.2d 619, 625 (N.D. 2005).

**5. Joint and Several Liability/Comparative Fault for Conversion Claim**

  a. When two or more parties contribute to the injury, the liability of each party is several only, and is not joint, except that any persons who act in concert in committing a tortious act or aid or encourage the act, or ratifies or adopts the act for their benefit, are jointly liable for all damages attributable to their combined percentage of fault. Under this section, fault includes negligence and willful conduct. *See* N.D. Cent. Code Ann. §32-03.2-02.

  b. To constitute a concerted action, the plaintiff must show a common plan to commit a tortious act, that the participants knew of the plan and its purpose, and the participants took substantial affirmative steps to encourage the achievement of the result. *See Tibert v. Nodak Mut. Ins. Co.*, 816 N.W.2d 31, 39 (N.D. 2012).

# OHIO - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. To prevail on a claim of conversion, a plaintiff must prove (1) that it owned or had the right to control the property at the time of the conversion, (2) the defendant's wrongful act or disposition of the plaintiff's property rights, and (3) damages. *See Pelmar USA, L.L.C. v. Mach. Exch. Corp.*, 976 N.E.2d 282, 286 (Ohio Ct. App. 2012).

2. **Conversion of Money**

   a. Where an action for conversion is based on the conversion of money, the action will only lie if it is possible to identify the funds at issue and there is an obligation to deliver the specific money in question. *See Dice v. White Family Cos.*, 878 N.E.2d 1105, 1109 (Ohio Ct. App. 2007).

3. **Necessary Intent for Conversion**

   a. To state a claim for conversion, the plaintiff need not demonstrate that the defendant acted in bad faith. *See Dice v. White Family Cos.*, 878 N.E.2d 1105, 1111 (Ohio Ct. App. 2007).

4. **Damages Recoverable for Conversion Claim**

   a. In general, the measure of damages is the value of the converted property at the time it was converted. *See Carpenter v. Johnson*, 962 N.E.2d 377, 382 (Ohio Ct. App. 2011).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Because conversion is an intentional tort, Ohio's apportionment statute did not requirement apportionment and the defendant was subject to joint and several liability under R.C. 2307.22(A)(3). *See Gurry v. C.P.*, 972 N.E.2d 154, 158 (Ohio Ct. App. 2012).

# OKLAHOMA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein, or any wrongful exercise or assumption of authority personally or by procurement, over another's goods, depriving him of the possession, permanently or for an indefinite time. *See Tillman v. Shofner*, 90 P.3d 582, 583 (Okla Civ. App. 2004).

2. **Conversion of Money**

   a. The Oklahoma Supreme Court has affirmed a verdict for conversion of money. *See Sisler v. Smith*, 267 P.2d 1081 (Oka. 1953).

3. **Necessary Intent for Conversion**

   a. Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent, therewith, may be treated as a conversion, and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved the plaintiff is entitled to recover irrespective of good or bad faith, care or negligence, knowledge or ignorance. *See U.S. Zinc Co. v. Colburn*, 255 P. 688, 689 (Okla. 1927).

4. **Damages Recoverable for Conversion Claim**

   a. In an action for the conversion of property, the plaintiff's measure of damages is the fair market value of the property converted at the time and place of conversion, together with interest. *See Hamco Oil & Drilling Co. v. Ervin*, 354 P.2d 442, 445 (Okla. 1960).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. In any civil action based on fault and not arising out of contract, the liability for damages caused by two or more persons shall be several only and a joint tortfeasor shall be liable only for the amount of damages allocated to that tortfeasor. Okla. Stat. Ann. tit. 23, §15.

## OREGON - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. *See State v. Labar*, 314 P.3d 328, 330 (Or. Ct. App. 2013).

2. **Conversion of Money**

   a. For the purposes of a conversion claim, money can be chattel. *See Cron v. Zimmer*, 296 P.3d 567, 577 (Or. Ct. App. 2013).

3. **Necessary Intent for Conversion**

   a. An actor commits conversion even if the actor mistakenly believes that he or she is acting legally with respect to the other person's property. *See Davis v. F.W. Fin. Servs., Inc.*, 260 Or. App. 191, 208 (2013).

4. **Damages Recoverable for Conversion Claim**

   a. In a civil action for conversion, the measure of damages is the reasonable market value of the goods converted at the time and place of conversion. *See State v. Labar*, 314 P.3d 328, 330 (Or. Ct. App. 2013).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Under ORS 31.610, liability is several only; a tortfeasor is responsible only for its percentage of fault as determined in the action brought by the plaintiff. *See Lasley v. Combined Transp., Inc.*, 261 P.3d 1215, 1226 (Or. 2011).

   b. However, Oregon's Comparative Fault Statute does not require a fault comparison between negligent and intentional tortfeasors. *See Shin v. Sunriver Preparatory Sch.*, Inc., 111 P.3d 762, 775 (Or. Ct. App. 2005).

**PENNSYLVANIA - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and without lawful justification. *See PTSI, Inc. v. Haley*, 71 A.3d 304, 314 (Pa. Super. Ct. 2013).

2. **Conversion of Money**

   a. Money may be the subject of conversion. *See Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. Ct. 2003).

3. **Necessary Intent for Conversion**

   a. Although the exercise of control over the chattel must be intentional, the tort of conversion does not rest on proof of specific intent to commit a wrong. *See Snead v. Soc'y for Prevention of Cruelty to Animals of Pennsylvania*, 929 A.2d 1169, 1183 (Pa. Super. Ct. 2007) aff'd, 604 Pa. 166, 985 A.2d 909 (Pa. 2009).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for conversion is the market value of the converted property at the time and place of conversion. *See L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 777 A.2d 1090, 1096 (Pa. Super. Ct. 2001).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Joint and several liability as a principle of recovery for an indivisible injury caused by multiple tortfeasors lies at the very heart of the common law of tort, and also has a solid foundation in Pennsylvania's statutory law. *See Carrozza v. Greenbaum*, 916 A.2d 553, 565 (2007).

   b. 42 Pa. Cons. Stat. Ann. §7102 provides, "A defendant's liability in any of the following actions shall be joint and several, and the court shall enter a joint and several judgment in favor of the plaintiff and against the defendant for the total dollar amount awarded as damages: . . . (ii) An intentional tort."

# RHODE ISLAND - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. The gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession. *See DeChristofaro v. Machala*, 685 A.2d 258, 263 (R.I. 1996).

2. **Conversion of Money**

   a. Money, where specifically identifiable, is usually regarded as a form of property subject to conversion. *See DeChristofaro v. Machala*, 685 A.2d 258, 263 (R.I. 1996).

3. **Necessary Intent for Conversion**

   a. A person may be liable for conversion even though he was reasonably mistaken in thinking the facts to be such as would give him a legal right to the goods. *See Case v. Bogosian*, C.A. KC 92-0763, 1996 WL 936944, at *5 n.5 (R.I. Super. June 14, 1996) aff'd, 708 A.2d 905 (R.I. 1998); *Greenstein v. Singer*, 112 A.2d 525, 527-28 (1955).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages of a converted chattel is its value at the time of its conversion. *See Goodbody & Co., Inc. v. Parente*, 358 A.2d 32, 33 n.2 (R.I. 1976).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. An injury resulting from the joint tort of two or more persons involves each of them, jointly and severally, in liability for the entire damage. *See Hawkins v. Gadoury*, 713 A.2d 799, 802 (R.I. 1998).

   b. It is a well-settled  that a plaintiff may recover 100% of his or her damages from a joint tortfeasor who has contributed to the injury in any degree.  See *Roberts-Robertson v. Lombardi*, 598 A.2d 1380, 1381 (R.I. 1991).

# SOUTH CAROLINA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of the condition or the exclusion of the owner's rights. *See Hawkins v. City of Greenville*, 594 S.E.2d 557, 566 (S.C. Ct. App. 2004).

2. **Conversion of Money**

   a. Money may be the subject of conversion when it is capable of being identified and there may be conversion of determinate sums even though the specific coins and bills are not identified. *See Moore v. Weinberg*, 681 S.E.2d 875, 878 (S.C. 2009).

3. **Necessary Intent for Conversion**

   a. Only if the owner seeks punitive damages must the evidence show that the conversion was done recklessly and with conscious indifference to the owner's rights. *See Green v. Waidner*, 324 S.E.2d 331, 333 (S.C. Ct. App. 1984); *Marlow v. Conway Iron Works*, 125 S.E. 569, 571 (1924) (Affirmative act or course of conduct on part of bailee resulting in transfer of bailed property without authority from bailor to third person, whether intentional or not, is wrongful conversion).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages in an action for conversion is the value of the property with interest and that the jury may award the highest value up to the time of trial. *See Causey v. Blanton*, 314 S.E.2d 346, 348 (S.C. Ct. App. 1984).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. South Carolina has reaffirmed the applicability of joint and several liability among joint tortfeasors. *See Branham v. Ford Motor Co.*, 701 S.E.2d 5, 23 (S.C. 2010). Under the law of South Carolina, one injured by the conduct of two or

more joint tort-feasors may elect that party or parties whom he will sue and may pursue the collection of a judgment procured against any one or more of the judgment debtors. *See Travelers Ins. Co. v. Allstate Ins. Co.*, 155 S.E.2d 591, 594 (S.C. 1967).

## SOUTH DAKOTA - CONVERSION

1.  **Definition of Conversion/Elements of Conversion**

    a.  Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right. *See W. Consol. Co-op. v. Pew*, 2011795 N.W.2d 390, 396 (S.D. 2011).

2.  **Conversion of Money**

    a.  A fixed and determined sum of money is the subject of conversion. *See Christiansen v. United Nat. Bank of Vermillion*, 176 N.W.2d 65, 68 (S.D. 1970). Thus, the South Dakota Supreme Court found that a defendant's failure to return another's money amounted to conversion as a matter of law. *See Jacobson v. Leisinger*, 746 N.W.2d 739, 741 (S.D. 2008).

3.  **Necessary Intent for Conversion**

    a.  The tort of conversion does not require the intent to deprive the true owner of his property rights. *See W. Consol. Co-op. v. Pew*, 795 N.W.2d 390, 398 (S.D. 2011).

4.  **Damages Recoverable for Conversion Claim**

    a.  The measure of damages for conversion is the value of the property at the time and place of conversion, with interest from the date of conversion. *See Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 273 (S.D. 1986).

5.  **Joint and Several Liability/Comparative Fault for Conversion Claim**

    a.  SDCL 15-8-11 provides: "For the purposes of §§ 15-8-12 to 15-8-22, inclusive, the term "joint tort-feasors" means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."

    b.  Each joint tort-feasor is responsible for the wrong and they may be sued jointly or severally. *See Whiting v. Hoffine*, 294 N.W.2d 921, 923 (S.D. 1980).

    c.  However, if the court enters judgment against any party liable on the basis of joint

and several liability, any party who is allocated less than fifty percent of the total fault allocated to all the parties may not be jointly liable for more than twice the percentage of fault allocated to that party.  S.D. Codified Laws § 15-8-15.1; *see W. Consol. Co-op. v. Pew*, 795 N.W.2d 390, 399 (S.D. 2011).

**TENNESSEE - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. The elements of a conversion claim include: (1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel. *See White v. Empire Exp., Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012).

2. **Conversion of Money**

   a. The borrowing of money which the borrower knows does not belong to the lender is a conversion, for which the borrower and lender are both liable to the real owner. *See Kramer v. Wood*, 52 S.W. 1113, 1116 (Tenn. Ch. App. 1899).

3. **Necessary Intent for Conversion**

   a. A wrongful intent on the part of the defendant is not an element of conversion and, therefore, need not be proved. *See White v. Empire Exp., Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012).

4. **Damages Recoverable for Conversion Claim**

   a. Damages in a conversion action are generally determined by the fair, reasonable market value of the property at the time and place of conversion. *See Franklin Capital Associates, L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 406 (Tenn. Ct. App. 2005).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Tenn. Code Ann. §29-11-107 provides that, subject to some exceptions, "[i]f multiple defendants are found liable in a civil action governed by comparative fault, a defendant shall only be severally liable for the percentage of damages for which fault is attributed to such defendant by the trier of fact, and no defendant shall be held jointly liable for any damages."

   b. The adoption of comparative fault abrogated the use of the doctrine of joint and

several liability only in those cases where the defendants are charged with separate, independent acts of negligence. *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 87 (Tenn. 2001). When an intentional actor and a negligent actor are both named as defendants, and each are found to be responsible for the plaintiff's injuries, then each defendant is jointly and severally responsible for the plaintiff's total damages. *See id.*

## TEXAS - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. To prevail on a conversion claim a plaintiff must establish that (1) the plaintiffs owned, had legal possession of, or was entitled to possession of the property; (2) the defendant unlawfully and without authorization assumed and exercised control over the property, to the exclusion of and inconsistent with the plaintiffs' rights as owners; and (3) the defendant refused to return the property. *See Ghosh v. Grover*, 412 S.W.3d 749, 755 (Tex. App. 2013).

2. **Conversion of Money**

   a. An action will lie for conversion of money when its identification is possible and there is an obligation to deliver the specific money in question or otherwise particularly treat specific money. *See Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 175 (Tex. App. 2011).

3. **Necessary Intent for Conversion**

   a. Wrongful intent is not an element of conversion. *See Vibbert v. PAR, Inc.*, 224 S.W.3d 317, 321 (Tex. App. 2006).

4. **Damages Recoverable for Conversion Claim**

   a. Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion. *See R.J. Suarez Enterprises Inc. v. PNYX L.P.*, 380 S.W.3d 238, 242 (Tex. App. 2012).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Other than an intentional tortfeasor whose conduct violates one of the fourteen penal statutes listed in section 33.013(b)(2), a defendant may be found jointly and severally liable only if his percentage of responsibility is found to be greater than fifty percent. *See Vien v. Del Buono*, 10-09-00318-CV, 2010 WL 5117248, at *8 n.11 (Tex. App. Dec. 15, 2010); Tex. Civ. Prac. & Rem. Code Ann. §33.013.

   b. However, joint and several liability is appropriate in tort cases when the

independent tortious conduct of two or more persons is a legal cause of an indivisible injury.  *See Bluestar Energy, Inc. v. Murphy*, 205 S.W.3d 96, 99 (Tex. App. 2006).

**UTAH - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession. *See Bonnie & Hyde, Inc. v. Lynch*, 305 P.3d 196, 205 (Utah Ct. App. 2013).

2. **Conversion of Money**

   a. Money may be the subject of conversion when the party charged wrongfully received it. *See State v. Twitchell*, 832 P.2d 866, 870 (Utah Ct. App. 1992).

3. **Necessary Intent for Conversion**

   a. Although conversion results only from intentional conduct it does not however require a conscious wrongdoing, but only an intent to exercise dominion or control over the goods inconsistent with the owner's right. *See Phillips v. Utah State Credit Union*, 811 P.2d 174, 179 (Utah 1991).

4. **Damages Recoverable for Conversion Claim**

   a. Generally, the measure of damages for conversion is the value of the converted property at the time of conversion, plus interest. *See Firkins v. Ruegner*, 213 P.3d 895, 898 (Utah Ct. App. 2009).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Subject to Section 78B-5-818, the maximum amount for which a defendant may be liable to any person seeking recovery is that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant. Utah Code Ann. § 78B-5-820.

   b. However, the Utah Liability Reform Act does not apportion fault among intentional tortfeasors and/or between intentional and negligent tort feasors. Thus, under the Utah Liability Reform Act, a defendant shopping mall that was allegedly negligent for failing to provide adequate security was not entitled to

have its fault compared to or apportioned against an intentional tortfeasor who assaulted the plaintiff; the intent of the Utah legislature as expressed in Act's definition of term "fault" does not contemplate comparison of negligence (or similar conduct) with intentional conduct. *See Cortez v. Univ. Mall Shopping Ctr.*, 941 F. Supp. 1096, 1098 (D. Utah 1996).

# VERMONT - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. To establish a claim for conversion, the owner of property must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title. *See Montgomery v. Devoid*, 915 A.2d 270, 275 (Vt. 2006).

2. **Conversion of Money**

   a. The Vermont Supreme Court addressed a claim for conversion of money. While the court indicated that a conversion claim could apply to money, it found that the defendant had not exercised control or dominion over the money. *See Montgomery v. Devoid*, 915 A.2d 270, 276 276 (Vt. 2006); *see also Jurgs & Co. v. O'Brien*, 629 A.2d 325, 329 (Vt. 1993) (applying conversion claim to proceeds of accounting firm merger).

3. **Necessary Intent for Conversion**

   a. Specific intent to convert, that is, knowledge that the property is owned by another, is not required for liability for the tort. It follows that the converter's good faith belief in ownership of the property, or lack of knowledge as to its true ownership, is irrelevant. *See P.F. Jurgs & Co. v. O'Brien*, 629 A.2d 325, 329 (Vt. 1993).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages for conversion is generally the value of the thing converted, measured by its cost to produce or fair market value, at the time and place of the conversion. *See Birchwood Land Co., Inc. v. Ormond Bushey & Sons, Inc.*, 82 A.3d 539, 546 (Vt. 2013).

**5. Joint and Several Liability/Comparative Fault for Conversion Claim**

    a. Where recovery for *negligence* is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal *negligence* to the amount of causal *negligence* attributed to all defendants against whom recovery is allowed. *See* Vt. Stat. Ann. tit. 12, §1036.

# VIRGINIA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. A person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights. *See Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001).

2. **Conversion of Money**

   a. Conversion encompasses any wrongful exercise or assumption of authority over another's goods, depriving him of their possession. The Virginia Supreme Court went on to find that the jury was entitled to find that the defendant, without justification, wrongfully withheld $250,000 in settlement proceeds from the plaintiff and thus, the plaintiff had stated a claim for conversion. *See PGI, Inc. v. Rathe Prods., Inc.*, 576 S.E.2d 438, 443 (Va. 2003).

3. **Necessary Intent for Conversion**

   a. Where the property of one has been delivered to another under a mutual mistake of fact, and the latter has converted the same to his own use, he is accountable to the owner for the value of the property. *See Crauford's Adm'r v. Smith's Ex'r*, 23 S.E. 235 237-38 (Va. 1895).

4. **Damages Recoverable for Conversion Claim**

   a. In conversion, the measure of damages, as a general rule, is the value of the property converted at the time and the place of conversion. *See Straley v. Fisher*, 10 S.E.2d 551, 553 (Va. 1940).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. In determining the liability of a person whose concurrent tortious conduct causes a single indivisible injury, comparative degrees of fault should not be considered and both wrongdoers are equally liable irrespective of whether one may have contributed in a greater degree to the injury. *See Sullivan v. Robertson Drug Co.*,

Inc., 639 S.E.2d 250, 255 (Va. 2007).

## WASHINGTON - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the willful interference with another's property without lawful justification, resulting in the deprivation of the owner's right to possession. *See Lowe v. Rowe*, 294 P.3d 6, 11 (Wash Ct. App. 2012).

2. **Conversion of Money**

   a. Money may be the subject of conversion if the defendant wrongfully received it. *See Alhadeff v. Meridian on Bainbridge Island, LLC*, 220 P.3d 1214, 1223 (Wash. 2009).

3. **Necessary Intent for Conversion**

   a. Neither good nor bad faith, nor care or negligence, nor knowledge or ignorance, are elements of a conversion claim. *See In re Marriage of Langham & Kolde*, 106 P.3d 212, 216 (Wash. 2005); *see also Brown ex rel. Richards v. Brown*, 239 P.3d 602, 611 (Wash Ct. App. 2010).

4. **Damages Recoverable for Conversion Claim**

   a. Absent willful misconduct, the measure of damages for conversion is the fair market value of the property at the time and place of conversion. *See Potter v. Washington State Patrol*, 196 P.3d 691, 697 (Wash. 2008).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Except as otherwise provided in RCW §4.22.070, if more than one person is liable to a claimant on an indivisible claim for the same injury, death or harm, the liability of such persons shall be joint and several. Wash. Rev. Code Ann. §4.22.030.

   b. Under RCW §4.22.030, joint and several liability principles still apply to intentional torts, like trespass and conversion. *See Standing Rock Homeowners Ass'n v. Misich*, 23 P.3d 520, 528 (Wash Ct. App. 2001).

# WEST VIRGINIA - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion. *See Rodgers v. Rodgers*, 399 S.E.2d 664, 677 (W. Va. 1990).

2. **Conversion of Money**

   a. West Virginia courts have found that a person converts money by taking that money from a client's account for his/her own use. *See Comm. on Legal Ethics of the W. Virginia State Bar v. Six*, 380 S.E.2d 219, 222 (W. Va. 1989).

   b. As a result, a person wronged by conversion of money or property can pursue the tort or waive the tort an recover on an implied promise or for money had and received. *See Inter-Ocean Cas. Co. v. Leccony Smokeless Fuel Co.*, 17 S.E.2d 51 (W. Va. 1941).

3. **Necessary Intent for Conversion**

   a. A person who is charged with conversion of property need not be shown to have acted in bad faith or to have been negligent. Bad faith or evil motive are not required. *See Rodgers v. Rodgers*, 399 S.E.2d 664, 677 (W. Va. 1990).

4. **Damages Recoverable for Conversion Claim**

   a. The measure of damages in conversion is the value of the property, and interest from the time of conversion. *See Cecil v. Clark*, 39 S.E. 202, 207 (W. Va. 1901).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. West Virginia is committed to the concept of joint and several liability among joint tortfeasors. *See Strahin v. Cleavenger*, 603 S.E.2d 197, 210 (W. Va. 2004).

   b. West Virginia's adoption of modified rule for contributory negligence did not change its adherence to joint and several liability. *See Sitzes v. Anchor Motor Freight, Inc.*, 169 W. Va. 698, 289 S.E.2d 679 (1982).

# WISCONSIN - CONVERSION

1. **Definition of Conversion/Elements of Conversion**

   a. Conversion is the intentional, unauthorized control of another's chattel so as to interfere with the owner's possessory rights. A person is liable for conversion when he or she (1) intentionally controls or takes property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the owner's rights to possess the property. *See Midwestern Helicopter, LLC v. Coolbaugh*, 839 N.W.2d 167, 170 (Wis. Ct. App. 2013).

2. **Conversion of Money**

   a. The thing that the defendant diverts to his or her own use need not be a chattel; money may also be converted. *See Methodist Manor of Waukesha, Inc. v. Martin*, 647 N.W.2d 409, 412 (Wis. Ct. App. 2002).

3. **Necessary Intent for Conversion**

   a. By itself, conversion does not include wrongful intent or knowledge that what is being taken rightfully belongs to another. *See Bruner v. Heritage Companies*, 593 N.W.2d 814, 818 (Wis. Ct. App. 1999).

4. **Damages Recoverable for Conversion Claim**

   a. The general rule followed in Wisconsin is that in an action for conversion the plaintiff may recover the value of the property at the time of the conversion plus interest to the date of the trial. *See Metro. Sav. & Loan Ass'n v. Zuelke's, Inc.,* 175 N.W.2d 634, 639 (Wis. 1970).

5. **Joint and Several Liability/Comparative Fault for Conversion Claim**

   a. Wisconsin's Comparative Fault Statute (Wis. Stat. Ann. § 895.045) is inapplicable to intentional tort claims. *See Crest Chevrolet-Oldsmobile-Cadillac, Inc. v. Willemsen*, 384 N.W.2d 692, 700 (Wis. 1986).

**WYOMING - CONVERSION**

1. **Definition of Conversion/Elements of Conversion**

   a. To establish a claim for conversion, the following elements must be met: (1) plaintiff had legal title to the converted property; (2) plaintiff either had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his rights to use and enjoy the property; (4) in those cases where the defendant lawfully, or at least without fault, obtained possession of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property. *See Motzko Co. USA, LLC. v. A & D Oilfield Dozers, Inc.*, 316 P.3d 1177, 1182 (Wyo. 2014).

2. **Conversion of Money**

   a. That money may be the subject of a conversion action is an old and well established legal principle. The money must be identifiable, though specific coins or bills do not have to be identified. *See Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 978 (Wyo. 1994).

3. **Necessary Intent for Conversion**

   a. A conversion can occur without intent to steal, as where the possession of the property is retained because of ignorance, mistake of fact. *See Stapleman v. State*, 680 P.2d 73, 75 (Wyo. 1984).

4. **Damages Recoverable for Conversion Claim**

   a. The proper measure of damages for conversion of property is the actual value of the property converted and may include reasonable expenses incurred in an effort to recover possession of the property. *See Alcaraz v. State*, 44 P.3d 68, 71 (Wyo. 2002).

**5. Joint and Several Liability/Comparative Fault for Conversion Claim**

    a. Every tort is complete in itself, and all who participate in its commission are jointly and severally liable for the harm resulting therefrom. *See Hagar v. Mobley*, 638 P.2d 127, 139 (Wyo. 1981).

    b. The Wyoming Comparative Negligence Statute (Wyo. Stat. Ann. §1-1-109), as drafted by the legislature and interpreted by the courts, is limited to those actions based on negligence only. See *Jackson State Bank v. King*, 844 P.2d 1093, 1096 (Wyo. 1993); Wyo. Stat. Ann §1-1-109.

    c. The legislature did not intend by replacing word "negligence" with word "fault" in the Wyoming Comparative Negligence Statute (Wyo. Stat. Ann. §1-1-109) to allow the statute to reach non-negligence claims. *See Phillips v. Duro-Last Roofing, Inc.*, 806 P.2d 834, 837 n.3 (Wyo. 1991).

## ALABAMA - NEGLIGENCE

1.  **Definition of Negligence/Elements of Negligence**

    a.  In a negligence action the plaintiff must prove (1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury. *See Hosea O. Weaver & Sons, Inc. v. Balch*, No. 1100637, -- So. 2d --, 2013 WL 5299290, at *3 (Ala. Sept. 20, 2013).

2.  **Existence of a Duty/Definition of a Duty**

    a.  Every person owes every other person a duty imposed by law to be careful not to hurt him. *See Taylor v. Smith*, 892 So. 2d 887, 893 (Ala. 2004).

3.  **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a.  The key factor is whether the injury was foreseeable by the defendant. *See DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 461 (Ala. 2008).

    b.  In addition to foreseeability, Alabama courts look to a number of factors to determine whether a duty exists, including (1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened. *See DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 461 (Ala. 2008).

4.  **Affirmative Actions and Assumption of Duty**

    a.  A party who volunteers to act, though under no duty to do so, is charged with the duty of acting with due care. *See Nance v. Southerland*, 79 So. 3d 612, 622 (Ala. Civ. App. 2010).

5.  **Standard of Care**

    a.  Negligence is the failure to do what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something that a reasonably prudent person would not have done under the same or similar

circumstances.  *See Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995).

**6.  Proximate/Actual Cause**

    a.  Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred.  *See Lingefelt v. Int'l Paper Co.*, 57 So. 3d 118, 122-23 (Ala. Civ. App. 2010).  Factual causation, or "but for" causation, is that part of causation analysis that asks if the complained-of injury or damage would have occurred but for the act or omission of the defendant.  *See Springer v. Jefferson Cnty.*, 595 So. 2d 1381, 1383 (Ala. 1992).

**7.  Joint & Several Liability**

    a.  Under Alabama law governing joint and several liability, a tort-feasor whose negligent act or acts proximately contribute in causing an injury may be held liable for the entire resulting loss.  *See Holcim (US), Inc. v. Ohio Cas. Ins. Co.*, 38 So. 3d 722, 729 (Ala. 2009).

# ALASKA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

    a. The tort of negligence consists of four separate and distinct elements: (1) duty, (2) breach of duty, (3) causation, and (4) harm. *See Parks Hiway Enterprises, LLC v. CEM Leasing, Inc.*, 995 P.2d 657, 667 (Alaska 2000).

2. **Existence of a Duty/Definition of a Duty**

    a. Generally an actor, if he acts at all, must exercise reasonable care to make his acts safe for others. *See Lynden Inc. v. Walker*, 30 P.3d 609, 614 (Alaska 2001).

    b. A fundamental tenet of negligence law is that a defendant owes a duty of due care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous. *See Winschel v. Brown*, 171 P.3d 142, 146 (Alaska 2007).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a. Foreseeability of harm is the most important factor in determining whether a duty exists. Additionally, courts consider the following factors in deciding whether a duty exists: the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. *See Hurn v. Greenway*, 293 P.3d 480, 486-87 (Alaska 2013).

4. **Affirmative Actions and Assumption of Duty**

    a. Alaska has long recognized that a duty of reasonable care generally arises when a person undertakes an action and that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully. *See City of Seward v. Afognak Logging*, 31 P.3d 780, 784 (Alaska 2001).

5. **Standard of Care**

    a.  Generally speaking, the duty of due care or ordinary care is the duty to act with that amount of care which a reasonably prudent person would use under the same or similar circumstances. *See Leigh v. Lundquist*, 540 P.2d 492, 494 (Alaska 1975).

6. **Proximate/Actual Cause**

    a.  A proximate cause of an injury is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred. *See Johnson v. State*, 636 P.2d 47, 62 (Alaska 1981). As a general rule, Alaska follows the "substantial factor test" of actual causation, which states that an actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm. *See Vincent by Staton v. Fairbanks Mem'l Hosp.*, 862 P.2d 847, 851 (Alaska 1993).

7. **Joint & Several Liability**

    a.  Alaska Stat. Ann. §09.17.080 provides: "(a) In all actions involving fault of more than one person, including third-party defendants and persons who have settled or otherwise been released, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating (1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and (2) the percentage of the total fault that is allocated to each claimant, defendant, third-party defendant, person who has been released from liability, or other person responsible for the damages unless the person was identified as a potentially responsible person, the person is not a person protected from a civil action under AS 09.10.055, and the parties had a sufficient opportunity to join that person in the action but chose not to . . ."

**ARIZONA - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. A plaintiff must prove four elements to establish negligence: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages. *See Gilbert Tuscany Lender, LLC v. Wells Fargo Bank*, 307 P.3d 1025, 1028 (Az. Ct. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Every person is under a duty to avoid creating situations which pose an unreasonable risk of harm to others. *See Nunez v. Prof'l Transit Mgmt. of Tucson, Inc.*, 271 P.3d 1104, 1108 (Az. 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. A duty of care is indispensable to liability for negligence and one element of the duty is foreseeability. *See Davis v. Mangelsdorf*, 673 P.2d 951, 954 (Ct. App. 1983).

   b. A duty of care is merely an expression of the sum total of policy considerations that lead the law to say that a particular plaintiff is entitled to protection. *See Diggs v. Arizona Cardiologists, Ltd.*, 8 P.3d 386, 389 (Ct. App. 2000).

4. **Affirmative Actions and Assumption of Duty**

   a. A party may voluntarily assume a duty not imposed at common law and, once assumed, must discharge the duty with reasonable care. *See Knauss v. DND Neffson Co.*, 963 P.2d 271, 277 (Az. Ct. App. 1997).

5. **Standard of Care**

   a. If there is a duty, then a defendant must act reasonably in light of the known and foreseeable risks. What is reasonable necessarily depends on the circumstances. *See Booth v. State*, 83 P.3d 61, 65 (Az. Ct. App. 2004).

6. **Proximate/Actual Cause**

   a. A plaintiff proves proximate cause, also referred to as legal cause, by demonstrating a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred. *Barrett v. Harris*, 86 P.3d 954, 958 (Ariz. Ct. App. 2004). A defendant's acts are the actual cause of a plaintiff's injury only if they are a substantial factor in bringing about the harm. *See Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 167 P.3d 711, 717 (Az. Ct. App. 2007).

7. **Joint & Several Liability**

   a. Ariz. Rev. Stat. Ann. §12-2506 provides, "[i]n an action for personal injury, property damage or wrongful death, the liability of each defendant for damages is several only and is not joint, except as otherwise provided in this section. Each defendant is liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be entered against the defendant for that amount.

# ARKANSAS - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. The essential elements of a cause of action for negligence are that the plaintiff show a duty owed and a duty breached, and that the defendant's negligence was a proximate cause of the plaintiff's damages. *See Pace v. Davis*, 394 S.W.3d 859 (Ark. 2012).

2. **Existence of a Duty/Definition of a Duty**

   a. The law of negligence requires as an essential element that the plaintiff show that a duty of care was owed; "duty" is a concept that arises out of the recognition that relations between individuals may impose upon one a legal obligation for the other. *See Bedell v. Williams*, 386 S.W.3d 493, 499 (Ark. 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Ultimate test in determining existence of duty to use due care is found in the foreseeability that harm may result if care is not exercised. *See Shannon v. Wilson*, 947 S.W.2d 349, 352 (Ark. 1997).

   b. In determining whether a duty exists, a court should consider the foreseeability of harm, the degree of certainty of damages, the closeness of connection between defendant's conduct and the damage, the moral blame for the conduct, who could have best prevented the damage, the policy of preventing future damage, and the overall consequences to the state for imposing a duty. *See Driggers v. Locke*, 913 S.W.2d 269, 276 (Ark. 1996).

4. **Affirmative Actions and Assumption of Duty**

   a. Even where no duty arises, if a person undertakes to act, they must do so carefully or they may be liable for negligence. *See Yanmar Co., Ltd. v. Slater*, 386 S.W.3d 439, 450 (Ark. 2012).

5. **Standard of Care**

   a. A party bringing negligence action must prove that the defendant has failed to use

the care that a reasonably careful person would use under circumstances similar to those shown by the evidence in the case. *See Graftenreed v. Seabaugh*, 268 S.W.3d 905, 917 (Ark. Ct. App. 2007).

6. **Proximate/Actual Cause**

   a. Proximate cause is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *See Graftenreed v. Seabaugh*, 268 S.W.3d 905, 916 (Ark. Ct. App. 2007). This traditional tort standard requires proof that "but for" the tortfeasor's negligence, the plaintiff's injury or death would not have occurred. *See Dodd v. Sparks Reg'l Med. Ctr.*, 204 S.W.3d 579, 585 (Ark. Ct. App. 2005).

7. **Joint & Several Liability**

   d. Ark. Code Ann. §16-55-201 provides, "[i]n any action for personal injury, medical injury, property damage, or wrongful death, the liability of each defendant for compensatory or punitive damages shall be several only and shall not be joint. (b)(1) Each defendant shall be liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault."

# CALIFORNIA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. For negligence, a plaintiff must establish (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries. *See Lueras v. BAC Home Loans Servicing, LP*, 221 Cal. App. 4th 49, 62 (2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Under general negligence principles, a person is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct. *See Thomas v. Stenberg*, 206 Cal. App. 4th 654, 662 (2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability is the chief factor in the duty analysis. In determining if a duty exists, the inquiry into foreseeability entails three considerations: (1) the general foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered injury; and (3) the closeness of the connection between the defendant's conduct and the injury suffered. *See Pedeferri v. Seidner Enterprises*, 216 Cal. App. 4th 359, 368 (2013).

   b. The Court must also assess whether other public policies militate against a duty notwithstanding the general foreseeability of the harm, considering: (1) the moral blame attached to the defendant's conduct, (2) the policy of preventing future harm, (3) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and (4) the availability, cost, and prevalence of insurance for the risk involved. *See Pedeferri v. Seidner Enterprises*, 216 Cal. App. 4th 359, 368 (2013).

//

4. **Affirmative Actions and Assumption of Duty**

   a. A defendant who enters upon an affirmative course of conduct affecting the interests of another is regarded as assuming a duty to act, and will be liable for negligent acts or omissions, because one who undertakes to do an act must do it with care. *See Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1156 (2013).

5. **Standard of Care**

   a. As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. *See Amezcua v. Los Angeles Harley-Davidson*, 200 Cal. App. 4th 217, 227-28 (2011). The general standard of care is that of a reasonably prudent person under like circumstances. *See Orey v. Superior Court*, 213 Cal. App. 4th 1241, 1255 (2013).

6. **Proximate/Actual Cause**

   a. A plaintiff meets the causation element by showing that (1) the defendant's breach of its duty to exercise ordinary care was a substantial factor in bringing about plaintiff's harm, and (2) there is no rule of law relieving the defendant of liability. *See Ortega v. Kmart Corp.*, 26 Cal. 4th 1200, 1205 (2001). Proximate cause is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury complained of and without which such result would not have occurred. *See Walt Rankin & Associates, Inc. v. City of Murrieta*, 84 Cal. App. 4th 605, 626 (2000).

7. **Joint & Several Liability**

   a. In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Cal. Civ. Code §1431.2. However, with respect to economic damages, codefendants are jointly and severally liable. *See Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1322 n.20 (2013).

# COLORADO - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To establish a claim of negligence, a plaintiff must show that the defendant owed him or her a legal duty of care, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury. *See Collard v. Vista Paving Corp.*, 292 P.3d 1232, 1239 (Colo. Ct. App. 2012).

2. **Existence of a Duty/Definition of a Duty**

   a. Ultimately, whether a duty exists in a particular situation is based on fairness under contemporary standards, that is, whether reasonable persons would recognize and agree that a duty of care exists. *See Collard v. Vista Paving Corp.*, 292 P.3d 1232, 1239 (Colo. Ct. App. 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. To determine whether the law imposes a duty on a defendant, relevant factors include (1) the risk involved; (2) the foreseeability of harm to others and likelihood of injury as weighed against the social utility of the actor's conduct; (3) the magnitude of the burden of guarding against the injury or harm; and (4) the consequences of placing the burden on the actor. A court may consider any other relevant factors based on the competing individual and societal interests implicated by the facts of the case. *See Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 104 (Colo. Ct. App. 2008).

4. **Affirmative Actions and Assumption of Duty**

   a. In determining whether a defendant owes a duty to a particular plaintiff, Colorado law distinguishes between acting and failure to act, that is, misfeasance, which is active misconduct that injures others, and nonfeasance, which is a failure to take positive steps to protect others from harm. The reason for this distinction is that a misfeasant creates a risk of harm; while the nonfeasant, although not creating a risk of harm, merely fails to benefit the injured party by interfering in his or her

affairs. Thus, because in misfeasance the actor has created a new risk, and in nonfeasance the actor has simply preserved the status quo, the situations in which nonfeasance leads to liability are more circumscribed than those for misfeasance. Accordingly, in nonfeasance cases, the plaintiff has the added burden of establishing that a special relationship exists between the parties such that social policy justifies the imposition of a duty to act. *See Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 105 (Colo. Ct. App. 2008).

**5. Standard of Care**

a. Negligence is the failure to do an act that a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances to protect oneself or others from injury. *See Lombard v. Colorado Outdoor Educ. Ctr., Inc.*, 266 P.3d 412, 416 (Colo. Ct. App. 2011).

**6. Proximate/Actual Cause**

a. The plaintiff must show that the defendant's alleged negligence was a substantial factor in producing the injury. *See Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 985 (Colo. Ct. App. 2011). Proximate cause is that which, in natural and continued sequence, unbroken by any efficient, intervening cause, produced the result complained of, and without which that result would not have occurred. *See Stout v. Denver Park & Amusement Co.*, 287 P. 650 (Colo. 1930).

**7. Joint & Several Liability**

a. Colo. Rev. Stat. Ann. §13-21-111.5 provides, "(1) In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss, except as provided in subsection (4) of this section."

# CONNECTICUT - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. The essential elements of a cause of action in negligence are duty, breach of that duty, causation, and actual injury. *See Sic v. Nunan*, 54 A.3d 553 (Conn. 2012).

2. **Existence of a Duty/Definition of a Duty**

   a. The nature of the duty owed by the defendant, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. *See Mirjavadi v. Vakilzadeh*, 74 A.3d 1278, 1288 (Conn. 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Although there is no universal test for the determination of the existence of a duty, the threshold inquiry in a negligence action on this issue is whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. *See Mirjavadi v. Vakilzadeh*, 74 A.3d 1278, 1288 (Conn. 2013).

   b. The test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. *See McDermott v. State*, 73 A.3d 886, 891 (Conn. App. Ct. 2013).

4. **Affirmative Actions and Assumption of Duty**

   a. In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable person to protect them against an unreasonable risk of harm arising out of the act. *See Doe v. Saint Francis Hosp. & Med. Ctr.*, 72 A.3d 929, 947 (Conn. 2013).

5. **Standard of Care**

   a. The standard of care in the ordinary negligence case is the care that a reasonably prudent person would exercise under the same circumstances. *See Roach v. Ivari Int'l Centers, Inc.*, 822 A.2d 316, 322 (Conn. App. Ct. 2003).

6. **Proximate/Actual Cause**

   a. "Proximate cause," as required to prove negligence, is defined as an actual cause that is a substantial factor in the resulting harm. *See Ward v. Ramsey*, 77 A.3d 935, 940 (Conn. App. Ct. 2013). A finding that the defendant's act or omission did not, in a natural and continuous sequence, produce the injury would undermine proximate causation. *See Barry v. Quality Steel Products, Inc.*, 444, 820 A.2d 258, 270 (Conn. 2003).

7. **Joint & Several Liability**

   a. Conn. Gen. Stat. Ann. §52-572h provides, "[i]n a negligence action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, if the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for such party's proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section."

# DELAWARE - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

    a. In order to establish a negligence claim, a plaintiff must establish that defendant owed plaintiff a duty of care; defendant breached that duty; and defendant's breach was the proximate cause of plaintiff's injury. *See Pipher v. Parsell*, 930 A.2d 890, 892 (Del. 2007).

2. **Existence of a Duty/Definition of a Duty**

    a. To determine whether one party owed another a duty of care, we have often looked to the Restatement (Second) of Torts for guidance. According to the Restatement, negligent conduct involves either (1) "an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another," (commonly described as misfeasance), or (2) "a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do" (commonly described as nonfeasance). *See Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166-67 (Del. 2011).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a. Where a duty of care exists, it is measured in terms of reasonableness and one's duty is to act reasonably and protect against reasonably foreseeable events. *See Shepard v. Reinoehl*, 830 A.2d 1235, 1238-39 (Del. Super. Ct. 2002).

    b. The determination of the existence and scope of a legal duty presents a mixed question of fact and law, and the court must decide whether a plaintiff's interest in a negligence action is entitled to legal protection as a matter of public policy. *See Jeffries v. State Dep't of Health & Soc. Servs.*, No. C.A. 96C-01-008, 1998 WL 281179, at *1 (Del. Super. Mar. 13, 1998).

4. **Affirmative Actions and Assumption of Duty**

    a. "Malfeasance" or "misfeasance," a negligent act, is distinguished from

"nonfeasance," a negligent omission. In the case of misfeasance, the party who does an affirmative act owes a general duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the affirmative act. *See Doe 30's Mother v. Bradley*, 58 A.3d 429, 447-48 (Del. Super. Ct. 2012).

5. **Standard of Care**

   a. Negligence includes acts that the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another, and a failure to do an act that is necessary for the protection or assistance of another and which the actor is under a duty to do. *See Rogers v. Christina Sch. Dist.*, 73 A.3d 1, 7 (Del. 2013).

6. **Proximate/Actual Cause**

   a. Delaware applies the traditional "but for" definition of proximate cause. *See Hudson v. Old Guard Ins. Co.*, 3 A.3d 246, 250 (Del. 2010). In other words, a proximate cause is one which in natural and continuous sequence, *unbroken by any efficient intervening cause,* produces the injury and without which the result would not have occurred. *See Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 829 (Del. 1995).

7. **Joint & Several Liability**

   a. Delaware has long recognized that when the tortious acts of two or more persons concur in producing a single indivisible injury, such persons are jointly and severally liable, though there was no common duty, common design, or concerted action. The joint and several liability of two codefendants entitles the plaintiff to seek recovery from either or both of the defendants, provided that total recovery does not exceed the full amount of damages. *See Campbell v. Robinson*, No. 06C-05-176PLA, 2007 WL 1765558, at *2 (Del. Super. June 19, 2007).

## DISTRICT OF COLUMBIA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. In general, the elements of a cause of action for negligence are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach. *See Woods v. D.C.*, 63 A.3d 551, 553 (D.C. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. A defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care. A determination of whether a duty exists is the result of a variety of considerations and not solely the relationship between the parties. *See Presley v. Commercial Moving & Rigging, Inc.*, 25 A.3d 873, 888 (D.C. 2011).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. In general, courts rely on the concept of "foreseeability" to determine whether the defendant owed a duty to the claimant in a negligence action and examine whether the risk to the claimant was "reasonably foreseeable" to the defendant. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

   b. Inherent also in the concept of duty is the concept of a relationship between the parties out of which the duty arises. Ultimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interest are, or are not, entitled to legal protection against the conduct of the defendant. *See W.C. & A.N. Miller Companies v. United States*, 963 F. Supp. 1231, 1243 (D.D.C. 1997).

4. **Affirmative Actions and Assumption of Duty**

   a. One who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all. *See Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F. Supp. 2d 45, 48 (D.D.C. 2004); *Remeikis v. Boss & Phelps*,

Inc., 419 A.2d 986, 991 (D.C. 1980).

**5. Standard of Care**

    a. The law of negligence requires an adherence to a uniform standard of conduct: that of reasonable care under the circumstances. *See Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979).

**6. Proximate/Actual Cause**

    a. To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable. *See Convit v. Wilson*, 980 A.2d 1104, 1125 (D.C. 2009). DC Courts have defined proximate causation as that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred. *See D.C. v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005).

**7. Joint & Several Liability**

    a. Ordinarily, when two tortfeasors jointly contribute to harm to a plaintiff, both are potentially liable to the injured party for the entire harm. *See Nat'l Health Labs., Inc. v. Ahmadi*, 596 A.2d 555, 557 (D.C. 1991).

    a. If two or more tortfeasors produce a single injury, the plaintiff may sue each one for the full amount of the damage and hold the defendants severally liable; but the plaintiff can obtain only a single recovery, and each defendant will be entitled to a credit for any sum that the plaintiff has collected from the other defendant. *See Leiken v. Wilson*, 445 A.2d 993, 999 (D.C. 1982).

**FLORIDA - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. The three elements a plaintiff must plead and prove in a cause of action for negligence are: (1) the existence of a duty recognized by law requiring the defendant to conform to a certain standard of conduct for the protection of others including the plaintiff; (2) a failure on the part of the defendant to perform that duty; and (3) an injury or damage to the plaintiff proximately caused by such failure. *See Kenz v. Miami-Dade Cnty.*, 116 So. 3d 461, 464 (Fla. Dist. Ct. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Florida, like other jurisdictions, recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others. *See R.J. Reynolds Tobacco Co. v. Grossman*, 96 So. 3d 917, 920 (Fla. Dist. Ct. App. 2012). The principle of "duty" is linked to the concept of foreseeability and may arise from four general sources: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case. *See Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader "zone of risk" that poses a general threat of harm to others. *See Festival Fun Parks, LLC v. Bellamy*, 123 So. 3d 684, 688 (Fla. Dist. Ct. App. 2013); *Gyongyosi v. Miller*, 80 So. 3d 1070, 1077 (Fla. Dist. Ct. App. 2012).

   b. Finding that a legal duty exists in a negligence case involves the public policy decision that a defendant should bear a given loss, as opposed to distributing the loss among the general public. *See Biglen v. Florida Power & Light Co.*, 910 So.

2d 405, 409 (Fla. Dist. Ct. App. 2005).

**4. Affirmative Actions and Assumption of Duty**

    a. The undertaker's doctrine provides that whenever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service thereby assumes a duty to act carefully and to not put others at an undue risk of harm. *See White v. Advanced Neuromodulation Sys., Inc.*, 51 So. 3d 631, 635 (Fla. Dist. Ct. App. 2011).

**5. Standard of Care**

    a. Negligence is a course of conduct that a reasonable and prudent man would know might possibly result in injury to persons. *See Boston ex rel. Estate of Jackson v. Publix Super Markets, Inc.*, 112 So. 3d 654, 659 (Fla. Dist. Ct. App. 2013).

**6. Proximate/Actual Cause**

    a. A defendant is liable for injury produced or substantially produced in a natural and continuous sequence by his conduct, such that "but for" such conduct, the injury would not have occurred. *See Jones v. Utica Mut. Ins. Co.*, 463 So. 2d 1153, 1156 (Fla. 1985); *State, Dep't of Children & Family Servs. v. Amora*, 944 So. 2d 431, 436 (Fla. Dist. Ct. App. 2006).

**7. Joint & Several Liability**

    a. Fla. Stat. Ann. §768.81 provides, "[i]n a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability.

    b. In action against car rental company for negligence in failing to warn of dangers of driving in certain areas, permitting jury to apportion fault between company and nonparty who committed intentional torts against customers was error; comparative fault statute generally governing negligence cases did not apply because action was based upon an intentional tort. *See Stellas v. Alamo Rent-A-Car, Inc.*, 702 So. 2d 232, *passim* (Fla. 1997).

**GEORGIA - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. The essential elements of a negligence claim are the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages. *See Danes v. Rogers*, 751 S.E.2d 135, 137-38 (Ga. Ct. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Thus, the threshold issue in a negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff. *See Danes v. Rogers*, 751 S.E.2d 135, 138 (Ga. Ct. App. 2013). A legal duty sufficient to support liability in negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of our appellate courts. *See Boller v. Robert W. Woodruff Arts Ctr., Inc.*, 716 S.E.2d 713, 716 (Ga. Ct. App. 2011).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. When assessing the extent to which one owes a duty to another and whether he has breached that duty, the governing consideration is what the person sought to be charged should reasonably have foreseen, the rule being that one is bound to anticipate the reasonable and natural consequences of his own conduct. *See Whitlock v. Moore*, 312 Ga. App. 777, 781, 720 S.E.2d 194, 199 (2011).

   b. Moreover, what duty a defendant owes is a question of legal policy to be decided as an issue of law. *See Lawson v. Entech Enterprises, Inc.*, 669 S.E.2d 211, 215 (Ga. Ct. App. 2008).

4. **Affirmative Actions and Assumption of Duty**

   a. If a defendant undertakes to do more for another person than the law requires, he or she may be liable if he or she acts unreasonably. *See Yearwood v. Club Miami, Inc.*, 728 S.E.2d 790, 791 (Ga. Ct. App. 2012).

5. **Standard of Care**

   a. Negligence is conduct that falls below the standard established by law for the protection of others. *See Lowry v. Cochran*, 699 S.E.2d 325, 331 (2010). Ordinary diligence, required under the law of negligence, is that degree of care exercised by ordinarily prudent persons under the same or similar circumstances. *See Beard v. Audio Visual Servs., Inc.*, 580 S.E.2d 272, 273 (Ga. Ct. App. 2003).

6. **Proximate/Actual Cause**

   a. Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. *See Peterson v. Reeves*, 727 S.E.2d 171, 176 (Ga. Ct. App. 2012). When an injury can be traced directly to a wrongful act, and but for such wrongful act it could not reasonably be supposed that the injury would have resulted, this essentially antecedent act may be said to be the proximate cause of the injury. *See Glisson v. Freeman*, 532 S.E.2d 442, 455 (Ga. Ct. App. 2000).

7. **Joint & Several Liability**

   a. Except as provided in Code Section 51-12-33, where an action is brought jointly against several persons, the plaintiff may recover damages for an injury caused by any of the defendants against only the defendant or defendants liable for the injury. Ga. Code Ann. § 51-12-31.

   e. Where an action is brought against more than one person for injury, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the persons who are liable according to the percentage of fault of each person. Damages apportioned by the trier of fact shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution. *See* Ga. Code Ann. §51-12-33.

## HAWAII - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. In order for a plaintiff to prevail on a negligence claim, the plaintiff is required to prove all four of the necessary elements of negligence: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *See Kaho'ohanohano v. Dep't of Human Servs., State of Haw.*, 178 P.3d 538, 563 (Haw. 2008).

2. **Existence of a Duty/Definition of a Duty**

   a. It is well settled that a negligence action lies only where there is a duty of care owed by the defendant to the plaintiff. The existence of a duty in a particular case, however, depends on the facts and circumstances attendant to that case. In considering whether to impose a duty of reasonable care on a defendant, we recognize that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *See Ah Mook Sang v. Clark*, 308 P.3d 911, 920 (Haw. 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. A defendant owes a duty of care only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. *See Murphy v. Lovin*, 284 P.3d 918, 931 (Haw. Ct. App. 2011).

   b. However, foreseeability alone is not dispositive of a duty's existence. The relationship between the parties is also a necessary consideration. Policy considerations play a role in the determination of the existence of a duty. *See Schwenke v. Outrigger Hotels Hawaii, LLP*, 227 P.3d 555, 557 (Haw. Ct. App. 2010). Whether a duty exists is a question of fairness that involves a weighing of the nature of the risk, the magnitude of the burden of guarding against the risk, and the public interest in the proposed solution. *See Hao v. Campbell Estate*, 869

P.2d 216, 219 (Haw. 1994).

**4. Affirmative Actions and Assumption of Duty**

    a. Hawaii has adopted the general principle that one who gratuitously acts so as to expose another person to danger must observe ordinary care in so doing, notwithstanding that he would have been wholly free from obligation if he had refrained from acting. *See Geremia v. State*, 573 P.2d 107, 111 (Haw. 1977).

**5. Standard of Care**

    a. Generally, the defendant's conduct is measured against what a reasonable and prudent person would have done under the circumstances in determining whether there has been a breach of a duty of care owed to the plaintiff. *See Doe Parents No. 1 v. State, Dep't of Educ.*, 58 P.3d 545, 593 (Haw. 2002).

**6. Proximate/Actual Cause**

    a. The best definition and the most workable test of proximate cause seems to be this: The actor's negligent conduct is a legal cause of harm to another if (a) his [or her] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted in the harm. *See Estate of Klink ex rel. Klink v. State*, 152 P.3d 504, 533 (Haw. 2007).

**7. Joint & Several Liability**

    a. Haw. Rev. Stat. § 663-10.9 provides that "[j]oint and several liability for joint tortfeasors as defined in section 663-11 is abolished except in the following circumstances: . . ."

## IDAHO - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To state a cause of action for negligence, a plaintiff must establish four elements: (1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage. *See Beers v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 316 P.3d 92, 97 (Idaho 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Every person has a duty to exercise ordinary care to prevent, unreasonable, foreseeable risks of harm to others. *See Frogley v. Meridian Joint Sch. Dist. No. 2*, 314 P.3d 613, 624 (Idaho 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. In determining whether a duty will arise in a particular context, the Court has identified several factors to consider: the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. *See Turpen v. Granieri*, 985 P.2d 669, 672 (Idaho 1999).

4. **Affirmative Actions and Assumption of Duty**

   a. Even when an affirmative duty generally is not present, a legal duty may arise if one voluntarily undertakes to perform an act, having no prior duty to do so. In such a case, the acting party has a duty to perform that act in a non-negligent manner. When a party assumes a duty by voluntarily performing an act that the

party had no duty to perform, the duty that arises is limited to the duty actually assumed. *See Beers v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 316 P.3d 92, 100 (Idaho 2013).

**5. Standard of Care**

   a. In determining whether a party is negligent, his or her conduct is judged against that of an ordinarily prudent person acting under the same conditions and circumstances. *See Miller v. Idaho State Patrol*, 252 P.3d 1274, 1289 (Idaho 2011).

**6. Proximate/Actual Cause**

   a. Where there are multiple actual causes of the harm, the plaintiff may recover if the defendant's negligence was a "substantial factor" in causing the injury. When there is only one actual cause alleged, Idaho courts apply the more stringent "but for" test. *See Collins v. Collins*, 946 P.2d 1345, 1349 (Idaho Ct. App. 1997). Proximate cause means the cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the result. *See Chatterton v. Pocatello Post*, 70 Idaho 480, 484, 223 P.2d 389, 391 (Idaho 1950).

**7. Joint & Several Liability**

   a. Idaho Code Ann. §6-803 provides "[t]he common law doctrine of joint and several liability is hereby limited to causes of action listed in subsection (5) of this section. In any action in which the trier of fact attributes the percentage of negligence or comparative responsibility to persons listed on a special verdict, the court shall enter a separate judgment against each party whose negligence or comparative responsibility exceeds the negligence or comparative responsibility attributed to the person recovering. [¶ Subsection 5] A party shall be jointly and severally liable for the fault of another person if he/she was acting in concert . . . . As used in this section, "acting in concert" means pursuing a common plan or design which results in the commission of an intentional or reckless tortious act."

**ILLINOIS - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. To succeed in an action for negligence, the plaintiff must establish that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) the breach proximately caused injury to the plaintiff. *See Hougan v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 999 N.E.2d 792, 797 (Ill. App. Ct. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. A duty is an obligation imposed by law which requires one to conform to a certain standard of conduct for the protection of another against an unreasonable risk. *See Morris v. Ingersoll Cutting Tool Co.*, 2013 IL App (2d) 120760 (2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. In determining whether a duty exists and the scope of that duty, we consider the foreseeability of injury, the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *See Morris v. Ingersoll Cutting Tool Co.*, 2013 IL App (2d) 120760 (2013).

4. **Affirmative Actions and Assumption of Duty**

   a. One who voluntarily renders some service or undertakes some action must do so using ordinary care and may be held liable for damages proximately caused by the negligent performance of that service or action. *See Miller v. Hecox*, 969 N.E.2d 914, 921 (Ill. App. Ct. 2012).

5. **Standard of Care**

   a. In an ordinary negligence case, the standard of care required of a defendant is to act as would an ordinary careful person or a reasonably prudent person. *See Colburn v. Mario Tricoci Hair Salons & Day Spas, Inc.*, 972 N.E.2d 266, 276 (Ill. App. Ct. 2012).

//

6. **Proximate/Actual Cause**

   a. Proximate cause requires the plaintiff to show that the defendant's negligence was the actual cause or the cause in fact of his injury, *i.e.*, but for the defendant's conduct, the accident would not have occurred. *See Trigsted v. Chicago Transit Auth.*, 994 N.E.2d 682, 691 (Ill App. Ct. 2013). A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause. *See Calloway v. Bovis Lend Lease, Inc.*, 995 N.E.2d 381, 405 (Ill. App. Ct. 2013).

7. **Joint & Several Liability**

   a. 735 ILCS 5/2-1117 provides, 'except as provided in Section 2-1118, in actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be severally liable for all other damages. Any defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants except the plaintiff's employer, shall be jointly and severally liable for all other damages."

   a. Thus, it is a well-established principle in Illinois law, that where a plaintiff's injuries are separable, defendants are not jointly and severally liable for the damages. However, "where defendants, albeit sharing no common purpose or duty, and failing to act in concert, nevertheless acted concurrently to produce an indivisible injury to the plaintiff," the defendants are joint tortfeasors. *See Auten v. Franklin*, 942 N.E.2d 500, 509 (Ill. Ct. App. 2010).

# INDIANA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail on a theory of negligence, a plaintiff must prove: (1) that the defendant owed plaintiff a duty; (2) that it breached the duty; and (3) that plaintiff's injury was proximately caused by the breach. *See Mohr v. Virginia B. Smith Revocable Trust*, 5 N.E.2d 50 (Ind. Ct. App. 2014).

2. **Existence of a Duty/Definition of a Duty**

   a. Duty is usually created by the normal expectations of our civil society. Those risks against which an actor is required to take precautions are those which society, in general, considers sufficiently great to demand preventive measures. A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *See Key v. Hamilton*, 963 N.E.2d 573, 580 (Ind. Ct. App. 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The following three factors must be balanced in considering whether to impose a duty at common law: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the persons injured; and (3) public policy concerns. *See Gresser v. Dow Chem. Co., Inc.*, 989 N.E.2d 339, 349 (Ind. Ct. App. 2013).

   b. Various public policy factors play into the consideration of whether a duty exists, including the convenience of administration, the capacity of the parties to bear the loss, a policy of preventing future injuries, and the moral blame attached to the wrongdoer. *See Clary v. Dibble*, 903 N.E.2d 1032, 1040 (Ind. Ct. App. 2009).

4. **Affirmative Actions and Assumption of Duty**

   a. The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Id.* Failure to act in a reasonable manner will give rise to an action for negligence.

*See Medtronic, Inc. v. Malander*, 996 N.E.2d 412, 420 (Ind. Ct. App. 2013).

**5. Standard of Care**

a. The standard of conduct to which one must conform to avoid being negligent is that of a reasonable person under like circumstances. Negligence occurs when conduct falls below this standard. Lack of reasonable care that an ordinary person would exercise in like or similar circumstances is the factor upon which the presence or absence of negligence depends. *See Key v. Hamilton*, 963 N.E.2d 573, 579 (Ind. Ct. App. 2012).

**6. Proximate/Actual Cause**

a. To prove the causation element of a negligence claim, a plaintiff has to establish that the harm would not have occurred but for the defendant's conduct. *See Mr. Bults, Inc. v. Orlando*, 990 N.E.2d 1, 5 (Ind. Ct. App. 2013). A cause is proximate if in a natural and continuous sequence, unbroken by any efficient intervening cause, it produces the result complained of and without which the result would not have occurred. *See Coffman v. Rohrman*, 811 N.E.2d 868, 873-74 (Ind. Ct. App. 2004).

**7. Joint & Several Liability**

b. If the percentage of fault of the claimant is not greater than fifty percent (50%) of the total fault, the jury shall then determine the total amount of damages the claimant would be entitled to recover if contributory fault were disregarded. The jury next shall multiply the percentage of fault of each defendant by the amount of damages determined . . . and shall enter a verdict against each defendant . . . in the amount of the product of the multiplication of each defendant's percentage of fault times the amount of damages as determined under subdivision (3). *See* Ind. Code Ann. §34-51-2-8. However, joint liability may be established if the acts of various tortfeasors through cooperation or in concert accomplish a particular wrong or where independent acts that combine to produce a single injury. *See*

*Nance v. Miami Sand & Gravel, LLC*, 825 N.E.2d 826, 835 (Ind. Ct. App. 2005).

**IOWA - NEGLIGENCE**

1.  **Definition of Negligence/Elements of Negligence**

    a.  To establish a claim for negligence, the plaintiff must normally prove: (1) the existence of a duty owed by the defendant to conform to a standard of care, (2) the failure to conform to the standard, (3) proximate cause, and (4) damages. *See Benham v. King*, 700 N.W.2d 314, 317 (Iowa 2005).

2.  **Existence of a Duty/Definition of a Duty**

    a.  In negligence cases the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. It should be recognized that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *See Nationwide Agribusiness v. Structural Restoration, Inc.*, 705 F. Supp. 2d 1070, 1078-79 (S.D. Iowa 2010).

3.  **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a.  In determining whether a legal duty exists, courts are guided by consideration of three factors: 1) the relationship between the parties; 2) the reasonable foreseeability of the harm to the person who is injured; and 3) public policy considerations. Iowa courts additionally look to legislative enactments, prior judicial decisions, and general legal principles as source for the existence of a duty. *See Union Cnty., IA v. Piper Jaffray & Co., Inc.*, 741 F. Supp. 2d 1064, 1108 (S.D. Iowa 2010).

    b.  However, the critical element in establishing a duty is the foreseeability of harm to a potential plaintiff. *See Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 106 (Iowa 2012).

4.  **Affirmative Actions and Assumption of Duty**

    a.  Iowa and other jurisdictions recognize the concept of an "assumed duty." That is,

a duty can be imposed on a defendant who undertakes to render a service to another. *See McCormick v. Nikkel & Associates, Inc.*, 819 N.W.2d 368, 375 (Iowa 2012).

**5. Standard of Care**

   a. A person acts negligently if the person does not exercise reasonable care under all of the circumstances. The primary factors considered in ascertaining whether a person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm. *See Hill v. Damm*, 804 N.W.2d 95, 99 (Iowa Ct. App. 2011).

**6. Proximate/Actual Cause**

   a. Iowa courts apply a "but for" test to determine whether the defendant's conduct was a cause in fact of the plaintiff's harm. *See Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 774 (Iowa 2006). Iowa courts define the proximate cause of an injury in a legal sense as that cause which in its natural and continuous sequence, unbroken by any new cause, produces an event and without which the event would not have occurred. Proximate cause is an element of negligence. *See Roller v. Indep. Silo Co.*, 49 N.W.2d 838, 842 (Iowa 1951).

**7. Joint & Several Liability**

   c. Iowa Code Ann. §668.4 provides that "[i]n actions brought under this chapter, the rule of joint and several liability shall not apply to defendants who are found to bear less than fifty percent of the total fault assigned to all parties. However, a defendant found to bear fifty percent or more of fault shall only be jointly and severally liable for economic damages and not for any noneconomic damage awards.

## KANSAS - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. A plaintiff in a negligence action must prove four elements: a duty owed to the plaintiff, breach of that duty, causation between the breach of duty and the injury to the plaintiff, and damages suffered by the plaintiff. *See Shirley v. Glass*, 308 P.3d 1, 6 (Kan. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Duty has been defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. An act is negligent only if a prudent person would perceive the risk of damage. The risk to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. *See Major By & Through Major v. Castlegate, Inc.*, 935 P.2d 225, 230 (Kan. Ct. App. 1997).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Three elements must be satisfied before a legal duty arises: (1) the plaintiff must be a foreseeable plaintiff, i.e., within the range of apprehension; (2) the probability of harm must be foreseeable; and (3) there must be no public policy against imposing the claimed duty on the defendant. *See Berry v. Nat'l Med. Servs., Inc.*, 205 P.3d 745, 749 (2009) *aff'd,* 292 Kan. 917, 257 P.3d 287 (Kan. 2011). Kansas courts may choose not to recognize a duty if the duty is contrary to public policy. *See Berry v. Nat'l Med. Servs., Inc.*, 257 P.3d 287, 291 (Kan. 2011).

4. **Affirmative Actions and Assumption of Duty**

   a. A duty is owed to third persons by one who undertakes, by an affirmative act, to render services to another and then is negligent in the performance of that undertaking. *See Hauptman v. WMC, Inc.*, 224 P.3d 1175, 1192 (2010).

//

5. **Standard of Care**

    a. An act is negligent only if done without reasonable care, the care which the actor is required to exercise to avoid being negligent in the doing of the act is that which a reasonable man in his position, with his information and competence, would recognize as necessary to prevent the act from creating an unreasonable risk of harm to another. *See Shirley v. Glass*, 308 P.3d 1, 8 (Kan. 2013).

6. **Proximate/Actual Cause**

    a. The Kansas Supreme Court has defined proximate cause as that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. *Zimmerman v. Brown*, 306 P.3d 306, 315 (2013). The proximate or legal cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. *See Baker v. City of Garden City*, 731 P.2d 278, 280 (Kan. 1987).

7. **Joint & Several Liability**

    a. When the comparative negligence of the parties is an issue and recovery is permitted against more than one party, each party is liable for that portion of the total dollar amount awarded as damages to a claimant in the proportion that the amount of that party's causal negligence bears to the amount of the causal negligence attributed to all parties against whom recovery is permitted. Kan. Stat. Ann. §60-258a.

    b. However, the Kansas comparative fault statute has done nothing to change common-law rule of joint and several liability for defendants in intentional tort actions. *See Gray v. City of Kansas City, Kan.*, 603 F. Supp. 872, 876 (D. Kan. 1985).

# KENTUCKY - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To establish a claim for common law negligence, a plaintiff must present evidence that: (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached of that duty, (3) the plaintiff was injured plaintiff, and (4) there is legal causation between the defendant's breach and the plaintiff's injury. *See Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012).

2. **Existence of a Duty/Definition of a Duty**

   a. The concept of liability for negligence expresses a universal duty owed by all to all. And every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury. *See Dick's Sporting Goods, Inc. v. Webb*, 413 S.W.3d 891, 897 (Ky. 2013), as corrected (Nov. 25, 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability of the injury defines the scope and character of a defendant's duty. The most important factor in determining whether a duty exists is foreseeability. *See Wilkerson v. Williams*, 336 S.W.3d 919, 923 (Ky. Ct. App. 2011).

   b. Deciding the scope of a duty of care is essentially a policy determination. To do so requires considering the policy consequences of imposing liability on certain classes of situations. *See Norris v. Corr. Corp. of Am.*, 521 F. Supp. 2d 586, 591 (W.D. Ky. 2007).

4. **Affirmative Actions and Assumption of Duty**

   a. Kentucky courts recognize a "universal duty" of care under which every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury. *See Lee v. Farmer's Rural Elec. Co-op. Corp.*, 245 S.W.3d 209, 212 (Ky. Ct. App. 2007).

//

5. **Standard of Care**

   a. The standard of care applicable to a common-law negligence action is that of ordinary care—that is, such care as a reasonably prudent person would exercise under the circumstances. *See Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).

6. **Proximate/Actual Cause**

   a. A defendant's conduct is deemed to have caused an injury if the conduct was a substantial factor in bringing about the injury. *See Nissan Motor Co., Ltd. v. Maddox*, No. 2012-CA-000952-MR, 2013 WL 4620488 (Ky. Ct. App. Aug. 30, 2013). Proximate cause of injury is that which in natural and continuous sequence, unbroken by any independent responsible cause, produces injury, and without which it would not have occurred. *See Morris v. Combs' Adm'r*, 200 S.W.2d 281, 283 (Ky. Ct. App. 1947).

7. **Joint & Several Liability**

   c. Liability among joint tortfeasors is no longer joint and several, but is several only; and because the liability is several as to each joint tortfeasor, it is necessary to apportion a specific share of the total liability to each of them, whether joined in the original complaint or by third-party complaint, and the several liability of each joint tortfeasor with respect to the judgment is limited by the extent of his/her fault. *See Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 779 (Ky. 2000); Ky. Rev. Stat. Ann. §411.182.

# LOUISIANA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. A plaintiff must prove five separate elements in order to succeed on a negligence claim: (1) whether the defendant had a duty to conform his conduct to a specific standard of care; (2) whether the defendant's conduct failed to conform to the appropriate standard of care (breach of duty); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) whether the plaintiff was damaged. *See Falcone v. Touro Infirmary*, 129 So. 3d 641, 645 (La. Ct. App. 2013).

   b. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. Civ. Code Ann. art. 2315.

2. **Existence of a Duty/Definition of a Duty**

   a. In analyzing the existence of a duty, Louisiana courts ask whether there is any law-whether statutory, jurisprudential, or arising from general principles of fault-to support the plaintiff's claim. Deciding whether to impose a duty requires the court to make a policy decision in light of the unique facts and circumstances of each case. *See Todd v. Angel*, 114 So. 3d 512, 520 (La. Ct. App. 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Determination of scope of defendant's duty depends on factual determinations of foreseeability and ease of association. *See Brodnax v. Foster*, 92 So. 3d 427, 433 (La. Ct. App. 2013).

   b. Under Louisiana's duty-risk analysis, foreseeability is not in itself determinative, and at times yields to policy considerations in the determination of whether the defendant will be held liable for a particular harm. As will be explained below, the ultimate issue is "ease of association" of the specific actual harm to the breach and/or to foreseeable harms rather than foreseeability *per se*. *See Smith v.*

*Louisiana Health & Human Res. Admin.*, 637 So. 2d 1177, 1181 (La. Ct. App. 1994).

    c. In determining whether to impose a duty in a particular situation, the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the plaintiff's harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving. *See Gammill v. Invacare Corp.*, 2 So. 3d 557, 559 (La. Ct. App. 2008).

**4. Affirmative Actions and Assumption of Duty**

    a. Under Louisiana law, one who does not owe a duty to act may assume such a duty by acting. *See Hebert v. Rapides Parish Police Jury*, 974 So. 2d 635, 643 (La. 2007).

**5. Standard of Care**

    a. Duty can be stated generally as the obligation to conform to the standard of conduct of a reasonable man under like circumstances. *See Alexander v. Parish of St. John the Baptist*, 102 So. 3d 904, 909 (La. 2012).

**6. Proximate/Actual Cause**

    a. Proximate cause is generally a "but for" inquiry, which requires the plaintiff to show that he or she would not have sustained injury but for the defendant's conduct. *See Carney v. Eldorado Resort Casino Shreveport*, 48,761 (La. Ct. App. 2 Cir. 1/29/14). The proximate cause of an injury is the primary or moving cause, or that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the accident could not have happened, if the injury be one which might be reasonably anticipated or

foreseen as a natural consequence of the wrongful act. *See Harvey v. Great Am. Indem. Co.*, 110 So. 2d 595, 600 (La. Ct. App. 1958).

## 7. Joint & Several Liability

d. La. Civ. Code Ann. art. 2324 provides, "A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable."

**MAINE - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. A cause of action for negligence has four elements: (1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury. *See Bell ex rel. Bell v. Dawson*, 82 A.3d 827, 831-32 (Me. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Duty involves the question of whether the defendant is under any obligation for the benefit of the particular plaintiff. *See Davis v. Dionne*, 26 A.3d 801, 805 (Me. 2011). The duty is to conform to the legal standard of reasonable conduct in the light of the apparent risk. *See Alexander v. Mitchell*, 930 A.2d 1016, 1020 (Me. 2007).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Although the foreseeability of an injury is a foundational consideration, it is never the sole determinant of duty. Maine courts also consider societal expectations regarding behavior and individual responsibility in allocating risks and costs, and we consider. *See Alexander v. Mitchell*, 930 A.2d 1016, 1020 (2007).

   b. Maine courts consider several policy factors when determining if the defendant owes a duty, including concerns that fall into these broad categories: "the hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. *See Decker v. New England Pub. Warehouse, Inc.*, 749 A.2d 762, 765 (Me. 2000).

4. **Affirmative Actions and Assumption of Duty**

   a. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or (b) he

has undertaken to perform a duty owed by the other to the third person, or (c) the

harm is suffered because of reliance of the other or the third person upon the

undertaking. *See Noyes v. R. E. Coleman, Inc.*, No. CV-01-457, 2002 WL

31367234, at \*2 (Me. Super. Sept. 18, 2002).

**5. Standard of Care**

    a.  The standard of negligence is that of reasonable care. *See Arnst v. Estes*, 8 A.2d

        201, 205 (Me. 1939).

**6. Proximate/Actual Cause**

    a.  Proximate cause is an action occurring in a natural and continuous sequence,

        uninterrupted by an intervening cause, that produces an injury that would not have

        occurred but for the action. *See Cyr v. Adamar Associates Ltd. P'ship*, 752 A.2d

        603, 604 (2000).

**7. Joint & Several Liability**

    a.  When two tort-feasors cause a single injury through their independent tortious

        acts, the victim has the option to recover full damages from either or both. *See*

        *Peerless Div., Lear Siegler, Inc. v. U.S. Special Hydraulic Cylinders Corp.*, 742

        A.2d 906, 909 (Me. 1999).

    b.  Me. Rev. Stat. tit. 14, §156 provides in part, "In a case involving multiparty

        defendants, each defendant is jointly and severally liable to the plaintiff for the

        full amount of the plaintiff's damages."

# MARYLAND - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. In order to state a claim in negligence, the plaintiff must allege and prove facts demonstrating (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. *See Evergreen Associates, LLC v. Crawford*, 75 A.3d 1038, 1042-43 (Md. Ct. Spec. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. In the law of negligence, the term duty is shorthand for an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *See Premium of Am., LLC v. Sanchez*, 73 A.3d 343, 353 (Md. Ct. Spec. App. 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. In establishing whether a duty exists, courts first apply a foreseeability of harm test, which is based upon the recognition that duty must be limited to avoid liability for unreasonably remote consequences. *See Bd. of Cnty. Comm'rs for Cecil Cnty. v. Dorman*, 979 A.2d 167, 174 (Md. Ct. Spec. App. 2009).

   b. In determining whether such an obligation exists, Maryland courts also consider the policy reasons supporting a cause of action in negligence. The purpose is to discourage or encourage specific types of behavior by one party to the benefit of another party. *See Moore v. Myers*, 868 A.2d 954, 969 (Md. Ct. Spec. App. 2005) *holding modified by Tracey v. Solesky*, 53 SEPT.TERM 2011, 2012 WL 1432263 (Md. Apr. 26, 2012) and *holding modified by Tracey v. Solesky*, 50 A.3d 1075 (Md. 2012).

4. **Affirmative Actions and Assumption of Duty**

   a. Although generally there is no duty in negligence terms to act for the benefit of

any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner. *See Muthukumarana v. Montgomery Cnty.*, 805 A.2d 372, 396 (Md. 2002).

5. **Standard of Care**

    a. Negligence is the failure to use reasonable care under the circumstances. *See Hines v. French*, 852 A.2d 1047, 1060 (Md. Ct. Spec. App. 2004).

6. **Proximate/Actual Cause**

    a. The "but for" test applies in cases where only one negligent act is at issue; cause-in-fact is found when the injury would not have occurred absent or "but for" the defendant's negligent act. When two or more independent negligent acts bring about an injury, however, the substantial factors test controls. Causation-in-fact may be found if it is "more likely than not" that the defendant's conduct was a substantial factor in producing the plaintiff's injuries. *See Pittway Corp. v. Collins*, 973 A.2d 771, 786-87 (Md. 2009). Proximate cause in this sense is the cause which, in a natural and continuous sequence, unbroken by any efficient intervening cause, logically and probably produces the injury. *See CSX Transp., Inc. v. Cont'l Ins. Co.*, 680 A.2d 1082, 1088 (Md. 1996).

7. **Joint & Several Liability**

    a. The concept of a "joint tort-feasor" is derived from the notion that a single injury can result from the joint actions of two or more individuals, who, putting aside defenses, may be jointly and severally liable. Each individual is severally liable for the entire damage, regardless of whether the conduct of one directly caused more or less injury compared to that of another, because they acted together with a common purpose resulting in responsibility for the common injury. *See Mercy Med. Ctr. v. Julian*, 56 A.3d 147, 150 (Md. 2012).

# MASSACHUSETTS - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To state a claim for negligence, the plaintiff must show that the defendant owed a duty of reasonable care, that the defendant committed a breach of that duty, that damage resulted, and that there was a causal relation between the breach of duty and the damage. *See Go-Best Assets Ltd. v. Citizens Bank of Massachusetts*, 972 N.E.2d 426, 431 (Mass. 2012).

2. **Existence of a Duty/Definition of a Duty**

   a. As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others. *See Judge v. Carrai*, 934 N.E.2d 276, 279 (Mass. App. Ct. 2010).

   b. The concept of duty is not sacrosanct in itself, but is only an expression of the sum total of considerations of policy which lead the law to say that the plaintiff is entitled to protection. *See Afarian v. Massachusetts Elec. Co.*, 866 N.E.2d 901, 905 (Mass. 2007).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. To the extent that a legal standard does exist for determining the existence of a tort duty, it is a test of the reasonable foreseeability of the harm. *See Afarian v. Massachusetts Elec. Co.*, 866 N.E.2d 901, 906 (Mass. 2007).

   b. Whether a defendant has a duty of care to the plaintiff in the circumstances is a question of law for the court, to be determined by reference to existing social values and customs and appropriate social policy. *See Feinstein v. Beers*, 801 N.E.2d 300, 302 (Mass. App. Ct. 2004).

4. **Affirmative Actions and Assumption of Duty**

   a. A basic principle of negligence law is that ordinarily everyone has a duty to refrain from affirmative acts that unreasonably expose others to a risk of harm. In

contrast, a person generally does not have a duty to take affirmative action. If, however, a person voluntarily assumes a duty, that duty must be performed with due care. *See Massachusetts Asset Fin. Corp. v. Harter, Secrest & Emery, LLP*, 430 F.3d 59, 61-62 (1st Cir. 2005); *Feinstein v. Beers*, 801 N.E.2d 300, 302 (Mass. App. Ct. 2004).

5. **Standard of Care**

   a. Negligence is the failure to exercise that degree of care which a reasonable person would exercise in the circumstances. *See Guzman v. Pring-Wilson*, 963 N.E.2d 1196, 1198 (Mass. App. Ct. 2012).

6. **Proximate/Actual Cause**

   a. A jury need not find that a defendant's negligence was the only factor causing the loss, but only that it was more probable than not that a defendant's negligence was a substantial factor in bringing about injury and harm. *See Lawrence Sav. Bank v. Levenson*, 797 N.E.2d 485, 492 (2003). If the plaintiff's damage does not directly result from the risk created, or is not a 'natural consequence' thereof, recovery will be denied. *See Clark-Aiken Co. v. Cromwell-Wright Co., Inc.*, 323 N.E.2d 876, 887 n.21 (Mass. 1975).

7. **Joint & Several Liability**

   a. Under Massachusetts' current system of joint and several liability, a plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages. *See Shantigar Found. v. Bear Mountain Builders*, 804 N.E.2d 324, 332 (Mass. 2004).

   b. Massachusetts' comparative negligence law, G.L. c. 231, § 85, is irrelevant to the apportionment of liability among joint tortfeasors. *See Mitchell v. Hastings & Koch Enterprises, Inc.*, 647 N.E.2d 78, 84 (Mass. Ct. App. 1995).

# MICHIGAN - NEGLIGENCE

1.  **Definition of Negligence/Elements of Negligence**

    a.  In order to establish a prima facie negligence claim, a plaintiff must prove four elements: (1) duty, (2) breach of the duty, (3) causation, and (4) damages. *See Seldon v. Suburban Mobility Auth. for Reg'l Transp.*, 824 N.W.2d 318, 321 (Mich. Ct. App. 2012).

2.  **Existence of a Duty/Definition of a Duty**

    a.  Duty is the legal obligation to conform to a specific standard of conduct in order to protect others from unreasonable risks of injury. *See New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 761 N.W.2d 832, 845 (Mich. Ct. App. 2008).

3.  **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a.  In deciding whether a duty should be imposed, the court must look at several factors, including the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented. *See New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 761 N.W.2d 832, 845 (Mich. Ct. App. 2008). A defendant's duty of care generally turns on foreseeability. *See Laier v. Kitchen*, 702 N.W.2d 199, 209 (Mich. Ct. App. 2005). Generally, whether a duty exists depends in part on foreseeability: whether it was foreseeable that a defendant's conduct may create a risk of harm to another person and whether the result of that conduct and intervening causes was foreseeable. *See Ghaffari v. Turner Const. Co.*, 708 N.W.2d 448, 452 (Mich. Ct. App. 2005).

    b.  Where foreseeability fails as an adequate template for the existence of a duty, recourse must be had to the basic issues of policy underlying the core problem whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. *See Buczkowski v. McKay*, 490 N.W.2d 330, 333 (Mich.. 1992).

//

4. **Affirmative Actions and Assumption of Duty**

   a. Michigan recognizes the voluntary assumption of duty doctrine. A party may be under a legal duty when it voluntarily assumes a function that it is not legally required to perform. When a person voluntarily assumes a duty not otherwise imposed by law, that person is required to perform it carefully, not omitting to do what an ordinarily prudent person would do in accomplishing the task. *See Rupert v. Daggett*, 695 F.3d 417, 424 (6th Cir. 2012).

5. **Standard of Care**

   a. In interpreting the so-called "general standard of care" applicable in negligence cases, the phrase "ordinary care" means the care that a reasonably careful person would use under the circumstances. *See Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000).

6. **Proximate/Actual Cause**

   a. An actor's negligent conduct will not be a legal cause of harm to another unless that conduct was a substantial factor in bringing about the harm. *See McLean v. Rogers,* 300 N.W.2d 389, 391 (Mich. Ct. App. 1980). Proximate cause is that which, in a natural and continuous sequence, unbroken by new and independent causes, produces the injury. *See Wiley v. Henry Ford Cottage Hosp.*, 668 N.W.2d 402, 410 (Mich. Ct. App. 2003).

7. **Joint & Several Liability**

   a. Mich. Comp. Laws Ann. §600.2956 provides, "Except as provided in section 6304, in an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each defendant for damages is several only and is not joint."

# MINNESOTA - NEGLIGENCE

1.  **Definition of Negligence/Elements of Negligence**

    a.  To recover for a claim of negligence, a plaintiff must prove (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury. *See Eischen v. Crystal Valley Co-op.*, 835 N.W.2d 629, 633 (Minn. Ct. App. 2013).

2.  **Existence of a Duty/Definition of a Duty**

    a.  Every person in the conduct of his affairs is under a legal duty to act with care and forethought; and, if injury results to another from his failure so to do, he may be held accountable in an action at law. *See Bundy v. Holmquist*, 669 N.W.2d 627, 632 (Minn. Ct. App. 2003).

3.  **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a.  General negligence law imposes a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff. *See Eischen v. Crystal Valley Co-op.*, 835 N.W.2d 629, 634 (Minn. Ct. App. 2013).

    b.  Public policy is a major consideration in identifying a legal duty. *See Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 421 (Minn. Ct. App. 1993). As an example, one policy consideration is the cost-benefit equation. The question is whether the foreseeable likelihood of harm warrants the burden imposed to prevent that harm. *See K.L. v. Riverside Med. Ctr.*, 524 N.W.2d 300, 303 (Minn. Ct. App. 1994).

4.  **Affirmative Actions and Assumption of Duty**

    a.  Minnesota has long recognized that one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so. *See Ironwood Springs Christian Ranch, Inc. v. Walk to Emmaus*, 801 N.W.2d 193, 198 (Minn. Ct. App. 2011).

//

5. **Standard of Care**

   a. A person acts with reasonable care when they exercise the degree of care which a reasonably prudent person would exercise under the same or similar circumstances. *See Domagala v. Rolland*, 805 N.W.2d 14, 28 (Minn. 2011).

6. **Proximate/Actual Cause**

   a. A party's negligence is the proximate cause of an injury if the negligent act was one that the alleged tortfeasor ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others and if his conduct was a substantial factor in bringing about the injury. *See Renswick v. Wenzel*, 819 N.W.2d 198, 209 (Minn. Ct. App. 2012). Proximate cause is that which caused injury directly and immediately or through natural sequence of events without intervening independent efficient cause. *See Shastid v. Shue*, 77 N.W.2d 273, 281 (Minn. 1956).

7. **Joint & Several Liability**

   a. Minn. Stat. Ann. §604.02 provides, "[w]hen two or more persons are severally liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that the following persons are jointly and severally liable for the whole award: (1) a person whose fault is greater than 50 percent; (2) two or more persons who act in a common scheme or plan that results in injury; (3) a person who commits an intentional tort; or . . ."

## MISSISSIPPI - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To prove negligence, the plaintiff has the burden to establish (1) the existence of a duty owed to it by the defendant; (2) a breach of that duty; (3) a causal connection between the breach of duty and the alleged injury to the plaintiff; and (4) injury and damages. *See Eli Investments, LLC v. Silver Slipper Casino Venture, LLC,* 118 So. 3d 151, 154 (Miss. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. To prevail in any type of negligence action the plaintiff must show the existence of a duty to conform to a specific standard for the protection of others against the unreasonable risk of injury. *See Enter. Leasing Co. S. Cent., Inc. v. Bardin*, 8 So. 3d 866, 868 (Miss. 2009).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The important component of the existence of the duty is that the injury is reasonably foreseeable. *See Smith v. Waggoners Trucking Corp.*, 69 So. 3d 773, 780 (Miss. Ct. App. 2011).

   b. Negligence can only proceed from a duty imposed by a contract, by the statutes of the state, or by a well-defined public policy. *See Georgia Cas. Co. v. Cotton Mills Products Co.*, 159 Miss. 396, 132 So. 73, 75 (1931) *overruled on other grounds by Hartford Acc. & Indem. Co. v. Foster*, 528 So. 2d 255 (Miss. 1988).

4. **Affirmative Actions and Assumption of Duty**

   a. A duty exists where a party contracts to undertake or otherwise assumes a duty. *See Doe ex rel. Doe v. Wright Sec. Servs., Inc.*, 950 So. 2d 1076, 1080 (Miss. Ct. App. 2007).

5. **Standard of Care**

   a. The standard of care applicable to negligence cases is whether the defendant acted as a reasonable and prudent person would have under the same or similar

circumstances.  *See Eli Investments, LLC v. Silver Slipper Casino Venture, LLC*, 118 So. 3d 151, 154 (Miss. 2013).

6. **Proximate/Actual Cause**

   a. Proximate cause is defined as the cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred.  *See Cade v. Beard*, 130 So. 3d 77, 85 n.7 (Miss. 2014).  Cause in fact means that, but for the defendant's negligence, the injury would not have occurred.  *See Huynh v. Phillips*, 95 So. 3d 1259, 1263 (Miss. 2012).

7. **Joint & Several Liability**

   a. Miss. Code. Ann. §85-5-7 provides "[i]n any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault."

**MISSOURI - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. To establish a claim for negligence, a plaintiff must demonstrate: (1) a duty in the defendant to protect the plaintiff from injury; (2) the failure by a defendant to perform that duty; and (3) the defendant's failure proximately caused injury to the plaintiff. *See Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 597 (Mo. Ct. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Duty is an obligation imposed by law to conform to a standard of conduct toward another to protect others against unreasonable, foreseeable risks. *See Chiney v. Am. Drug Stores, Inc.*, 21 S.W.3d 14, 16 (Mo. Ct. App. 2000).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Under the principles of general negligence law, whether a duty exists in a given situation depends upon whether a risk was foreseeable. *See Richey v. Philipp*, 259 S.W.3d 1, 13 (Mo. Ct. App. 2008). Foreseeability is the paramount factor in determining existence of a duty, but foreseeability alone is not enough to establish a duty. There must also be some right or obligation to control the activity that presents the danger of injury. *See Miles ex rel. Miles v. Rich*, 347 S.W.3d 477, 483 (Mo. Ct. App. 2011).

   b. Additionally, the determination of the existence of a duty rests on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; the foreseeability of harm and the degree of certainty that the protected person suffered injury; moral blame society attaches to the conduct; the prevention of future harm; consideration of cost and ability to spread the risk of loss; the economic burden upon the actor and the community and others. *See Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 699 (Mo. Ct. App. 2008).

**4. Affirmative Actions and Assumption of Duty**

    a. Once someone assumes a duty they would not otherwise have, either by contract or conduct, he or she may be held liable in tort if an injury results from a negligent performance of the assumed duty. *See Robert T. McLean Irrevocable Trust v. Patrick Davis, P.C.*, 283 S.W.3d 786, 794 (Mo. Ct. App. 2009).

**5. Standard of Care**

    a. Missouri law defines negligence as the failure to exercise the degree of care that a reasonably prudent person would use under the same or similar circumstances. *See Nagaragadde v. Pandurangi*, 216 S.W.3d 241, 243 (Mo. Ct. App. 2007).

**6. Proximate/Actual Cause**

    a. Causation in fact exists where the injury would not have happened "but for" the defendant's negligence or when the defendant's conduct is a substantial factor in bringing about the harm. Proximate causation exists where the injury appears to be the natural and probable consequence, unbroken by any new cause of the act or omission of the defendant without which the accident would not have occurred. *See Weaks v. Rupp*, 966 S.W.2d 387, 393 (Mo. Ct. App. 1998).

**7. Joint & Several Liability**

    a. Joint and several liability is recognized in Missouri to allocate the financial burden of harm among the parties at fault in causing the plaintiff's injuries. Joint or concurrent tort-feasors are severally, as well as jointly, answerable to the injured party for the full amount of the injuries. The injured party may sue all or any of the joint or concurrent tort-feasors and obtain a judgment against all or any of them. Unless the damage caused by each of such concurrent or joint tort-feasors is clearly separable each is liable for the entire damage. *See Gramex Corp. v. Green Supply, Inc.*, 89 S.W.3d 432, 439-40 (Mo. 2002).

**MONTANA - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. A cause of action in negligence consists of four elements: duty, breach of duty, causation, and damages. *See Harrington v. Crystal Bar, Inc.*, 306 P.3d 342, 344-45 (Mont. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. A defendant owes a duty with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous and hence negligent in the first instance. *See Hinkle v. Shepherd Sch. Dist. No. 37*, 93 P.3d 1239, 1244 (Mont. 2004).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Whether a party owes a legal duty depends largely on whether the allegedly negligent act was foreseeable. Foreseeability is measured on a scale of reasonableness dependent upon the foreseeability of the risk involved with the conduct alleged to be negligent. *See Gourneau ex rel. Gourneau v. Hamill*, 311 P.3d 760, 762-63 (Mont. 2013).

   b. Courts also consider the following factors in determining the existence of a duty: (1) the moral blame attached to a defendant's conduct; (2) the prevention of future harm; (3) the extent of the burden placed on the defendant; (4) the consequences to the public of imposing such a duty; and (5) the availability and cost of insurance for the risk involved. *See Fisher v. Swift Transp. Co., Inc.*, 181 P.3d 601, 608 (Mont. 2008).

4. **Affirmative Actions and Assumption of Duty**

   a. Where a person undertakes to do an act which may be properly regulated and governed, he is bound to perform it in such a manner that those who are rightfully led to a course of conduct or action on the faith that the act or duty will be duly and properly performed shall not suffer loss or injury by reason of negligent

failure so to perform it.  *See Sult v. Scandrett*, 178 P.2d 405, 406-07 (Mont. 1947).

**5.   Standard of Care**

    a.   At the most basic level, we all share the common law duty to exercise the level of care that a reasonable and prudent person would under the same circumstances. *See Fisher v. Swift Transp. Co., Inc.*, 181 P.3d 601, 606 (Mont. 2008).

**6.   Proximate/Actual Cause**

    a.   In Montana, proximate cause is an act or omission which, in a natural and continuous sequence, unbroken by any new, independent cause, produces injury, and without which the injury would not have occurred.  The phrase "without which the injury would not have occurred" incorporates the "but for" test.  *See In re Yellowstone Mountain Club, LLC*, 415 B.R. 769, 778 (Bankr. D. Mont. 2009).

**7.   Joint & Several Liability**

    a.   Mont. Code Ann. §27-1-703 provides, "Each party against whom recovery may be allowed is jointly and severally liable for the amount that may be awarded to the claimant but has the right of contribution from any other person whose negligence may have contributed as a proximate cause to the injury complained of."

    b.   In the absence of proof that an injury is divisible, the defendant is jointly and severally liable for the plaintiff's entire injury pursuant to the indivisible injury rule.  *See Truman v. Montana Eleventh Judicial Dist. Court*, 68 P.3d 654, 659 (2003).

    c.   The rule is well settled in Montana that, 'if the concurrent negligence of two or more persons causes an injury to a third person, they are jointly and severally liable, and the injured person may sue them jointly or severally, and recover against one or all.  *See Panasuk v. Seaton*, 277 F.  Supp. 979, 980 (D. Mont. 1968).

# NEBRASKA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. *See Durre v. Wilkinson Dev., Inc.*, 830 N.W.2d 72, 80 (Neb. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. A "duty" is an obligation, to which the law gives recognition and effect, to conform to a particular standard of conduct toward another. *See Durre v. Wilkinson Dev., Inc.*, 830 N.W.2d 72, 80 (2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Under the Restatement (Third), foreseeable risk is an element in the determination of negligence, not legal duty. In order to determine whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence. We expressly hold that foreseeability is not a factor to be considered by courts when making determinations of duty. *See A.W. v. Lancaster Cnty. Sch. Dist. 0001*, 784 N.W.2d 907, 918 (Neb. 2010).

   b. The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. Whether a duty exists is a policy determination. Duty rules are meant to serve as broadly applicable guidelines for public behavior, i.e., rules of law applicable to a category of cases. *See Tolbert v. Jamison*, 794 N.W.2d 877, 883 (2011).

4. **Affirmative Actions and Assumption of Duty**

   a. The common law imposes an obligation that every person must do that which he undertakes so as not to injure another. *See Carroll v. Action Enterprises, Inc.*, 292 N.W.2d 34, 36 (Neb. 1980).

//

**5. Standard of Care**

    a.  As a general matter, the existence of a duty serves as a legal conclusion that an actor must exercise such degree of care as would be exercised by a reasonable person under the circumstances. *See Blaser v. Cnty. of Madison*, 826 N.W.2d 554, 566-67 (Neb. 2013).

**6. Proximate/Actual Cause**

    a.  As a general matter, the existence of a duty serves as a legal conclusion that an actor must exercise such degree of care as would be exercised by a reasonable person under the circumstances. *See Blaser v. Cnty. of Madison*, 826 N.W.2d 554, 566-67 (Neb. 2013). A defendant's conduct is a proximate cause of an event if the event would not have occurred but for that conduct, but it is not a proximate cause if the event would have occurred without that conduct. *See Scott v. Khan*, 790 N.W.2d 9, 19 (Neb. Ct. App. 2010).

**7. Joint & Several Liability**

    a.  Neb. Rev. Stat. § 25-21,185.10 provides, "In an action involving more than one defendant when two or more defendants as part of a common enterprise or plan act in concert and cause harm, the liability of each such defendant for economic and noneconomic damages shall be joint and several. [¶] In any other action involving more than one defendant, the liability of each defendant for economic damages shall be joint and several and the liability of each defendant for noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of negligence, and a separate judgment shall be rendered against that defendant for that amount."

**NEVADA - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail on a traditional negligence theory, a plaintiff must demonstrate that "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the breach was the legal cause of the plaintiff's injuries, and (4) the plaintiff suffered damages. *See Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 153 (Nev. 2012).

2. **Existence of a Duty/Definition of a Duty**

   a. Nevada courts define the scope of duty in negligence cases by making a vital expression of the aggregate of those policy considerations which cause the law to conclude that protection is owed. *See Ashwood v. Clark Cnty.*, 930 P.2d 740, 742-43 (Nev. 1997).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability of harm is, of course, a predicate to establishing the element of duty. *See Ashwood v. Clark Cnty.*, 930 P.2d 740, 743 (Nev. 1997).

   b. Nevada courts have also looked to public policy considerations in deciding whether to recognize a duty. *See Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1282-83 (Nev. 2009) (finding that public policy did not create duty on part of pharmacies to protect victims of automobile accident that occurred when pharmacies' customers caused accident while under influence of controlled substance).

4. **Affirmative Actions and Assumption of Duty**

   a. Nevada courts have recognized that where one undertakes to render services to another, which he/she should recognize as necessary for the protection of a third person, the undertaking party is liable to the third person for harm resulting from his/her failure to exercise reasonable care if that failure to exercise reasonable care increased the risk of harm. *See Dow Chem. Co. v. Mahlum*, 114 Nev. 1468,

1492, 970 P.2d 98, 113-14 (Nev. 1998).

5. **Standard of Care**

    a. Negligence is failure to exercise that degree of care in a given situation which a reasonable man under similar circumstances would exercise. The standard of care is that of the ordinary prudent man, not that of extraordinarily prudent man. *See Driscoll v. Erreguible*, 482 P.2d 291, 294 (Nev. 1971).

6. **Proximate/Actual Cause**

    a. Proximate cause is any cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury complained of and without which the result would not have occurred. *See Goodrich & Pennington Mortgage Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d 792, 797 (Nev. 2004). Nevada relies on the substantial factor test to determine legal causation, otherwise known as proximate causation. *See Holcomb v. Georgia Pac., LLC*, 289 P.3d 188, 196 (Nev. 2012).

7. **Joint & Several Liability**

    a. Nev. Rev. Stat. Ann. §41.141 provides that "Where recovery is allowed against more than one defendant, except as otherwise provided in subsection 5, each defendant is severally liable to the plaintiff only for that portion of the judgment which represents the percentage of negligence attributable to that defendant."

**NEW HAMPSHIRE - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail on a negligence claim, the plaintiff must show: (1) the defendant owed the plaintiff a duty; (2) the defendant breached this duty; and (3) the breach proximately caused the plaintiff's injuries. *See Macie v. Helms*, 934 A.2d 562, 565 (N.H. 2007).

2. **Existence of a Duty/Definition of a Duty**

   a. When charged with determining whether a duty exists in a particular case, New Hampshire courts necessarily encounter the broader, more fundamental question of whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. In making this determination, we consider whether the social importance of protecting the plaintiff's interest outweighs the importance of immunizing the defendant from extended liability. *See Pesaturo v. Kinne*, 20 A.3d 284, 289 (N.H. 2011).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The scope of the duty imposed is limited by what risks, if any, are reasonably foreseeable. *See Kellner v. Lowney*, 761 A.2d 421, 424 (N.H. 2000).

   b. The resolution of the question of duty and legal causality ultimately depends upon consideration of the competing policy reasons for and against the recognition of a duty. *See Cui v. Chief, Barrington Police Dep't*, 924 A.2d 397, 400 (N.H. 2007).

4. **Affirmative Actions and Assumption of Duty**

   a. One who gratuitously or contractually provides services may be liable to third parties for a foreseeable harm resulting from the breach of a duty of care. *See Carignan v. New Hampshire Int'l Speedway, Inc.*, 858 A.2d 536, 540 (2004).

5. **Standard of Care**

   a. To determine whether, once found, a duty of care has been breached, an examination of what reasonable prudence would demand under similar

circumstances is required.  *See White v. Asplundh Tree Expert Co.*, 864 A.2d 1101, 1104 (N.H. 2004).

**6. Proximate/Actual Cause**

    a. The proximate cause element involves both cause-in-fact and legal cause.  Cause-in-fact requires the plaintiff to establish that the injury would not have occurred without the negligent conduct.  Legal cause requires a plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm.  *See Estate of Joshua T. v. State*, 840 A.2d 768, 771 (N.H. 2003).

**7. Joint & Several Liability**

    a. N.H. Rev. Stat. Ann. §507:7-e provides that in all cases the Court shall enter a judgment against each party liable on the basis of the rules of joint and several liability, except that if any party shall be less than 50 percent at fault, then that party's liability shall be several and not joint and he shall be liable only for the damages attributable to him.

## NEW JERSEY - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To establish a prima facie case of negligence, an injured plaintiff must demonstrate: (1) a duty of care, (2) breach of that duty, (3) proximate cause, and (4) damages. *See McGlynn v. State*, 82 A.3d 252, 256 (N.J. Super. Ct. App. Div. 2014).

2. **Existence of a Duty/Definition of a Duty**

   a. A duty is an obligation imposed by law requiring one party to conform to a particular standard of conduct toward another. The word duty denotes the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another to whom the duty is owed for any injury sustained by such other, of which that actor's conduct is a legal cause. *See Kubert v. Best*, 75 A.3d 1214, 1222 (N.J. Super. Ct. App. Div. 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists. *See Kubert v. Best*, 75 A.3d 1214, 1227 (N.J. Super. Ct. App. Div. 2013).

   b. Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. *See Estate of Desir ex rel. Estiverne v. Vertus*, 69 A.3d 1247, 1258 (N.J. 2013).

4. **Affirmative Actions and Assumption of Duty**

   a. The law is well-settled that one who undertakes to render services to another,

even absent a contract, may be found liable in tort for negligently performing or failing to perform the service assumed. *See Dawson v. Bunker Hill Plaza Associates*, 673 A.2d 847, 856 (N.J. Super. Ct. App. Div. 1996).

5. **Standard of Care**

    a. To establish a negligence claim, a plaintiff must show that the defendant's conduct falls below the standard established by law for the protection of others against unreasonable risk of harm, which is generally what a reasonable person would do under like circumstances. *See Smith v. Jersey Cent. Power & Light Co.*, 24 A.3d 300, 309-10 (N.J. Super. Ct. App. Div. 2011).

6. **Proximate/Actual Cause**

    a. Proximate cause is defined as any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred. *See Townsend v. Pierre*, 60 A.3d 800, 805 (N.J. Super. App. Div. 2013). The traditional "but for" test applies in most negligence settings, but in a limited class of claims the "substantial factor" test is more appropriate. *See Verdicchio v. Ricca*, 843 A.2d 1042, 1056 (N.J. 2004).

7. **Joint & Several Liability**

    a. N.J. Stat. Ann. §2A:15-5.3 provides, "Except as provided in subsection d. of this section, the party so recovering may recover as follows: a. The full amount of the damages from any party determined by the trier of fact to be 60% or more responsible for the total damages. . . c. Only that percentage of the damages directly attributable to that party's negligence or fault from any party determined by the trier of fact to be less than 60% responsible for the total damages."

    b. However, where a plaintiff who suffers a unitary harm at the hands of multiple defendants, the plaintiff is relieved of the burden of proving apportionment because joint liability is the usual concomitant of concurrent negligence. In that

case, the plaintiff may collect damages from the defendants jointly and severally unless the defendants can apportion the harm. *See Reichert v. Vegholm*, 840 A.2d 942, 949 (N.J. Super. Ct. App. Div. 2004).

# NEW MEXICO - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

    a. Negligence as a cause of action requires the proof of the following elements: duty, breach of that duty by failing to conform to the required standard, proximate cause, and loss or damage. *See Alcantar v. Sanchez*, 257 P.3d 966, 974 (N.M. Ct. App. 2011).

2. **Existence of a Duty/Definition of a Duty**

    a. A duty is a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons; and conduct which unreasonably amplifies the risk of harm to persons to whom a duty is owed constitutes a breach of that duty. *See Baxter v. Noce*, 752 P.2d 240, 243 (N.M. 1988).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a. Determining whether a duty exists in a particular case is a two-step procedure. First, we must consider foreseeability as to a particular plaintiff and a particular harm. If foreseeability exists, we then consider public policy to determine whether imposing a duty is supported by law. *See Lessard v. Coronado Paint & Decorating Ctr., Inc.*, 168 P.3d 155, 166 (N.M. Ct. App. 2007).

    b. The policy consideration is whether the responsibility or obligation asserted against a defendant "is one to which the law will give recognition and effect. *See Estate of Eric S. Haar v. Ulwelling*, 154 P.3d 67, 70 (N.M. Ct. App. 2007).

4. **Affirmative Actions and Assumption of Duty**

    a. It is a general proposition that every person has a duty to exercise ordinary care for the safety of others, when that person does choose to act. *See Berlangieri v. Running Elk Corp.*, 76 P.3d 1098, 1110 (N.M. 2003).

5. **Standard of Care**

    a. The responsibility for determining whether the defendant has breached a duty

owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances. *See Herrera v. Quality Pontiac*, 73 P.3d 181, 194 (N.M. 2003).

**6. Proximate/Actual Cause**

    a. A proximate cause of an injury is that which in a natural and continuous sequence unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred. It need not be the only cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury. *See Herrera v. Quality Pontiac*, 73 P.3d 181, 195 (N.M. 2003). Moreover, to establish liability, there must be a chain of causation initiated by some negligent act or omission of the defendant, which in legal terms is the cause in fact or the "but for" cause of plaintiff's injury. *See Chamberland v. Roswell Osteopathic Clinic, Inc.*, 27 P.3d 1019, 1023 (N.M. Ct. App. 2001).

**7. Joint & Several Liability**

    a. N.M. Stat. Ann. §41-3A-1 provides, [i]n causes of action to which several liability applies, any defendant who establishes that the fault of another is a proximate cause of a plaintiff's injury shall be liable only for that portion of the total dollar amount awarded as damages to the plaintiff that is equal to the ratio of such defendant's fault to the total fault attributed to all persons, including plaintiffs, defendants and persons not party to the action."

## NEW YORK - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To establish a prima facie case of negligence, a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach was a proximate cause of injury to the plaintiff. *See Ortega v. Liberty Holdings, LLC*, 976 N.Y.S.2d 147, 148 (N.Y. App. Div. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he or she did not use ordinary care and skill in his or her own conduct with regard to the circumstances he or she would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger. *See Hyer v. Fuller*, 967 N.Y.S.2d 236, 237-38 (N.Y. App. Div. 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The scope of any such duty of care varies with the foreseeability of the possible harm and takes into consideration the reasonable expectations of the parties and society in general. Although foreseeability is a critical factor in defining an alleged tortfeasor's duty, it will not create a duty which does not otherwise exist. *See Elmaliach v. Bank of China Ltd.*, 971 N.Y.S.2d 504, 512 (N.Y. App. Div. 2013).

   b. Courts must be guided by public policy considerations in circumscribing the scope of duty so that the legal consequences of civil wrongs are limited to a controllable degree. *See Lee v. New York City Hous. Auth.*, 803 N.Y.S.2d 538, 541 (N.Y. App. Div. 2005).

4. **Affirmative Actions and Assumption of Duty**

   a. One who assumes a duty to act, even though gratuitously, may thereby become subject to the duty of acting carefully. *See Kievman v. Philip*, 924 N.Y.S.2d 112,

113 (N.Y. App. Div. 2011).

**5. Standard of Care**

    a. New York's system of tort law is generally predicated on fault, attaching liability for the breach of a duty owed and a departure from the expected behavior of reasonable person. *See Walsh v. Super Value, Inc.*, 904 N.Y.S.2d 121, 125 (N.Y. App. Div. 2010).

**6. Proximate/Actual Cause**

    a. The classic definition of proximate cause describes it as that which in a natural and continuous sequence, unbroken by any new cause, produces the event, and without which that event would not have occurred. A less cumbersome definition is that which concludes that negligent conduct is a legal or proximate cause of harm to another if such conduct is a substantial factor in bringing about the harm. *See Hoggard v. Otis Elevator Co.*, 276 N.Y.S.2d 681, 686 (Sup. Ct. 1966) *aff'd*, 28 A.D.2d 1207, 285 N.Y.S.2d 262 (N.Y. App. Div. 1967).

**7. Joint & Several Liability**

    a. New York law contains an apportionment rule that applies to "non-economic" damages. N.Y. C.P.L.R. 1601 (McKinney).

    b. Moreover, when two or more tortfeasors act concurrently or in concert to produce a single injury, they may be held jointly and severally liable. *See Palermo v. Taccone*, 913 N.Y.S.2d 859, 862 (N.Y. App. Div. 2010).

# NORTH CAROLINA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail on a negligence claim, a plaintiff must prove (1) that defendant failed to exercise proper care in the performance of a duty owed plaintiff; (2) the negligent breach of that duty was a proximate cause of plaintiff's injury; and (3) a person of ordinary prudence should have foreseen that plaintiff's injury was probable under the circumstances. *See Nowlin v. Moravian Church in Am.*, 745 S.E.2d 51, 53 (N.C. Ct. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Duty is defined as an obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks. *See Bridges v. Parrish*, 731 S.E.2d 262, 265 (N.C. Ct. App. 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The duty of ordinary care does not require perfect prescience, but instead extends only to causes of injury that were reasonably foreseeable and avoidable through the exercise of due care. *See Carsanaro v. Colvin*, 716 S.E.2d 40, 45 (N.C. Ct. App. 2011).

   b. Whether or not a party has placed himself in such a relation with another so that the law will impose upon him a duty to act in such a way that the other will not be injured calls for the balancing of various factors: (1) the extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm. *See United Leasing Corp. v. Miller*, 263 S.E.2d 313, 318 (N.C. Ct. App. 1980).

   //

4. **Affirmative Actions and Assumption of Duty**

   a. Generally, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking. *See Quail Hollow E. Condo. Ass'n v. Donald J. Scholz Co.*, 268 S.E.2d 12, 15 (N.C. Ct. App. 1980).

5. **Standard of Care**

   a. Actionable negligence occurs when a defendant owing a duty fails to exercise the degree of care that a reasonable and prudent person would exercise under similar conditions, or where such a defendant of ordinary prudence would have foreseen that the plaintiff's injury was probable under the circumstances. *See Pittmann v. Hyatt Coin & Gun, Inc.*, 735 S.E.2d 856, 858 (N.C. Ct. App. 2012).

6. **Proximate/Actual Cause**

   a. Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred. *See Gaines ex rel. Hancox v. Cumberland Cnty. Hosp. Sys., Inc.*, 692 S.E.2d 119, 122 (N.C. Ct. App. 2010). To establish that negligence was a proximate cause of the injury suffered, a plaintiff must establish that the injury would not have occurred but for the defendant's negligence. *See Liller v. Quick Stop Food Mart, Inc.*, 507 S.E.2d 602, 606 (N.C. Ct. App. 1998).

7. **Joint & Several Liability**

   a. Joint and several liability is allowed when (1) defendants have acted in concert to commit a wrong that caused an injury; or (2) defendants, even without acting in concert, have committed separate wrongs that still produced an indivisible injury. *See GE Betz, Inc. v. Conrad*, 752 S.E.2d 634, 650 (N.C. Ct. App. 2013).

# NORTH DAKOTA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. In a negligence action, the plaintiff must prove (1) duty, (2) breach of that duty, (3) causation, and (4) damages. *See Barbie v. Minko Const., Inc.*, 766 N.W.2d 458, 461 (N.D. 2009).

2. **Existence of a Duty/Definition of a Duty**

   a. Every person has a duty to act reasonably to protect others from harm. *See Hansen v. Scott*, 645 N.W.2d 223, 233 n.1 (2002).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. In analyzing when a duty exists, North Dakota courts balance the following factors: (1) foreseeability of harm to plaintiff; (2) degree of certainty that plaintiff suffered injury; (3) closeness of connection between defendant's conduct and injury suffered; (4) moral blame attached to defendant's conduct; (5) policy of preventing future harm; (6) extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) availability, cost, and prevalence of insurance for the risk involved. *See Hurt v. Freeland*, 589 N.W.2d 551, 555 (N.D. 1999).

4. **Affirmative Actions and Assumption of Duty**

   a. A person may voluntarily perform an affirmative act and may thereby assume a legal duty that will afford a basis for tort liability. In such case the standard of reasonable care applies. *See Clairmont v. State Bank of Burleigh Cnty. Trust Co.*, 295 N.W.2d 154, 158 (N.D. 1980).

5. **Standard of Care**

   a. Negligence in North Dakota is based upon what a reasonable person, while exercising ordinary care, would have foreseen and would have done in the light of reasonable foresight under the circumstances then existing. *See Zebley v.*

*Heartland Indus. of Dawson, Inc.*, 625 F.3d 449, 457 (8th Cir. 2010).

6.  **Proximate/Actual Cause**

    a.  A proximate cause is a cause which, in natural and continuous sequence, produces the injury and without which the injury would not have occurred. *See Perius v. Nodak Mut. Ins. Co.*, 782 N.W.2d 355, 360 (N.D. 2010). The "substantial factor" test was created by courts to provide for an adequate definition of proximate cause in those cases in which the alleged facts supported concurrent causes and in which the traditional "but-for" definition tended to mislead juries. *See Beilke by Beilke v. Coryell*, 524 N.W.2d 607, 610 (N.D. 1994).

7.  **Joint & Several Liability**

    a.  When two or more parties contribute to the injury, the liability of each party is several only, and is not joint, except that any persons who act in concert in committing a tortious act or aid or encourage the act, or ratifies or adopts the act for their benefit, are jointly liable for all damages attributable to their combined percentage of fault. Under this section, fault includes negligence and willful conduct. *See* N.D. Cent. Code Ann. §32-03.2-02.

# OHIO - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

    a. To recover on a claim for negligence, such as the case here, the plaintiff must prove (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, and (3) the breach of the duty proximately caused the plaintiff's injury. *See Vanderbilt v. Pier 27, LLC*, 2 N.E.3d 966, 970 (Ohio Ct. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

    a. In negligence cases the duty is always the same: to conform to the legal standard of reasonable conduct in light of apparent risk. What a defendant must do, or must not do, is a question of the standard of conduct reasonably required to satisfy the defendant's duty. *See Wise v. Wise*, 964 N.E.2d 464, 466 (Ohio Ct. App. 2011).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a. Under Ohio law, the existence of a duty, or standard of care, depends on the foreseeability of the injury. *See Cox v. MetroHealth Med. Ctr. Bd. of Trustees*, 971 N.E.2d 1026, 1040-41 (Ohio Ct. App. 2012).

    b. There is no formula for ascertaining whether a duty exists. Duty is the court's expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. *See Svaldi v. Holmes*, 986 N.E.2d 443, 446-47 (Ohio Ct. App. 2012).

4. **Affirmative Actions and Assumption of Duty**

    a. The voluntary assumption of an undertaking, which is not imposed as a duty, renders the one who undertakes it liable for an injury which results from an

improper performance of it.  *See Judt v. Reinhardt Transfer Co.*, 17 Ohio Supp. 105, 108 (Ohio Ct. Common Pleas 1945).

5. **Standard of Care**

   a. The common law duty of due care is that degree of care which an ordinarily reasonable and prudent person exercises, or is accustomed to exercising, under the same or similar circumstances.  *See Carpenter v. Long*, 963 N.E.2d 857, 877 (Ohio Ct. App. 2011).

6. **Proximate/Actual Cause**

   a. Proximate cause is that which in a natural and continued sequence contributes to produce the result, without which it would not have happened.  *See Roberts v. RMB Ents., Inc.*, 967 N.E.2d 1263, 1273 (Ohio Ct. App. 2011).  This requirement is, in essence, a "but for" test of causation, which is the standard test for establishing cause in fact.  *See Ackison v. Anchor Packing Co.*, 897 N.E.2d 1118, 1128 (Ohio 2008).

7. **Joint & Several Liability**

   a. Ohio Rev. Code Ann. §2307.22 provides "[i]n a tort action in which the trier of fact determines that two or more persons proximately caused the same injury or loss to person or property or the same wrongful death and in which the trier of fact determines that more than fifty per cent of the tortious conduct is attributable to one defendant, that defendant shall be jointly and severally liable in tort for all compensatory damages that represent economic loss. . . [but] each defendant who is determined by the trier of fact to be legally responsible for the same injury or loss to person or property or the same wrongful death and to whom fifty per cent or less of the tortious conduct is attributable shall be liable to the plaintiff only for that defendant's proportionate share of the compensatory damages that represent economic loss."

## OKLAHOMA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. In order to establish actionable negligence, a party must show (1) existence of a duty on the party of the defendant to protect plaintiff from injury; (2) defendant's breach of the duty; and (3) injury to plaintiff proximately resulting therefrom. *See Gobble v. Chesapeake Energy Corp.*, 311 P.3d 454, 457 (Okla. Civ. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights. Okla. Stat. Ann. tit. 76, §1. Whenever a person is placed in such a position with regard to another that it is obvious that if he did not use due care in his own conduct he will cause injury to the other, the duty at once arises to exercise care commensurate with the situation in order to avoid such injury. *See Brewer v. Murray*, 292 P.3d 41, 46, (Okla. Civ. App. 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability is often the primary policy consideration in defining the scope of duty in a particular case. Foreseeability establishes a "zone of risk," which is to say that it forms a basis for assessing whether the conduct creates a generalized and foreseeable risk of harming others. *See Brewer v. Murray*, 292 P.3d 41, 50 (Okla Civ. App. 2012).

   b. Oklahoma courts also consider policy factors in determining the existence of a duty, including: 1) foreseeability of harm to the plaintiff, 2) degree of certainty of harm to the plaintiff, 3) moral blame attached to defendant's conduct, 4) need to prevent future harm, 5) extent of the burden to the defendant and consequences to the community of imposing the duty on defendant, and 6) availability of insurance

for the risk involved.  *See Lowery v. Echostar Satellite Corp.*, 160 P.3d 959, 964 n.4 (Okla. 2007).

**4.  Affirmative Actions and Assumption of Duty**

    a.  Even when a person has no duty to act with regard to a matter, if he volunteers to assume that duty, either expressly or by his conduct, he must exercise ordinary care and is liable for injury resulting from his failure to do so.  *See Fry Land & Cattle Co. v. Colorado Interstate Gas Co.*, 805 P.2d 695, 696 (Okla. Civ. App. 1990).

**5.  Standard of Care**

    a.  In negligence cases, the standard of conduct is that of a reasonably prudent person under the same or similar circumstances.  *See Mansfield v. Circle K. Corp.*, 877 P.2d 1130, 1132 (Okla. 1994).

**6.  Proximate/Actual Cause**

    a.  The proximate cause of an event is that which in a natural and continuous sequence, unbroken by an independent cause, produces the event and without which the event would not have occurred.  *See Brewer v. Murray*, 292 P.3d 41, 53 (Okla Civ. App. 2012).  Cause in fact is the threshold "but for" question, while legal causation is a limiting principal that requires a determination based on both common sense and policy arguments.  *See Jones v. Mercy Health Ctr., Inc.*, 155 P.3d 9, 14 (Okla. 2006).

**7.  Joint & Several Liability**

    a.  Okla. Stat. Ann. tit. 23, §15 provides, "[i]n any civil action based on fault and not arising out of contract, the liability for damages caused by two or more persons shall be several only and a joint tortfeasor shall be liable only for the amount of damages allocated to that tortfeasor."

# OREGON - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail on a claim for negligence, a plaintiff must demonstrate (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent. *See Towe v. Sacagawea, Inc.*, 264 P.3d 184, 190 (Or. Ct. App. 2011).

2. **Existence of a Duty/Definition of a Duty**

   a. The first inquiry in a negligence action is to determine whether some status, relationship or statute created or limited a duty owed by defendant to plaintiff to use reasonable care to avoid injury. *See German v. Murphy*, 932 P.2d 580, 584 (Or. Ct. App. 1997)

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. To recover in negligence, a complainant must prove that the respondent's conduct created a foreseeable risk of harm and caused injury to the complainant. *See Hettle v. Constr. Contractors Bd.*, 316 P.3d 344, 351 (Or. Ct. App. 2013). However, liability for purely economic harm must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm. *See Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 328 (Or. 2004). Oregon courts will examine the traditional policies underlying the relationship between the plaintiff and the defendant in analyzing whether a special relationship exists. *See Hettle v. Constr. Contractors Bd.*, 260 316 P.3d 344, 351 (Or. Ct. App. 2013).

4. **Affirmative Actions and Assumption of Duty**

   a. The Oregon Court of Appeals found the following jury instruction proper: "Although a party may have no initial responsibility to act in a given area, once he undertakes to act, he must do so reasonably." *See Peterson v. Multnomah Cnty. Sch. Dist. No. 1*, 668 P.2d 385, 393 (Or. Ct. App. 1983).

5. **Standard of Care**

   a. A person is negligent if the person fails to exercise reasonable care, a standard that is measured by what a reasonable person of ordinary prudence would, or would not, do in the same or similar circumstances. *See Cowan v. Nordyke*, 222 P.3d 1093, 1095 (Or. Ct. App. 2009).

6. **Proximate/Actual Cause**

   a. The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *See Miami Quarry Co. v. Seaborg Packing Co.*, 204 P. 492, 495 (Or. 1922). The element of "causation" ordinarily refers to "causation-in-fact" or "but-for" causation. That is to say, in order to prevail in a negligence action, a plaintiff must establish that *but for* the negligence of the defendant, the plaintiff would not have suffered the harm that is the subject of the claim. *See Watson v. Meltzer*, 270 P.3d 289, 293 (Or. Ct. App. 2011).

7. **Joint & Several Liability**

   a. Under ORS 31.610, liability is several only; a tortfeasor is responsible only for its percentage of fault as determined in the action brought by the plaintiff. *See Lasley v. Combined Transp., Inc.*, 261 P.3d 1215, 1226 (Or. 2011).

# PENNSYLVANIA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To state a claim for negligence, a claimant must establish the presence of a legal duty or obligation; a breach of that duty; a causal link between that breach and the injury alleged; and actual damage or loss suffered by the claimant as a consequence of thereof. *See Wright v. Eastman*, 63 A.3d 281, 284 (Pa. Super. Ct. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. In negligence cases, a duty consists of one party's obligation to conform to a particular standard of care for the protection of another. This concept is rooted in public policy. *See Wisniski v. Brown & Brown Ins. Co. of PA*, 906 A.2d 571, 576 (Pa. Super. Ct. 2006).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability of harm is an element of negligence. *See State Farm Fire & Cas. Co. v. PECO*, 54 A.3d 921, 931 (Pa. Super. Ct. 2012). In determining whether the defendant owed a duty of care, Pennsylvania courts weigh the following five factors: (1) the relationship between the parties; (2) the social utility of the defendant's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the proposed solution. *See Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.*, 52 A.3d 347, 352-53 (Pa. Super. Ct. 2012), *appeal granted in part,* 66 A.3d 763 (Pa. 2013).

4. **Affirmative Actions and Assumption of Duty**

   a. The assumption of a tort duty, when otherwise no duty exists, is governed by the Restatement (Second) of Torts § 323 (1965). It states in pertinent part that: one who undertakes for consideration to render services to another which he should

recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking. *See Henry v. First Fed. Sav. & Loan Ass'n of Greene Cnty.*, 459 A.2d 772, 775 n.3 (Pa. 1983).

5. **Standard of Care**

   a. Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances. *See Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009).

6. **Proximate/Actual Cause**

   a. The doctrine of proximate cause is defined as that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *See Bodick v. Harcliff Min. Co.*, 222 A.2d 615, 616 (Pa. Super. Ct. 1966). A defendant's negligence may be the proximate cause of an injury where it is a substantial, though not the only, factor in bringing about the injury. *See id.* But for causation or the cause in fact standard requires a direct causal connection between the individual's negligence and the injury sustained, meaning that the harmful result would not have come about but for the negligent conduct. *See Thomas Lindstrom Co., Inc. v. W.C.A.B. (Braun)*, 992 A.2d 961, 967 (Pa. Commw. Ct. 2010).

7. **Joint & Several Liability**

   a. Joint and several liability as a principle of recovery for an indivisible injury caused by multiple tortfeasors lies at the very heart of the common law of tort, and also has a solid foundation in Pennsylvania's statutory law. *See Carrozza v. Greenbaum*, 916 A.2d 553, 565 (2007).

   b. 42 Pa. Cons. Stat. Ann. §7102 provides, "a defendant's liability shall be several and not joint, and the court shall enter a separate and several judgment in favor of the plaintiff and against each defendant for the apportioned amount of that

defendant's liability. [However, a] defendant's liability in any of the following actions shall be joint and several, and the court shall enter a joint and several judgment in favor of the plaintiff and against the defendant for the total dollar amount awarded as damages: . . .Where the defendant has been held liable for not less than 60% of the total liability apportioned to all parties."

# RHODE ISLAND - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To maintain a claim for negligence, a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage. *See Wyso v. Full Moon Tide, LLC*, 78 A.3d 747, 750 (R.I. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. This duty of care element of negligence is an obligation imposed by the law upon a person. It requires that person to conform his or her actions to a particular standard. *See Lucier v. Impact Recreation, Ltd.*, 864 A.2d 635, 638-39 (R.I. 2005).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The linchpin in the analysis of whether a duty flows from a defendant to a plaintiff is foreseeability. *See Selwyn v. Ward*, 879 A.2d 882, 887 (R.I. 2005).

   b. In determining whether such a duty exists, Rhode Island courts also consider other relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations and notions of fairness. *See Lucier v. Impact Recreation, Ltd.*, 864 A.2d 635, 639 (R.I. 2005).

4. **Affirmative Actions and Assumption of Duty**

   a. Even one who assumes to act gratuitously, may become subject to the duty of acting carefully if he acts at all. *See Davis v. New England Pest Control Co.*, 576 A.2d 1240, 1242 (R.I. 1990).

5. **Standard of Care**

   a. To succeed on a general claim for negligence, plaintiff must demonstrate that defendant did not act as a reasonably prudent person would under the

circumstances.  *See Konar v. PFL Life Ins. Co.*, 840 A.2d 1115, 1119 (R.I. 2004).

**6.  Proximate/Actual Cause**

    a.  Proximate cause requires a finding that the harm would not have occurred but for the defendant's act and that the harm was a natural and probable consequence of the act.  In most cases, proximate cause may be demonstrated by establishing that the harm to the plaintiff would not have occurred but for the defendant's negligence. *See Almonte v. Kurl*, 46 A.3d 1, 18 (R.I. 2012).

**7.  Joint & Several Liability**

    a.  An injury resulting from the joint tort of two or more persons involves each of them, jointly and severally, in liability for the entire damage.  See *Hawkins v. Gadoury*, 713 A.2d 799, 802 (R.I. 1998).

    b.  It is a well-settled  that a plaintiff may recover 100% of his or her damages from a joint tortfeasor who has contributed to the injury in any degree.  See *Roberts-Robertson v. Lombardi*, 598 A.2d 1380, 1381 (R.I. 1991).

## SOUTH CAROLINA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail on a negligence claim, a plaintiff must establish duty, breach, causation, and damages. *See Babb v. Lee Cnty. Landfill SC, LLC*, 747 S.E.2d 468, 481 (S.C. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Generally, duty is defined as the obligation to conform to a particular standard of conduct toward another. *See Nelson v. Piggly Wiggly Cent., Inc.*, 701 S.E.2d 776, 781 (S.C. Ct. App. 2010).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. A breach of duty exists when it is foreseeable that one's conduct may likely injure the person to whom the duty is owed. *See Vinson v. Hartley*, 477 S.E.2d 715, 720 (S.C. Ct. App. 1996). However, foreseeability of injury, in and of itself, does not give rise to a duty. *See Oblachinski v. Reynolds*, 706 S.E.2d 844, 846 (S.C. 2011). South Carolina courts also look to general considerations of public policy in determining whether a duty exists. *See, e.g.*, *Simmons v. Tuomey Reg'l Med. Ctr.*, 498 S.E.2d 408, 410 (S.C. Ct. App. 1998) *aff'd as modified,* 533 S.E.2d 312 (S.C. 2000) (finding "public policy now mandates that hospitals have a nondelegable duty to provide competent emergency room services").

4. **Affirmative Actions and Assumption of Duty**

   a. Where an act is voluntarily undertaken, however, the actor assumes the duty to use due care. *See Johnson v. Robert E. Lee Acad., Inc.*, 737 S.E.2d 512, 514 (S.C. Ct. App. 2012).

5. **Standard of Care**

   a. Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation; or doing what such

a person, under the existing circumstances, would not have done. *See Jones v. Am. Fid. & Cas. Co.*, 43 S.E.2d 355, 359 (S.C. 1947).

6. **Proximate/Actual Cause**

    a. A negligent act or omission is a proximate cause of injury if, in a natural and continuous sequence of events, it produces the injury, and without it, the injury would not have occurred. In other words, if the accident would have happened as a natural and probable consequence, even in the absence of the alleged breach, then a plaintiff has failed to demonstrate proximate cause. *See Hurd v. Williamsburg Cnty.*, 579 S.E.2d 136, 144 (S.C. Ct. App. 2003) *aff'd,* 611 S.E.2d 488 (S.C. 2005). Causation in fact is proved by establishing the plaintiff's injury would not have occurred "but for" the defendant's negligence. *See Hurd v. Williamsburg Cnty.*, 579 S.E.2d 136, 144 (S.C. Ct. App. 2003) *aff'd,* 611 S.E.2d 488 (S.C. 2005).

7. **Joint & Several Liability**

    a. South Carolina has reaffirmed the applicability of joint and several liability among joint tortfeasors. *See Branham v. Ford Motor Co.*, 701 S.E.2d 5, 23 (S.C. 2010). Under the law of South Carolina, one injured by the conduct of two or more joint tort-feasors may elect that party or parties whom he will sue and may pursue the collection of a judgment procured against any one or more of the judgment debtors. *See Travelers Ins. Co. v. Allstate Ins. Co.*, 155 S.E.2d 591, 594 (S.C. 1967).

# SOUTH DAKOTA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury. *See Hewitt v. Felderman*, 841 N.W.2d 258, 263 (S.D. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. The existence of a duty owed by the defendant to the plaintiff requires the defendant to conform to a certain standard of conduct in order to protect the plaintiff against unreasonable risks. *See Janis v. Nash Finch Co.*, 780 N.W.2d 497, 500 (S.D. 2010).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability is the touchstone of the existence of the duty of reasonable or ordinary care. *See Janis v. Nash Finch Co.*, 780 N.W.2d 497, 502 (S.D. 2010).

   b. However, public policy is also a major consideration in identifying a legal duty. *See Kirlin v. Halverson*, 758 N.W.2d 436, 453 (S.D. 2008).

4. **Affirmative Actions and Assumption of Duty**

   a. South Dakota recognizes the common law doctrine of gratuitous duty, under which one who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if, (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking. *See Andrushchenko v. Silchuk*, 744 N.W.2d 850, 858 (S.D. 2008).

5. **Standard of Care**

   a. Under South Dakota common law, negligence is the failure to exercise ordinary

care under the circumstances, which is that an ordinarily prudent or reasonable person would exercise under the same or similar circumstances. *See Lovell v. Oahe Elec. Co-op.*, 382 N.W.2d 396, 398 (S.D. 1986).

6. **Proximate/Actual Cause**

   a. Proximate cause is the legal cause of an injury; it is the immediate cause which in a natural and continuous sequence unbroken by the intervention of a new and independent cause produces the injury without which it could not have happened. *See Rumbolz v. Wipf*, 145 N.W.2d 520, 523 (S.D. 1966). Proximate or legal cause is a cause that produces a result in a natural and probable sequence *and without which the result would not have occurred. See Hertz Motel v. Ross Signs*, 698 N.W.2d 532, 537 (S.D. 2005). There is no distinction between legal cause and factual cause with respect to law on proximate cause. *See Musch v. H-D Co-op., Inc.*, 487 N.W.2d 623, 624 (S.D. 1992).

7. **Joint & Several Liability**

   a. SDCL 15-8-11 provides: "For the purposes of §§ 15-8-12 to 15-8-22, inclusive, the term "joint tort-feasors" means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."

   b. Each joint tort-feasor is responsible for the wrong and they may be sued jointly or severally. See *Whiting v. Hoffine*, 294 N.W.2d 921, 923 (S.D. 1980).

   c. However, if the court enters judgment against any party liable on the basis of joint and several liability, any party who is allocated less than fifty percent of the total fault allocated to all the parties may not be jointly liable for more than twice the percentage of fault allocated to that party. S.D. Codified Laws § 15-8-15.1; *see W. Consol. Co-op. v. Pew*, 795 N.W.2d 390, 399 (S.D. 2011).

**TENNESSEE - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail on a claim for negligence, a plaintiff must demonstrate: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *See Wilson v. Americare Sys., Inc.*, 397 S.W.3d 552, 558 (Tenn. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Duty is the legal obligation a defendant owes to a plaintiff to conform to the reasonable person standard of care in order to protect against unreasonable risks of harm. *See Green v. Roberts*, 398 S.W.3d 172, 177 (Tenn. Ct. App. 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability is a threshold requirement in the duty analysis. In order to determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable, and, if so, must then apply a balancing test based upon principles of fairness to identify whether the risk was unreasonable. *See Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 532 (Tenn. Ct. App. 2011).

   b. In determining the existence of a duty, Tennessee courts also consider the following policy-based factors: a) the possible magnitude of the potential harm or injury; b) the importance or social value of the activity engaged in by the defendant; c) the usefulness of the conduct to the defendant; d) the feasibility of alternative conduct that is safer; e) the relative costs and burdens associated with that safer conduct; f) the relative usefulness of the safer conduct; and g) the relative safety of alternative conduct. *See Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 531 (Tenn. Ct. App. 2011).

//

4. **Affirmative Actions and Assumption of Duty**

   a. One who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully. *See Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007).

5. **Standard of Care**

   a. In a negligence action, the standard of conduct is the standard of reasonable care in light of the apparent risk. *See Timmons v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee.*, 307 S.W.3d 735, 742 (Tenn. Ct. App. 2009).

6. **Proximate/Actual Cause**

   a. In determining what is proximate cause, the true rule is that the injury must be the natural and probable consequence of the act—such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act. *See Bradshaw v. Holt*, 292 S.W.2d 30, 34 (Tenn. 1956). Where causation in fact means that the injury or harm would not have occurred but for the defendant's negligent conduct. *See Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011).

7. **Joint & Several Liability**

   a. Tenn. Code Ann. §29-11-107 provides that, subject to some exceptions, if multiple defendants are found liable in a civil action governed by comparative fault, a defendant shall only be severally liable for the percentage of damages for which fault is attributed to such defendant by the trier of fact, and no defendant shall be held jointly liable for any damages.

   b. The adoption of comparative fault abrogated the use of the doctrine of joint and several liability only in those cases where the defendants are charged with separate, independent acts of negligence. *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 87 (Tenn. 2001).

**TEXAS - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *See Pjetrovic v. Home Depot*, 411 S.W.3d 639, 650 (Tex. App. 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. Duty is the threshold question in a negligence case. A duty is a legal obligation that requires a defendant to conform to a certain standard of conduct to protect others against unreasonable risks. *See City of Alton v. Sharyland Water Supply Corp.*, 402 S.W.3d 867, 874 (Tex. App. 2013).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Foreseeability of harm is the principal factor to consider when determining whether a party owes a duty. *See W. Houston Airport, Inc. v. Millennium Ins. Agency, Inc.*, 349 S.W.3d 748, 753 (Tex. App. 2011).

   b. In determining whether a defendant owes a duty, the court must consider a number of competing individual and social interests. *See Retzlaff v. Texas Dep't of Criminal Justice*, 135 S.W.3d 731, 742 (Tex. App. 2003). Texas courts look to the following factors in deciding whether to find a duty: (1) social, economic, and political questions and their application to the facts at hand; (2) the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant; and (3) whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm. *See San Benito Bank & Trust Co. v. Landair Travels*, 31 S.W.3d 312, 321 (Tex. App. 2000).

//

4. **Affirmative Actions and Assumption of Duty**

   a. It is well settled that even though one does not have a duty to act, if one acts voluntarily, he must do so with due care and is generally liable for negligence. *See Brown & Brown of Texas, Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 388 (Tex. App. 2010).

5. **Standard of Care**

   a. When a duty requires the defendant to exercise reasonable care, the defendant's standard of care is defined as what a reasonable prudent person would or would not have done under the same or similar circumstances regarding any reasonably foreseeable risk. *See Rodriguez v. Boerjan*, 399 S.W.3d 223, 231 (Tex. App. 2012).

6. **Proximate/Actual Cause**

   a. Proximate cause is that cause which in a natural and continuous sequence, unbroken by any new and independent cause, produces the injury and without which the injury would not have occurred. *See Helping Hands Home Care, Inc. v. Home Health of Tarrant Cnty., Inc.*, 393 S.W.3d 492, 507 n.13 (Tex. App. 2013). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.,* but for the act or omission—the harm would not have occurred. *See Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013).

7. **Joint & Several Liability**

   a. Other than an intentional tortfeasor whose conduct violates one of the fourteen penal statutes listed in section 33.013(b)(2), a defendant may be found jointly and severally liable only if his percentage of responsibility is found to be greater than fifty percent. *See Vien v. Del Buono*, 10-09-00318-CV, 2010 WL 5117248, at *8 n.11 (Tex. App. Dec. 15, 2010); Tex. Civ. Prac. & Rem. Code Ann. §33.013.

b. However, joint and several liability is appropriate in tort cases when the independent tortious conduct of two or more persons is a legal cause of an indivisible injury. *See Bluestar Energy, Inc. v. Murphy*, 205 S.W.3d 96, 99 (Tex. App. 2006).

# UTAH - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. For a plaintiff to prevail on a claim of negligence, the plaintiff must establish: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages. *See Torrie v. Weber Cnty.*, 309 P.3d 216, 219 (Utah 2013).

2. **Existence of a Duty/Definition of a Duty**

   a. In negligence cases, a duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *See B.R. ex rel. Jeffs v. W.*, 275 P.3d 228, 230 (Utah 2012).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. A court determines whether a duty exists by analyzing the legal relationship between the parties, the foreseeability of injury, the likelihood of injury, public policy as to which party can best bear the loss occasioned by the injury, and other general policy considerations. *See Normandeau v. Hanson Equip., Inc.*, 233 P.3d 546, 547 (Utah Ct. App. 2010).

4. **Affirmative Actions and Assumption of Duty**

   a. A duty arises when a person undertakes an affirmative act for the benefit of another, whether gratuitously or for pay. Where one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care. *See Robinson v. Mount Logan Clinic, LLC*, 182 P.3d 333, 336 (Utah 2008).

5. **Standard of Care**

   a. The "reasonably prudent person" standard of care is a flexible legal concept requiring a greater or lesser degree of care according to the nature of the

circumstances that a reasonably prudent person would consider in assessing possible risks of injury. *See Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 930 (Utah 1993).

**6. Proximate/Actual Cause**

    a. Proximate cause is that cause which, in natural and continuous sequence (unbroken by an efficient intervening cause), produces the injury and without which the result would not have occurred. *See Breton v. Clyde Snow & Sessions*, 299 P.3d 13, 16 (Utah Ct. App. 2013). The "cause in fact" inquiry asks whether a defendant's negligence, as a factual matter, played a role in bringing about the plaintiff's injury. *See Raab v. Utah Ry. Co.*, 221 P.3d 219, 226 (Utah Ct. App. 2009).

**7. Joint & Several Liability**

    a. Subject to Section 78B-5-818, the maximum amount for which a defendant may be liable to any person seeking recovery is that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant. Utah Code Ann. § 78B-5-820.

**VERMONT - NEGLIGENCE**

1. **Definition of Negligence/Elements of Negligence**

   a. To support a negligence claim, a plaintiff must show that the defendant owed her a legal duty, that the defendant breached that duty, that the breach was the proximate cause of the plaintiff's injury, and that she suffered actual loss or damage. *See Lenoci v. Leonard*, 21 A.3d 694, 697 (Vt. 2011).

2. **Existence of a Duty/Definition of a Duty**

   a. Vermont courts have defined duty as a legal obligation to conform to a certain standard of conduct so as to protect the plaintiff from an unreasonable risk of harm. *See Kellogg v. Wyeth*, 762 F. Supp. 2d 694, 704 (D. Vt. 2010).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. A cognizable legal duty depends on a variety of public policy considerations and relevant factors, where foreseeability is but one factor to be considered. Ultimately, whether a duty exists is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, and the public interest at stake. *See Long Trail House Condo. Ass'n v. Engelberth Const., Inc.*, 59 A.3d 752, 757 (Vt. 2012). Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution. *See Sorge v. State*, 762 A.2d 816, 820 (Vt. 2000).

4. **Affirmative Actions and Assumption of Duty**

   a. A person who undertakes, gratuitously or for consideration, to render to another services that the person should recognize as necessary to protect the other, is subject to liability for physical harm resulting from negligent performance of the undertaking if (1) the negligence increases the risk of harm, or (2) the harm results from the other's reliance upon the undertaking. *See Sabia v. State*, 669

A.2d 1187, 1194 (Vt. 1995).

**5. Standard of Care**

    a. The true test of negligence is what would a careful and prudent person have done under like circumstances, acting on his judgment then, and not on a judgment based on subsequent reflection. *See Garafano v. Neshobe Beach Club, Inc.*, 238 A.2d 70, 76 (Vt. 1967).

**6. Proximate/Actual Cause**

    a. Causation requires both but-for and proximate causation; thus, a plaintiff must show that the harm would not have occurred but for the defendant's conduct such that the tortious conduct was a necessary condition for the occurrence of the plaintiff's harm, and the plaintiff must also show that the defendant's negligence was legally sufficient to result in liability, such that liability attaches for all the injurious consequences that flow from the defendant's negligence until diverted by the intervention of some efficient cause that makes the injury its own. *See Collins v. Thomas*, 938 A.2d 1208 (Vt. 2007).

**7. Joint & Several Liability**

    a. Where recovery for *negligence* is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal *negligence* to the amount of causal *negligence* attributed to all defendants against whom recovery is allowed. *See* Vt. Stat. Ann. tit. 12, §1036.

# VIRGINIA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To establish a claim for negligence a plaintiff must show the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage. *See McGuire v. Hodges*, 639 S.E.2d 284, 288 (Va. 2007).

2. **Existence of a Duty/Definition of a Duty**

   a. Negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. *See Hale v. Maersk Line Ltd.*, 732 S.E.2d 8, 21 (2012). Under Virginia law, there is no such thing as negligence in the abstract, or in general. Rather, negligence must be in relation to some person. Thus, the scope of the duty will vary with the circumstances of each case but it is always a duty owed to a discernible individual, or to a class of which that individual is a member. *See Wise v. United States*, 8 F. Supp. 2d 535, 550 (E.D. Va. 1998).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. In determining whether a duty exists, the Virginia court considers factors including foreseeability of harm, the likelihood of injury, the magnitude of the burden of guarding against that injury, and the consequences of placing such a burden on the defendant. *See Jappell v. Am. Ass'n of Blood Banks*, 162 F. Supp. 2d 476, 480 (E.D. Va. 2001).

4. **Affirmative Actions and Assumption of Duty**

   a. Virginia has adopted the common-law principle of assumption of a duty. Under that principle, one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all. *See Burns v. Gagnon*, 727 S.E.2d 634, 643 (Va. 2012).

//

5. **Standard of Care**

   a. Duties imposed upon defendants and the violations of those duties are premised upon the objective concept of what a reasonably prudent person in the exercise of reasonable care would have done in similar circumstance. *See A.H. v. Rockingham Pub. Co., Inc.*, 495 S.E.2d 482, 487 (Va. 1998).

6. **Proximate/Actual Cause**

   a. A proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred. *See Zellars v. NexTech Ne., LLC*, 895 F. Supp. 2d 734, 751 (E.D. Va. 2012). Virginia follows the "but for" rule of proximate causation, which states that a defendant is not liable unless the harm would not have occurred but for the defendant's act. *See Marchant v. Boddie-Noell Enterprises, Inc.*, 344 F. Supp. 2d 495, 497 (W.D. Va. 2004).

7. **Joint & Several Liability**

   a. In determining the liability of a person whose concurrent tortious conduct causes a single indivisible injury, comparative degrees of fault should not be considered and both wrongdoers are equally liable irrespective of whether one may have contributed in a greater degree to the injury. *See Sullivan v. Robertson Drug Co., Inc.*, 639 S.E.2d 250, 255 (Va. 2007).

# WASHINGTON - NEGLIGENCE

1.  **Definition of Negligence/Elements of Negligence**

    a.  Negligence requires proof of four elements: (1) the existence of a duty to the person alleging negligence, (2) breach of that duty, (3) resulting injury, and (4) proximate cause between the breach and the injury. *See Nguyen v. City of Seattle*, 317 P.3d 518, 523 (Wash. Ct. App. 2014).

2.  **Existence of a Duty/Definition of a Duty**

    a.  In the law of negligence, a duty of care is defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *See Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 243 P.3d 521, 526 (Wash. 2010).

3.  **Role of Foreseeability and Public Policy Factor in Determining Duty**

    a.  To decide if the law imposes a duty of care, and to determine the duty's measure and scope, Washington courts weigh considerations of 'logic, common sense, justice, policy, and precedent. The concept of duty is a reflection of all those considerations of public policy which lead the law to conclude that a plaintiff's interests are entitled to legal protection against the defendant's conduct. *See Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 243 P.3d 521, 526 Wash. 2010).

    b.  Foreseeability does not create a duty but sets limits once a duty is established. Once this initial determination of legal duty is made, the jury's function is to decide the foreseeable range of danger therefore limiting the scope of that duty. *See Simonetta v. Viad Corp.*, 197 P.3d 127, 131 n.4 (Wash. 2008).

4.  **Affirmative Actions and Assumption of Duty**

    a.  As a general rule, one who undertakes to act in a given situation has a duty to follow through with reasonable care, even though he or she had no duty to act in

the first instance. *See Pruitt v. Savage*, 115 P.3d 1000, 1003 (Wash. Ct. App. 2005).

**5. Standard of Care**

    a. Duty is the duty to exercise ordinary care, or, alternatively phrased, the duty to exercise such care as a reasonable person would exercise under the same or similar circumstances. Breach is the failure to exercise ordinary care, or alternatively phrased, the failure to exercise such care as a reasonable person would exercise under the same or similar circumstances. *See Schwartz v. Elerding*, 270 P.3d 630, 634 (Wash. Ct. App. 2012).

**6. Proximate/Actual Cause**

    a. The proximate cause of an injury is that cause which, in a natural and continuous sequence, unbroken by any new, independent cause, produces the event, and without which that event would not have occurred. *See Childs v. Allen*, 105 P.3d 411, 415 (Wash. Ct. App. 2004). Cause in fact, or "but for" causation, refers to the physical connection between an act and an injury. *See Martini v. Post*, 313 P.3d 473, 479 (Wash. Ct. App. 2013).

**7. Joint & Several Liability**

    a. Except as otherwise provided in RCW §4.22.070, if more than one person is liable to a claimant on an indivisible claim for the same injury, death or harm, the liability of such persons shall be joint and several. Wash. Rev. Code Ann. §4.22.030.

## WEST VIRGINIA - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. To prevail in a negligence suit, the plaintiff must show that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff. *See Strahin v. Cleavenger*, 603 S.E.2d 197, 205 (W.Va. 2004).

2. **Existence of a Duty/Definition of a Duty**

   a. Negligence is the violation of the duty of taking care under the given circumstances. *See Strahin v. Cleavenger*, 216 W. Va. 175, 603 S.E.2d 197 (W. Va. 2004). To establish a cause of action in negligence, it must first be shown that the alleged tortfeasor was under a legal duty or obligation requiring the person to conform to a certain standard of conduct. *See Reed v. Phillips*, 452 S.E.2d 708, 712 (W. Va. 1994).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. While foreseeability of risk is a primary consideration in determining the scope of a duty an actor owes to another, beyond the question of foreseeability, the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection. Such considerations include the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant. *See Aikens v. Debow*, 541 S.E.2d 576, 581 (W. Va. 2000).

4. **Affirmative Actions and Assumption of Duty**

   a. The West Virginia Supreme Court held that when the defendant voluntarily assumed to repair a filling station and then allowed a condition to be created from which patrons of the station might be injured, through its failure to complete the repairs, the defendant became liable for injuries sustained by persons lawfully on

the premises. *See Wingrove v. Home Land Co.*, 196 S.E. 563, 565 (W. Va. 1938). West Virginia courts have read this case to state that an individual undertakes a legal duty if he/she affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm. *See Bragg v. United States*, 767 F. Supp. 2d 617, 623 (S.D.W. Va. 2011) *vacated on other grounds,* 528 F. App'x 282 (4th Cir. 2013).

**5. Standard of Care**

    a. Whether a person acts negligently is always determined by assessing whether or not the alleged negligent actor exercised reasonable care under the facts and circumstances of the case, with reasonable care being that level of care a person of ordinary prudence would take in like circumstances. *See Strahin v. Cleavenger*, 603 S.E.2d 197, 205 (W. Va. 2004).

**6. Proximate/Actual Cause**

    a. Proximate cause is as a cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of. *See Whitney v. Ralph Myers Contracting Corp.*, 118 S.E.2d 622, 624 (W. Va. 1961). Proximate cause must be understood as the cause that produced the wrong complained of and without which the wrong would not have occurred. The proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred. *See Wilkinson v. Duff*, 575 S.E.2d 335, 341 (W. Va. 2002).

**7. Joint & Several Liability**

    a. West Virginia is committed to the concept of joint and several liability among joint tortfeasors. *See Strahin v. Cleavenger*, 603 S.E.2d 197, 210 (W. Va. 2004).

    b. West Virginia's adoption of modified rule for contributory negligence did not change its adherence to joint and several liability. *See Sitzes v. Anchor Motor Freight, Inc.*, 169 W. Va. 698, 289 S.E.2d 679 (1982).

# WISCONSIN - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. The four elements of a negligence claim are: (1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the breach. *See Hocking v. City of Dodgeville*, 768 N.W.2d 552, 555 (Wis. 2009).

2. **Existence of a Duty/Definition of a Duty**

   a. Wisconsin has followed the dissent of Judge Andrews in *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), who explained that everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others. *See Tesar v. Anderson*, 789 N.W.2d 351, 355 (Wis. Ct. App. 2010).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. The concept of duty, as it relates to negligence cases, is inexorably interwoven with foreseeability. The duty of each person is to exercise ordinary care to refrain from any act which will cause foreseeable harm to another, to refrain from any act which creates an unreasonable risk to others. *See Tesar v. Anderson*, 789 N.W.2d 351, 354 (Wis. Ct. App. 2010).

   b. Even after the court finds the existence of a duty along with the other negligence elements, the court may still limit liability by considerations of public policy. *See Tesar v. Anderson*, 789 N.W.2d 351, 356 (Wis. Ct. App. 2010). Courts consider the following public factors: (1) is the injury is too remote from the negligence; (2) is the injury is too wholly out of proportion to the tortfeasor's culpability; (3) in retrospect does it appear too highly extraordinary that the negligence should have brought about the harm; (4) is allowing recovery would place too

unreasonable a burden upon the tortfeasor; (5) is allowing recovery would be too likely to open the way to fraudulent claims; or (6) is allowing recovery would have no sensible or just stopping point?  *See Kessel ex rel. Swenson v. Stansfield Vending, Inc.*, 714 N.W.2d 206, 217 (Wis. Ct. App. 2006).

**4. Affirmative Actions and Assumption of Duty**

    a.  One may have no duty to perform an act, but if he attempts to do something to another even although gratuitously, he must exercise reasonable care.  *See Ladewig ex rel. Grischke v. Tremmel*, 802 N.W.2d 511, 519 (Wis. Ct. App. 2011).

**5. Standard of Care**

    a.  The question is not whether or not there is a duty to do a specific act, but rather whether the conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person under the circumstances.  *See Heuser ex rel. Jacobs v. Cmty. Ins. Corp.*, 774 N.W.2d 653, 659 (Wis. Ct. App. 2009).

**6. Proximate/Actual Cause**

    a.  Legal cause in negligence consists of two parts: (1) cause-in-fact, which requires that the negligence is a substantial factor in producing the injuries; and (2) public policy considerations that may result in denial of recovery even though there is cause-in-fact.  *See Zarnstorff v. Neenah Creek Custom Trucking*, 792 N.W.2d 594, 604 (Wis. Ct. App. 2010).

**7. Joint & Several Liability**

    a.  Wis. Stat. Ann. §895.045 provides "The liability of each person found to be causally negligent whose percentage of causal negligence is less than 51% is limited to the percentage of the total causal negligence attributed to that person. A person found to be causally negligent whose percentage of causal negligence is 51% or more shall be jointly and severally liable for the damages allowed."

# WYOMING - NEGLIGENCE

1. **Definition of Negligence/Elements of Negligence**

   a. to establish negligence, the plaintiff must show the following: (1) the defendant owed the plaintiff a duty to conform to a specified standard of care, (2) the defendant breached the duty of care, (3) the defendant's breach of the duty of care proximately caused injury to the plaintiff, and (4) the injury sustained by the plaintiff is compensable by money damages. *See Lucero v. Holbrook*, 288 P.3d 1228, 1232 (Wyo. 2012).

2. **Existence of a Duty/Definition of a Duty**

   a. It is well settled that in order to establish a cause of action in tort there must first be a duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks. *See McCoy v. Crook Cnty. Sheriff's Dep't*, 987 P.2d 674, 677 (Wyo. 1999).

3. **Role of Foreseeability and Public Policy Factor in Determining Duty**

   a. Wyoming courts have relied upon a number of factors in determining whether the common law creates a duty of care, including (1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved. *See Lucero v. Holbrook*, 288 P.3d 1228, 1233 (Wyo. 2012).

4. **Affirmative Actions and Assumption of Duty**

   a. A person who voluntarily undertakes to render a service to another which he recognizes as necessary for the protection of a third person or his property is

subject to liability to that person for physical harm resulting from the failure to exercise reasonable care if that failure increases the risk of harm to the third person or the harm was occasioned by reliance on the voluntary service. *See Andersen v. Two Dot Ranch, Inc.*, 49 P.3d 1011, 1027 (Wyo. 2002).

5. **Standard of Care**

   a. Negligence occurs when one fails to act as would a reasonable person of ordinary prudence under like circumstances. *See Lucero v. Holbrook*, 288 P.3d 1228, 1232 (Wyo. 2012).

6. **Proximate/Actual Cause**

   a. In order for proximate cause to exist, the accident or injury must be the natural and probable consequence of the act of negligence. In fact, the ultimate test of proximate cause is foreseeability of injury. In order to qualify as a legal cause, the conduct must be a substantial factor in bringing about the plaintiff's injuries. *See Lucero v. Holbrook*, 288 P.3d 1228, 1234 (Wyo. 2012).

7. **Joint & Several Liability**

   a. Wyo. Stat. Ann. §1-1-109 provides, "[w]hether or not the claimant is free of fault, the court shall: (i) If a jury trial: (A) Direct the jury to determine the total amount of damages sustained by the claimant without regard to the percentage of fault attributed to the claimant, and the percentage of fault attributable to each actor; and (B) Inform the jury of the consequences of its determination of the percentage of fault. (ii) If a trial before the court without jury, make special findings of fact, determining the total amount of damages sustained by the claimant without regard to the percentage of fault attributed to the claimant, and the percentage of fault attributable to each actor. . . (e) Each defendant is liable only to the extent of that defendant's proportion of the total fault determined under paragraph (c)(i) or (ii) of this section."